ORAL ARGUMENT NOT YET SCHEDULED
BRIEF FOR RESPONDENTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

No. 23-1091

—————

CONSUMERS' RESEARCH, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

—————

ON PETITION FOR REVIEW OF AN ACTION OF THE
FEDERAL COMMUNICATIONS COMMISSION

—————

BRIAN M. BOYNTON
PRINCIPAL DEPUTY ASSISTANT ATTORNEY
    GENERAL

SARAH E. HARRINGTON
DEPUTY ASSISTANT ATTORNEY GENERAL

MARK B. STERN
GERARD J. SINZDAK
ATTORNEYS

UNITED STATES
    DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

JAMES M. CARR
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1. Parties.**

All parties and intervenors in this case are listed in the Brief for Petitioners.

**2. Ruling under review.**

Petitioners challenge the FCC's deemed approval of the universal service contribution factor for the second quarter of 2023. That contribution factor was proposed in a public notice issued on March 14, 2023. *See* Public Notice, *Proposed Second Quarter 2023 Universal Service Contribution Factor*, DA 23-216 (OMD March 14, 2023) (JA___).

**3. Related cases.**

This case has not previously been before this Court or any other court. Petitioners have challenged the FCC's deemed approval of universal service contribution factors for a number of other calendar quarters in cases in the Fifth, Sixth, and Eleventh Circuits. Those cases are listed in the Brief for Petitioners.

In *Consumers' Research v. FCC*, 67 F.4th 773 (6th Cir. 2023), the Sixth Circuit rejected the same constitutional claims that petitioners assert in this case.

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Glossary ......................................................................................... xii

Jurisdiction ....................................................................................... 1

Statement Of The Issues ................................................................... 2

Statutes and Regulations ................................................................... 2

Introduction ...................................................................................... 2

Counterstatement .............................................................................. 4

    A.   The FCC's Universal Service Mandate ................................... 4

    B.   Section 254 Of The Communications Act ............................. 6

    C.   The Implementation Of Section 254 ..................................... 9

    D.   The FCC's Universal Service Contribution Rules ............... 13

    E.   The Second Quarter 2023 Contribution Factor ................... 16

Summary of Argument .................................................................... 17

Standard of Review ......................................................................... 22

Argument ........................................................................................ 22

I.    Section 254 Does Not Unconstitutionally Delegate
     Legislative Power To The FCC. .............................................. 22

    A.   Congress Does Not Delegate Legislative Power When It
        Provides An "Intelligible Principle" To Guide
        Administrative Implementation Of Its Enactments. ............ 22

    B.   Section 254 Provides Ample Guidance To The FCC To
        Implement The Universal Service Program. ....................... 25

        1.   Section 254(b)'s Universal Service Principles. ............. 27

        2.   Section 254(c)'s Limits On Defining Eligible Services. ............... 34

i

3.  Section 254(d)'s Requirement That Contributions Be Equitable And Nondiscriminatory. ....................................37

4.  Section 254(e)'s Requirement That Support Be Sufficient. ....................................................39

5.  Section 254(h)'s Guidance For Calculating Support To Schools, Libraries, And Health Care Providers. ...........................41

C.  The Constitution Does Not Require Congress To Impose An Objective Limit On The Universal Service Program...................43

D.  The Intelligible Principle Standard Applies Even If Universal Service Contributions Are Taxes (Which They Are Not).................................................50

II.  The FCC Has Not Impermissibly Delegated Regulatory Power To USAC. ......................................................53

A.  USAC Merely Provides Administrative Support To The FCC........................................................54

B.  The Commission Supervises USAC And Retains Final Decisionmaking Authority. ....................................57

Conclusion.................................................64

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ..............................................................................23

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th
Cir. 2000)................................................................... 32, 39, 40, 41

*Allnet Commc'n Serv., Inc. v. Nat'l Exchange
Carrier Ass'n*, 965 F.2d 1118 (D.C. Cir. 1992) .........................................11

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ........................ 23, 25, 43

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366
(1999) .....................................................................................................5, 6

\*    *AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) . 4, 5, 6, 9, 20, 26, 27, 36,
39, 40, 41

*Citizens' Util. Ratepayer Bd. v. State Corp.
Comm'n*, 264 Kan. 363, 956 P.2d 685 (Kan.
1998)........................................................................................................53

*Comsat Corp. v. FCC*, 250 F.3d 931 (5th Cir. 2001)....................................38

*Consumers' Rsch. v. FCC*, 67 F.4th 773 (6th Cir.
2023)........................................................ 27, 28, 35, 39, 48, 52, 55, 58, 63

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 883
F.3d 895 (D.C. Cir. 2018) ........................................................................25

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940)....................................34

*Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d
Cir. 2008)................................................................................................57

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ........ 18, 19, 23, 24, 25, 31, 46

*In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).................................. 9, 41

*inContact, Inc. v. FCC*, 495 F. App'x 95 (D.C. Cir.
2013)........................................................................................................61

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S.
394 (1928) ............................................................... 18, 25, 46, 47

*La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*,
745 F.3d 653 (3d Cir. 2014) .....................................................................57

*La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691 (D.C. Cir. 2017).................................................................. 21, 58

\* *Lichter v. United States*, 334 U.S. 742 (1948) ................................... 20, 44, 45

*Loving v. United States*, 517 U.S. 748 (1996)..................................................22

*Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008)........................................................................ 49, 50

*Mistretta v. United States*, 488 U.S. 361 (1989) ......................... 22, 35, 43, 44

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) ................................................................................................24

*NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976) ................................................................................................34

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ............................................................................... 24, 34, 36

*Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336 (1974) ................................................................... 48, 52

*Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498 (D.C. Cir. 2020)........................................................................ 12, 50

*Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173 (D.C. Cir. 2014)........................................................................22

*Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184 (D.C. Cir. 2021) ..............................................23

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ......................................23

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004)................................................................................................57

*Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222 (10th Cir. 2005) ......................................................... 30, 31

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001)........................................................................ 29, 30, 31

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) ................................................................25

\* *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)................................................. 20, 31, 32, 39, 40, 41

iv

\*      *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012)........................................... 3, 15, 19, 21, 26, 43, 50, 51, 52, 53, 58

*Rural Tel. Coal. v. FCC*, 838 F.2d 1307 (D.C. Cir. 1988) ......................................................................... 26, 29, 53

*Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388 (D.C. Cir. 2022) ....................................25

*Schumacher v. Johanns*, 272 Neb. 346, 358-63, 722 N.W.2d 37 (Neb. 2006) ..................................................53

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) ................................... 58, 60

*Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989) ............................................................. 21, 48, 49, 50, 51, 52

*Sprint Commc'ns Co. v. FCC*, 274 F.3d 549 (D.C. Cir. 2001)........................................................................34

*State of Cal. v. EPA*, 72 F.4th 308 (D.C. Cir. 2023) ................................ 21, 54

*State of Tex. v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ......................................57

\*      *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ................................................................ 22, 57, 58, 63

*Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ...................... 5, 6, 10, 29, 30, 32, 33, 36, 37, 38, 39, 53

*Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001) ............................................... 5, 33, 36

*TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) .......................................25

*Transp. Intel., Inc. v. FCC*, 336 F.3d 1058 (D.C. Cir. 2003)........................................................................34

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)............................................................... 21, 56, 57

\*      *United States v. Grimaud*, 220 U.S. 506 (1911) .......................... 20, 26, 45, 46

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467 (2002) .........................................................................5

*Voicestream GSM I Operating Co. v. La. Pub. Serv. Comm'n*, 943 So. 2d 349 (La. 2006).........................................53

*Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54 (D.C. Cir. 2011)..........................................................................9

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ......................................24

\* *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457
    (2001) ........................................................... 20, 24, 43, 44, 45, 52

*Yakus v. United States*, 321 U.S. 414 (1944) .................................... 24, 31, 44

## ADMINISTRATIVE MATERIALS

*Alpaugh Unified Sch. Dist.*, 22 FCC Rcd 6035
    (2007) ....................................................................................54

*Changes to the Board of Directors of the National
    Exchange Carrier Association, Inc.*, 12 FCC Rcd
    18400 (1997) .......................................................... 11, 13

*Changes to the Board of Directors of the National
    Exchange Carrier Association, Inc.*, 13 FCC Rcd
    25058 (1998) .......................................................... 11, 12

*Connect America Fund*, 26 FCC Rcd 17663 (2011),
    *pets. for review denied*, *In re FCC 11-161*, 753
    F.3d 1015 (10th Cir. 2014) .................................... 9, 10

*Federal-State Joint Board on Universal Service*, 12
    FCC Rcd 8776 (1997), *aff'd in part and rev'd in
    part*, *Texas Office of Pub. Util. Counsel v. FCC*,
    183 F.3d 393 (5th Cir. 1999)................................. 10, 11

*First Quarter 1998 Universal Service Contribution
    Factors Revised and Approved*, 12 FCC Rcd
    21881 (CCB 1997) ................................................59

*Proposed Fourth Quarter 2023 Universal Service
    Contribution Factor*, DA 23-843, 2023 WL
    6036237 (OMD rel. Sept. 13, 2023)......................58

*Proposed Third Quarter 2023 Universal Service
    Contribution Factor*, DA 23-507, 2023 WL
    4012359 (OMD rel. June 14, 2023) ......................59

*Report on the Future of the Universal Service Fund*,
    FCC 22-67, 2022 WL 3500217 (released Aug.
    15, 2022).............................................................. 15, 41

*Revised Second Quarter 2003 Universal Service
    Contribution Factor*, 18 FCC Rcd 5097 (WCB
    2003)....................................................................59

*Streamlined Resolution of Requests Related to
Actions by the Universal Service Administrative
Company*, DA 22-448, 2022 WL 1302467 (WCB
rel. April 29, 2022) ................................................................54

*Universal Service Contribution Methodology*, 31
FCC Rcd 13220 (WCB 2016) ...................................................61

*Wireline Competition Bureau Announces the
Availability of Unused Funds to Fully Satisfy
Demand for Rural Health Care Program
Funding for Funding Year 2022*, DA 22-792,
2022 WL 2965199 (WCB rel. July 22, 2022)..........................60

*Wireline Competition Bureau Announces the
Availability of Unused Funds to Increase Rural
Health Care Program Funding for Funding Year
2021*, 36 FCC Rcd 10027 (WCB 2021) ...................................60

*Wireline Competition Bureau Provides Guidance to
the Universal Service Administrative Company
Regarding the High-Cost Universal Service
Mechanism Budget*, 32 FCC Rcd 9243 (WCB
2017)........................................................................................60

**STATUTES**

28 U.S.C. § 2342(1) .......................................................................1

31 U.S.C. § 1304 .........................................................................50

47 U.S.C. § 151 ....................................................................... 4, 26

47 U.S.C. § 153(53) ....................................................................35

47 U.S.C. § 254 ........................................................................2, 6

47 U.S.C. § 254(a)(1) ....................................................................9

47 U.S.C. § 254(a)(1)-(2) ..............................................................9

47 U.S.C. § 254(a)(2) ..................................................................34

47 U.S.C. § 254(b)........................................................ 27, 29, 33

47 U.S.C. § 254(b)(1) .............................................................. 19, 28

47 U.S.C. § 254(b)(1)-(6) ..............................................................8

47 U.S.C. § 254(b)(2)..................................................................28

47 U.S.C. § 254(b)(3) ........................................................28

47 U.S.C. § 254(b)(4) ........................................................28

47 U.S.C. § 254(b)(5) .................................................. 6, 28

47 U.S.C. § 254(b)(6) ........................................................28

47 U.S.C. § 254(b)(7) .................................................. 9, 33

47 U.S.C. § 254(c)(1) ............................................ 7, 35, 36

47 U.S.C. § 254(c)(1)(A) ...................................................35

47 U.S.C. § 254(c)(1)(A)-(D) .............................................7

47 U.S.C. § 254(c)(1)(B) ...................................................35

47 U.S.C. § 254(c)(1)(C) ...................................................35

47 U.S.C. § 254(c)(1)(D) ...................................................35

47 U.S.C. § 254(c)(3) ................................................. 7, 36

47 U.S.C. § 254(d).......................... 3, 6, 19, 26, 30, 37, 38, 49

47 U.S.C. § 254(e) ...................................................... 20, 39

47 U.S.C. § 254(h)..............................................................7

47 U.S.C. § 254(h)(1)(A) ...................................................42

47 U.S.C. § 254(h)(1)(A)-(B) ...................................... 30, 41

47 U.S.C. § 254(h)(1)(B) ...................................................42

47 U.S.C. § 254(h)(1)(B)(i)................................................42

47 U.S.C. § 254(j) .............................................................29

47 U.S.C. § 402(a)...............................................................1

47 U.S.C. § 405(a)............................................................50

47 U.S.C. § 410(c)..............................................................9

Improper Payments Elimination and Recovery Act
   of 2010, Pub. L. No. 111-204, 124 Stat. 2224
   (2010) ...........................................................................61

Improper Payments Elimination and Recovery
   Improvement Act of 2012, Pub. L. No. 112-248,
   126 Stat. 2390 (2013) ...................................................61

Tariff Act, 42 Stat. 858 (1922)..........................................47

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ............................................................................6

**REGULATIONS**

47 C.F.R. Part 54 ................................................................13

47 C.F.R. § 54.101(a) .......................................................10

47 C.F.R. §§ 54.302-54.321 ...............................................9

47 C.F.R. § 54.302 .............................................................55

47 C.F.R. § 54.303(a)(1) ...................................................56

47 C.F.R. § 54.308 .............................................................10

47 C.F.R. § 54.314 .............................................................55

47 C.F.R. §§ 54.400-54.423 ...............................................9

47 C.F.R. § 54.403 .............................................................55

47 C.F.R. § 54.410 .............................................................55

47 C.F.R. §§ 54.500-54.523 ...............................................9

47 C.F.R. § 54.502(a)(1)-(2) ............................................10

47 C.F.R. § 54.503 .............................................................55

47 C.F.R. § 54.504 .............................................................55

47 C.F.R. § 54.505 .............................................................56

47 C.F.R. § 54.507 .............................................................55

47 C.F.R. §§ 54.600-54.633 ...............................................9

47 C.F.R. §§ 54.604-54.606 .............................................56

47 C.F.R. § 54.619 .............................................................55

47 C.F.R. § 54.622 .............................................................55

47 C.F.R. § 54.623 .............................................................55

47 C.F.R. § 54.702(b) ................................................. 12, 54

47 C.F.R. § 54.702(b)-(c) .................................................21

* 47 C.F.R. § 54.702(c) ................................................. 12, 54

47 C.F.R. § 54.703(b) .......................................................12

47 C.F.R. § 54.703(c) .......................................................12

47 C.F.R. § 54.706(a) .................................................................13

47 C.F.R. § 54.706(b) .................................................................15

47 C.F.R. § 54.706(c) .................................................................38

47 C.F.R. § 54.709(a)(2) .............................................................14

47 C.F.R. § 54.709(a)(3) ........................... 1, 14, 15, 17, 55, 56, 57

47 C.F.R. § 54.709(b) .................................................................58

47 C.F.R. § 54.711(a) .................................................................56

47 C.F.R. § 54.712(a) .................................................................15

47 C.F.R. § 54.717 ............................................................... 13, 61

47 C.F.R. § 54.717(k) .................................................................13

47 C.F.R. §§ 54.719-54.725 .......................................................13

47 C.F.R. § 54.719(b) ......................................................... 54, 58, 61

47 C.F.R. §§ 54.801-54.1515 .......................................................9

47 C.F.R. § 54.901(a) .................................................................56

47 C.F.R. § 54.1304(b) ...............................................................56

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-560 (1994) .....................................................11

## OTHER MATERIALS

*Federal Communications Commission 2024 Budget
   Estimates to Congress* (March 2023) available at
   https://docs.fcc.gov/public/attachments/DOC-
   391605A1.pdf.............................................................................63

Letter from Jon Wilkins, FCC, to Chris Henderson,
   USAC, Dec. 15, 2014, available at
   https://docs.fcc.gov/public/attachments/DA-14-
   1820A1.pdf.................................................................................60

Letter from Mark Stephens, FCC, to Chris
   Henderson, USAC, April 17, 2017, available at
   https://docs.fcc.gov/public/attachments/DA-17-
   367A1.pdf...................................................................................60

x

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Aug. 2, 2018, available at
    https://www.fcc.gov/sites/default/files/fcc-letter-
    to-usac-08022018.pdf.................................................................62

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Aug. 30, 2019, available at
    https://www.fcc.gov/sites/default/files/fcc-letter-
    to-usac-08302019.pdf.................................................................62

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Dec. 13, 2018, available at
    https://www.fcc.gov/sites/default/files/fcc-letter-
    to-usac-12132018.pdf.................................................................62

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Feb. 7, 2018, available at
    https://www.fcc.gov/sites/default/files/fcc-letter-
    to-usac-02072018.pdf.................................................................62

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Jan. 14, 2020, available at
    https://www.fcc.gov/sites/default/files/fcc-afr-
    findings-ltr-to-usac-01142020.pdf ............................................62

Letter from Mark Stephens, FCC, to Radha Sekar,
    USAC, Jan. 14, 2021, available at
    https://www.fcc.gov/sites/default/files/fcc-letter-
    to-usac-01142021.pdf.................................................................62

Memorandum of Understanding Between the
    Federal Communications Commission and the
    Universal Service Administrative Company, Dec.
    19, 2018 .......................................................................................12

*\* Cases and other authorities principally relied upon are marked with asterisks.*

# GLOSSARY

| | |
|---|---|
| *NCTA* | *National Cable Television Association v. United States*, 415 U.S. 336 (1974) |
| NECA | National Exchange Carrier Association |
| *TOPUC I* | *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) |
| *TOPUC II* | *Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001) |
| USAC | Universal Service Administrative Company |
| *USTA* | *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————

No. 23-1091

——————

CONSUMERS' RESEARCH, ET AL.,

PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

——————

ON PETITION FOR REVIEW OF AN ACTION OF
THE FEDERAL COMMUNICATIONS COMMISSION

——————

BRIEF FOR RESPONDENTS

——————

## JURISDICTION

The universal service contribution factor for the second quarter of 2023 was deemed approved by the Federal Communications Commission on March 28, 2023.  JA___-___; 47 C.F.R. § 54.709(a)(3).  Petitioners filed a petition for review on April 3, 2023, invoking this Court's jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

## STATEMENT OF THE ISSUES

(1)  Whether section 254 of the Communications Act, which directs the FCC to preserve and advance universal service to all telecommunications subscribers, unconstitutionally delegates legislative power to the FCC.

(2)  Whether the FCC can lawfully rely on a private company to provide billing, accounting, and related administrative services for the universal service program, subject to the FCC's oversight and final decisionmaking authority.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum bound with this brief.

## INTRODUCTION

For the past quarter century, the FCC's universal service subsidy program authorized by section 254 of the Communications Act, 47 U.S.C. § 254, has benefited millions of Americans.  It has made telephone service affordable for low-income consumers and residents of "high-cost" rural areas. It has also supported the provision of essential telehealth services by rural health care providers, as well as the deployment of internet access services to classrooms and libraries throughout the nation.

Congress chose to fund the universal service program by requiring certain telecommunications carriers to "contribute, on an equitable and

2

nondiscriminatory basis," to the "mechanisms established by the Commission to preserve and advance universal service." *Id*. § 254(d).  Pursuant to that directive, the FCC, aided by the Universal Service Administrative Company (USAC), collects fees from providers of interstate telecommunications and distributes the collected funds to targeted populations through four programs it has established in detailed regulations.

Petitioners—a telephone service provider and several telephone service subscribers—contend that the FCC may not collect fees to support the universal service program because the agency's authority to do so stems from an unconstitutional delegation of legislative power from Congress.  In addition, they claim that the Commission improperly subdelegated its regulatory authority to USAC, a private entity.

Petitioners' claims lack merit.  As this Court has previously held, Congress's delegation of authority to the FCC under section 254 satisfies the constitutional standard set forth in controlling Supreme Court precedent because Congress has provided "an intelligible principle to guide the Commission's efforts" in implementing the statute.  *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012) (*Rural Cellular II*).  And it was entirely permissible for the FCC to rely on USAC for assistance in administering the universal service program.  USAC is wholly subordinate to

3

the Commission and assists only in performing the accounting, billing, disbursement, and related functions associated with administering the program. The Commission, which oversees USAC at every turn, makes all universal service policy decisions.

## COUNTERSTATEMENT

### A.   The FCC's Universal Service Mandate

"The Federal Communications Commission has, since the agency's inception, been charged to ensure that everyone in the United States has access to critical telecommunications services." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1239 (D.C. Cir. 2018). Section 1 of the Act, which created the FCC, directs the agency "to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. To fulfill this "core mission," the Commission "aims to achieve 'universal service' by ensuring that critical communications technologies are made available throughout the United States." *AT&T*, 886 F.3d at 1241.

For the first half-century of its existence, "the FCC achieved universal service by authorizing rates to monopoly providers sufficient to enable revenue from easy-to-reach customers, such as city dwellers, to implicitly

subsidize service to those in areas that were hard to reach." *Id*. at 1242. "In order to hold down charges for telephone service in rural markets with higher marginal costs," urban and business customers "were charged" above-cost rates with "subsidizing premiums." *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 480 (2002).

Such implicit subsidies would have been unsustainable if a telephone company that sought "to subsidize below-cost rates to rural customers with above-cost rates to urban customers" was "vulnerable to a competitor that offer[ed] at-cost rates to urban customers." *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) (*TOPUC I*). Historically, however, local exchange carriers (providers of local telephone service) "had natural monopolies … in their respective regions" and were not subject to competition. *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 317 (5th Cir. 2001) (*TOPUC II*). Until the 1990s, States typically "granted an exclusive franchise" to one local carrier "in each local service area." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). This enabled the FCC to support universal service with implicit subsidies embedded in regulated rates.

### B. Section 254 Of The Communications Act

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat.

56, "ended the longstanding regime of state-sanctioned monopolies" in "local

telephone markets." *AT&T*, 525 U.S. at 371. With the introduction of

competition, the FCC's use of implicit subsidies "no longer sufficed" to

promote universal service. *AT&T*, 886 F.3d at 1242. Recognizing that "the

universal service system of implicit subsidies would have to be re-examined,"

*TOPUC I*, 183 F.3d at 406, Congress added a new provision to the

Communications Act: 47 U.S.C. § 254.

Section 254 "directed the FCC to replace" the existing "patchwork of

explicit and implicit subsidies with 'specific, predictable and sufficient …

mechanisms to preserve and advance universal service.'" *TOPUC I*, 183

F.3d at 406 (quoting 47 U.S.C. § 254(b)(5)). "Every telecommunications

carrier that provides interstate telecommunications services" must

"contribute" to these mechanisms "on an equitable and nondiscriminatory

basis." 47 U.S.C. § 254(d).

Section 254 "makes clear" that the concept of "universal service" is

"dynamic" and must "keep pace with technological advancements, need, use,

and the public interest." *AT&T*, 886 F.3d at 1241. The statute describes

universal service as "an evolving level of telecommunications services that

6

the Commission shall establish periodically …, taking into account advances in telecommunications and information technologies and services."  47 U.S.C. § 254(c)(1).  In defining "the services that are supported by Federal universal service support mechanisms," the Commission "shall consider the extent to which such telecommunications services"—

> (A) are essential to education, public health, or public safety;
>
> (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
>
> (C) are being deployed in public telecommunications networks by telecommunications carriers; and
>
> (D) are consistent with the public interest, convenience, and necessity.

*Id*. § 254(c)(1)(A)-(D).  "In addition to the services included in the definition of universal service" under section 254(c)(1), "the Commission may designate additional services for [the] support mechanisms for schools, libraries, and health care providers for the purposes of" section 254(h).  *Id.* § 254(c)(3); *see id*. § 254(h) (requiring telecommunications carriers to provide discounted services to certain schools, libraries, and health care providers).

Section 254(b) provides that "the Commission shall base policies for the preservation and advancement of universal service" on six specified "principles":

7

(1) Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in section 254(h).

*Id.* § 254(b)(1)-(6). In addition, section 254(b)(7) permits the Commission to base its universal service policies on any "other principles" that "the [Federal-State] Joint Board [on Universal Service] and the Commission determine are

necessary and appropriate for the protection of the public interest" and "are consistent with" the Communications Act.  *Id*. § 254(b)(7).[1]

## C.   The Implementation Of Section 254

To implement section 254, Congress directed the FCC to revise its rules based on recommendations by the Joint Board.  *See id*. § 254(a)(1)-(2). After reviewing the Joint Board's recommendations and public comments, the Commission created four universal service programs to provide affordable service to (1) remote areas where the cost of providing service is high, 47 C.F.R. §§ 54.302-54.321, 54.801-54.1515; (2) low-income consumers who qualify for the FCC's Lifeline program, *id*. §§ 54.400-54.423; (3) schools and libraries, *id*. §§ 54.500-54.523; and (4) rural health care providers, *id*. §§ 54.600-54.633.  *See Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 56-57 (D.C. Cir. 2011).

---

[1] The Joint Board is comprised of three FCC Commissioners, four State Utility Commissioners, and a consumer advocate representative.  *See* 47 U.S.C. §§ 254(a)(1), 410(c); https://www.fcc.gov/general/universal-service-federal-state-joint-board.  The FCC has added two principles on the Joint Board's recommendation:  (1) the "principle of competitive neutrality among providers and technologies, requiring that specific universal [service] support mechanisms neither unfairly advantage nor disadvantage one provider [or technology] over another," *AT&T*, 886 F.3d at 1243 (cleaned up); and (2) the principle of "support for advanced services."  *Connect America Fund*, 26 FCC Rcd 17663, 17679 ¶45 (2011), *pets. for review denied*, *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

Pursuant to section 254(c)(1), the FCC adopted a rule designating the telecommunications services that qualify for universal service support. *Federal-State Joint Board on Universal Service*, 12 FCC Rcd 8776, 8809-22 ¶¶61-82 (1997) (*Universal Service Order*), *aff'd in part and rev'd in part*, *TOPUC I*, 183 F.3d 393. Under current FCC rules, the only telecommunications services eligible for support are voice telephony services, including those delivered over broadband-capable networks. *See* 47 C.F.R. § 54.101(a). "As a condition of receiving federal high-cost universal service support," carriers are "required to offer broadband service in their supported area." *Connect America Fund*, 26 FCC Rcd at 17695 ¶86; *see* 47 C.F.R. § 54.308.

Invoking its authority under sections 254(c)(3) and 254(h)(1)(B), the FCC designated two additional services provided to schools and libraries—internet access and internal connections—as services eligible for support. *Universal Service Order*, 12 FCC Rcd at 9008-23 ¶¶436-463; 47 C.F.R. § 54.502(a)(1)-(2). The Fifth Circuit upheld the FCC's authority to subsidize these services. *TOPUC I*, 183 F.3d at 440-43.

In 1997, the FCC appointed the National Exchange Carrier Association (NECA) as the temporary administrator of the new universal service support

10

mechanisms.  *Universal Service Order*, 12 FCC Rcd at 9216-17 ¶866.[2]  Later

that year, the FCC directed NECA "to create an independently functioning,

not-for-profit subsidiary"—the Universal Service Administrative Company

(USAC)—to "administer temporarily" the high cost and low income support

mechanisms, "as well as perform billing and collection functions" for all four

universal service support mechanisms.  *Changes to the Board of Directors of*

*the National Exchange Carrier Association, Inc.*, 12 FCC Rcd 18400, 18415

¶25 (1997) (*Contribution Order*).  On January 1, 1999, USAC became the

permanent administrator of the universal service support mechanisms.

*Changes to the Board of Directors of the National Exchange Carrier*

*Association, Inc.*, 13 FCC Rcd 25058, 25059-61, 25069-70 ¶¶2, 5, 20 (1998)

(*USAC Order*).

　　　USAC is an independent, not-for-profit private corporation.  *See*

https://www.usac.org/about/.  Its board of directors includes representatives

of private industry, recipients of universal service funding, and consumer

---

[2] NECA, "a nonprofit, non-stock membership corporation," was "formed
pursuant to FCC orders following the break-up of AT&T" in 1984.  *Allnet*
*Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1119
(D.C. Cir. 1992).  Before section 254 was enacted, NECA administered
several FCC programs designed to "keep local [telephone] rates affordable,"
including a "Universal Service Fund" and "two Lifeline Assistance
Programs."  H.R. Rep. No. 103-560, at 33 (1994).

groups, as well as USAC's Chief Executive Officer.  *See* 47 C.F.R.

§ 54.703(b).  USAC's directors are nominated by the groups represented on

the board and selected by the FCC Chair.  *Id*. § 54.703(c).

USAC's role is "exclusively administrative," *USAC Order*, 13 FCC

Rcd at 25067 ¶16, and "relatively narrow," *Nat'l Lifeline Ass'n v. FCC*, 983

F.3d 498, 503 (D.C. Cir. 2020).  USAC acts "as the Commission's agent,"[3]

with responsibility "for billing contributors, collecting contributions to the

universal service support mechanisms, and disbursing universal service

support funds."  47 C.F.R. § 54.702(b).

USAC "may not make policy, interpret unclear provisions of the statute

or rules, or interpret the intent of Congress.  Where the Act or the

Commission's rules are unclear, or do not address a particular situation,"

USAC must "seek guidance from the Commission."  *Id*. § 54.702(c).  The

FCC is ultimately "responsible for the overall management, oversight, and

administration" of the universal service program, "including all … policy

decisions."  FCC-USAC MOU at 2, § III.A.  The FCC's policy decisions are

---

[3] *See* Memorandum of Understanding Between the Federal
Communications Commission and the Universal Service Administrative
Company, Dec. 19, 2018, at 2, § III.B (FCC-USAC MOU), available at
https://www.fcc.gov/sites/default/files/usac-mou.pdf.

largely reflected in detailed regulations that govern the universal service program and its administration.  *See* 47 C.F.R. Part 54.

The FCC actively oversees USAC's administration of the universal service program.  Any party aggrieved by a USAC decision may request de novo review by the Commission.  *See* 47 C.F.R. §§ 54.719-54.725.  In addition, FCC rules require USAC to "obtain and pay for an annual audit conducted by an independent auditor" to determine whether USAC "is properly administering the universal service support mechanisms to prevent fraud, waste, and abuse."  *Id*. § 54.717.  "Based on the final audit report," the FCC's Managing Director "may take any action necessary to ensure that the universal service support mechanisms operate in a manner consistent with" the Commission's rules and "the public interest."  *Id*. § 54.717(k).

### D.   The FCC's Universal Service Contribution Rules

To implement section 254(d), FCC rules require all "telecommunications carriers providing interstate telecommunications services" and "[c]ertain other providers of interstate telecommunications" to "contribute to the universal service support mechanisms."  *Id*. § 54.706(a).  In 1997, the Commission adopted a rule prescribing the procedures for calculating the amount of each carrier's quarterly universal service contribution.  *See Contribution Order*, 12 FCC Rcd at 18424-28 ¶¶42-50.

13

Under that rule, at least 60 calendar days before the beginning of a quarter, USAC "must submit" to the FCC "its projections of demand" and "administrative expenses" for the universal service support mechanisms for the upcoming quarter "and the basis for those projections." 47 C.F.R. § 54.709(a)(3). At least 30 days before the beginning of the quarter, USAC "must submit" to the Commission "the total contribution base" (the projected collected interstate and international end-user telecommunications revenues for all carriers). *Ibid*.

After receiving USAC's submissions, the FCC announces USAC's projections and proposes a "contribution factor" for the next quarter "in a public notice … available on the Commission's website." *Ibid*. The "contribution factor" is "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions." *Id*. § 54.709(a)(2).

At any point "within the fourteen-day period following release of the Commission's public notice," the FCC may revise USAC's projections and set them "at amounts that the Commission determines will serve the public interest." *Id.* § 54.709(a)(3). "If the Commission takes no action" within 14

14

days of the public notice, USAC's projections and the proposed contribution factor are "deemed approved by the Commission." *Ibid*.

Once the contribution factor has been approved by the Commission, USAC applies it to each carrier's contribution base "to calculate the amount of individual" carriers' quarterly "contributions." *Ibid*.; *see Rural Cellular II*, 685 F.3d at 1086.  In general, a carrier's contribution base is its "projected collected interstate and international end-user telecommunications revenues, net of projected contributions."  47 C.F.R. § 54.706(b).

The Commission's rules permit—but do not require—carriers to recover their federal universal service contribution costs "through interstate telecommunications-related charges to end users."  *Id.* § 54.712(a).  About 18 percent of contributors do not pass universal service fees along to their customers.  *See Report on the Future of the Universal Service Fund*, FCC 22-67, 2022 WL 3500217, ¶90 (released Aug. 15, 2022) (*Report to Congress*), available at https://docs.fcc.gov/public/attachments/FCC-22-67A1.pdf.

### E.   The Second Quarter 2023 Contribution Factor

On January 31, 2023, USAC submitted to the FCC its projections of demand and administrative expenses for the universal service support mechanisms for the second quarter of 2023.[4]

Petitioners filed comments in response to USAC's projections on February 7, 2023.  *See* JA___-___.  They raised no specific objections to USAC's projections.  Instead, they argued that the Commission should set the contribution factor at zero and suspend the collection of universal service contributions because (according to petitioners) the FCC's universal service program is unlawful.  Among other things, petitioners maintained that section 254 violates the Constitution by delegating Congress's legislative power to the FCC, and that the Commission improperly re-delegated this power to USAC.  JA___-___.

After USAC provided the FCC with the contribution base for the second quarter of 2023,[5] the Commission proposed a contribution factor of 29 percent for that quarter in a public notice issued on March 14, 2023.  Public Notice, *Proposed Second Quarter 2023 Contribution Factor*, DA 23-216

---

[4] *See* Federal Universal Service Support Mechanisms Fund Size Projections for Second Quarter 2023 (JA___).

[5] *See* Federal Universal Service Support Mechanisms Quarterly Contribution Base for the Second Quarter 2023 (JA___).

(OMD March 14, 2023) (JA___).  The proposed contribution factor was based on USAC's cost and revenue projections, which were set forth in the public notice.  *See id*. at 1-2 (JA___-___).  In accordance with the Commission's rules, the public notice stated that if the FCC took "no action" within 14 days, USAC's projections and the proposed contribution factor would be "deemed approved by the Commission."  *Id*. at 4 (JA___).

In response to the public notice, petitioners filed comments with the Commission on March 21, 2023.  *See* JA___-___.  Once again, they did not dispute any of USAC's projections; nor did they question the accuracy of the Commission's calculation of the contribution factor.  Instead, petitioners reiterated their claims that the FCC's universal service program is unlawful.

The FCC took no action within 14 days after the public notice was released.  Accordingly, on March 28, 2023, the proposed contribution factor of 29 percent for the second quarter of 2023 was "deemed approved by the Commission."  *See* 47 C.F.R. § 54.709(a)(3).

## SUMMARY OF ARGUMENT

For decades, the FCC's universal service program has carried out a central goal of telecommunications regulation in the United States:  to provide access to affordable telecommunications to every American. Countless consumers, including low-income families and those in high-cost

17

areas, as well as schools, libraries, and health care providers, have relied on the program to support communications services that are critical to modern life.

Petitioners challenge the legality of the program on two grounds. First, they complain that section 254 of the Communications Act, which lays out a comprehensive set of guidelines for the Commission, nevertheless unconstitutionally delegates legislative power to the agency. Second, they claim that USAC, the program's administrator, is unlawfully vested with government power, even though USAC has no policymaking authority, performs solely administrative functions, and is overseen by the FCC at every step. Petitioners' claims are baseless.

I.a. The delegation of authority to the FCC under section 254 is constitutional if Congress has provided "an intelligible principle to which" the Commission "is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). The Supreme Court has applied this "intelligible principle" test for nearly a century, and it has upheld the vast majority of congressional delegations under that test. *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality).

Petitioners urge the Court to apply a different test based on an "original understanding" of nondelegation. Br. 29-35. But a majority of the Supreme

Court continues to apply the intelligible principle test, and it remains binding on this Court. *See Gundy*, 139 S. Ct. at 2123-30 (plurality); *id*. at 2130-31 (Alito, J., concurring in the judgment); *id*. at 2131-48 (Gorsuch, J., dissenting).

b.  This Court has previously held that section 254 "clearly provides an intelligible principle to guide the Commission's efforts" in collecting universal service contributions from carriers, "viz., 'to preserve and advance universal service.'" *Rural Cellular II*, 685 F.3d at 1091.  That precedent forecloses petitioners' nondelegation challenge to section 254.

In addition to the statute's general directive "to preserve and advance universal service," multiple provisions of section 254 further limit the FCC's discretion to implement the universal service program.  Section 254(b) requires the FCC to base its universal service policies on certain specified principles, including the availability of "affordable" telephone service for all consumers.  *See* 47 U.S.C. § 254(b)(1).  Section 254(c) directs the Commission to consider particular factors when defining the services that will receive universal service support.  Section 254(d) constrains the FCC's authority to assess universal service fees by requiring that carriers contribute to universal service "on an equitable and nondiscriminatory basis."  *Id*. § 254(d).  Section 254(e) mandates that universal service support be

"sufficient to achieve the purposes of" section 254.  *Id*. § 254(e).  This Court has construed the statute's requirement of "sufficient" funding to prohibit excessive funding of universal service.  *See AT&T*, 886 F.3d at 1252; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102-03 (D.C. Cir. 2009) (*Rural Cellular I*).  Finally, section 254(h) provides detailed instructions to the FCC concerning the establishment and funding of the universal service support mechanisms for rural health care providers, schools, and libraries.  All of these provisions intelligibly confine the FCC's discretion to increase the size and scope of its universal service program and the amount of fees it collects to finance the program.  The delegation of authority to the FCC under section 254 is therefore constitutional.

c.  Petitioners contend that where revenue-raising is concerned, the Constitution requires Congress to impose an "objective limit" on the amount of funds the agency can collect to support Congress's goals.  Br. 36-42.  But the Supreme Court has "never demanded" that statutory delegations like section 254 "provide a determinate criterion" specifying "how much" is "too much."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) (cleaned up).  And the Court has rejected nondelegation challenges to revenue-raising grants that had no such objective limit.  *See Lichter v. United States*, 334 U.S. 742 (1948); *United States v. Grimaud*, 220 U.S. 506 (1911).

20

d.  Petitioners' argument for more rigorous scrutiny of "taxing" delegations (Br. 50-64) is foreclosed by Supreme Court precedent, which holds that delegations of taxing power are "subject to no constitutional scrutiny greater than that … applied to other" delegations.  *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 223 (1989).  In any event, universal service contributions are fees, not taxes.  *See Rural Cellular II*, 685 F.3d at 1090-91.

II.  Petitioners' private delegation challenge likewise fails, for two reasons.  First, USAC does not exercise regulatory power.  It has no policymaking role in administering the universal service program.  *See* 47 C.F.R. § 54.702(b)-(c).  The FCC has not "conferred on [USAC] any authority to make rules under section [254]."  *State of Cal. v. EPA*, 72 F.4th 308, 316 (D.C. Cir. 2023).  Instead, the agency permissibly employs USAC to conduct "fact gathering," a "legitimate outside party input into [the FCC's] decision-making" regarding the contribution factor.  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) (*USTA*).  Second, "there has been no unlawful subdelegation" because the FCC exercises final "review authority" over USAC.  *La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017).  USAC "function[s] subordinately to" the FCC, which

21

retains final reviewing "authority and surveillance over [USAC's] activities."

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

## STANDARD OF REVIEW

Petitioners' constitutional claims are "subject to *de novo* review."

*Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1179 (D.C. Cir. 2014).

## ARGUMENT

**I.    SECTION 254 DOES NOT UNCONSTITUTIONALLY DELEGATE LEGISLATIVE POWER TO THE FCC.**

**A.    Congress Does Not Delegate Legislative Power When It Provides An "Intelligible Principle" To Guide Administrative Implementation Of Its Enactments.**

Although "Congress may not delegate the power to make laws," it may lawfully delegate "the authority to make policies and rules that implement its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996).  As a practical matter, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  "[N]o statute can be entirely precise," and "some judgments, even some judgments involving policy considerations, must be left to the officers executing the law." *Id*. at 415 (Scalia, J., dissenting).

22

Given these considerations, the Supreme Court has long recognized that Congress "may confer substantial discretion on executive agencies to implement and enforce the laws" so long as it "has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy*, 139 S. Ct. at 2123 (plurality). *Accord Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184, 1192-93 (D.C. Cir. 2021).

The intelligible principle test is "not demanding." *Gundy*, 139 S. Ct. at 2129 (plurality). "To date, the Supreme Court has found the requisite intelligible principle lacking in only two statutes." *Nat'l Postal*, 17 F.4th at 1192-93 (cleaned up). *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). In those cases (both decided in 1935), Congress "failed to articulate *any* policy or standard to confine discretion." *Gundy*, 139 S. Ct. at 2129 (plurality) (cleaned up).

Under the intelligible principle test, it is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of [the] delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). Courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."

23

*Whitman*, 531 U.S. at 474-75 (cleaned up).  As a result, over the years, the Supreme Court has upheld as constitutional congressional delegations to the FCC and the ICC to regulate broadcasting and railroad consolidations in the "public interest," *see Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932), to the EPA to regulate air quality "to protect the public health," *Whitman*, 531 U.S. at 472, and to the wartime Price Administrator to ensure that commodity prices are "fair and equitable," *Yakus v. United States*, 321 U.S. 414, 426-27 (1944).

Petitioners contend that section 254 violates the "original understanding of nondelegation," and that the Constitution "prohibit[s] any transfer of Congress's vested powers to another entity."  Br. 29.  But from the earliest days of the Republic, the Supreme Court has recognized that Congress may delegate to an administrative agency the power to "fill up the details" of a legislative program.  *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).  *Accord Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting).  In determining how far "the maker of the law may commit something to the discretion of other departments," *Wayman*, 23 U.S. at 46, it has long been settled that a delegation is constitutional if Congress provides an "intelligible principle" to guide administrative discretion, a standard that fixes the "extent

24

and character of that assistance . . . according to common sense and the inherent necessities of the governmental coordination." *J.W. Hampton*, 276 U.S. at 404, 406.[6]

### B. Section 254 Provides Ample Guidance To The FCC To Implement The Universal Service Program.

"[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Gundy*, 139 S. Ct. at 2123 (plurality). To resolve the nondelegation challenge mounted by petitioners in this case, the Court must construe section 254 to "figure out what task it delegates and what instructions it provides." *Ibid.* In examining these questions, the Court must consider not only the text of the relevant statute, but also its "purpose," its "factual background," and its "context." *See Am. Power & Light*, 329 U.S. at 104; *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 902 (D.C. Cir. 2018); *TOMAC v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006).

---

[6] While some Justices have expressed interest in reexamining the nondelegation doctrine, *see Gundy*, 139 S. Ct. at 2133-42 (Gorsuch, J., dissenting), this Court is "bound to apply the Supreme Court's current precedent, since only the Supreme Court enjoys 'the prerogative of overruling its own decisions.'" *Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388, 403 (D.C. Cir. 2022) (Randolph, J., concurring) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Section 254 does not authorize the FCC to raise revenues "for any and every purpose." *Grimaud*, 220 U.S. at 522. The contributions that the Commission collects from carriers under section 254 are designated for a statutorily specified purpose: "the preservation and advancement of universal service." 47 U.S.C. § 254(d). This policy goal is nothing new. "[U]niversal service" has long been "an important FCC objective." *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988). From its inception, the FCC has been tasked with taking action "to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide … wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151; *see AT&T*, 886 F.3d at 1241.

This Court previously held that section 254 "provides an intelligible principle to guide the Commission's efforts" in assessing how much money carriers should contribute to the agency's universal service program—"viz., [enough] 'to preserve and advance universal service.'" *Rural Cellular II*, 685 F.3d at 1091. As this Court has thus recognized, that goal by itself instructs and constrains the Commission's actions in a manner that satisfies the requirements of the Constitution. And in light of that binding Circuit precedent, the Court must reject at the outset petitioners' claim that section 254 unlawfully delegates legislative power to the FCC.

26

Moreover, even if the issue had not previously been resolved in this Circuit, section 254 provides additional specifications about the universal service objectives that Congress has directed the FCC to pursue. Numerous provisions of section 254 delineate the metes and bounds of the universal service program and limit the FCC's discretion to expand its scope. These provisions furnish the FCC with ample additional guidance in implementing the program, more than enough under any view of the matter to satisfy the intelligible principle standard.

### 1. Section 254(b)'s Universal Service Principles.

To start with, section 254(b) requires the FCC to "base policies for the preservation and advancement of universal service on" six specified "principles." 47 U.S.C. § 254(b). As this Court has noted, those "principles" are designed "[t]o guide" the Commission in its pursuit of the statute's universal service goals. *AT&T*, 886 F.3d at 1242. And as the Sixth Circuit has explained in rejecting petitioners' nondelegation challenge to the fourth quarter 2021 contribution factor, the principles "identify specific goals and provide a detailed framework for universal service," giving the FCC "comprehensive and substantial guidance" as to how it should implement section 254. *Consumers' Rsch. v. FCC*, 67 F.4th 773, 791 (6th Cir. 2023). The Commission must consider:

27

(1) the availability of "[q]uality services" at "affordable rates," 47 U.S.C. § 254(b)(1);

(2) nationwide "[a]ccess to advanced telecommunications and information services," *id*. § 254(b)(2);

(3) providing low-income and rural consumers with access to telecommunications and information services that are "reasonably comparable" in quality and price to "those services provided in urban areas," *id*. § 254(b)(3);

(4) ensuring that all telecommunications carriers "make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," *id*. § 254(b)(4);

(5) the creation of "specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service," *id*. § 254(b)(5); and

(6) "access to advanced telecommunications services" for "schools and classrooms, health care providers, and libraries," in accordance with section 254(h), *id*. § 254(b)(6).

Section 254(b) thus details (1) "what" policy goals the agency "must pursue," (2) the "method" it must use to achieve them, (3) "how" it "must fund these efforts," and (4) who should receive universal service subsidies. *Consumers' Rsch.*, 67 F.4th at 791.

Principles such as "affordable" and "reasonably comparable" service, *see* 47 U.S.C. § 254(b)(1), (3), are neither "vague" (Br. 45) nor unfamiliar to the Commission or Congress. Those principles formed the foundation for the FCC's longstanding policies to subsidize the provision of telecommunications service to "low-income subscribers" and residents of

"high-cost" rural areas—policies that had been in place for years before section 254 became law.  *See TOPUC I*, 183 F.3d at 406; *Rural Tel. Coal.*, 838 F.2d at 1315-16.

By including the "affordable" and "reasonably comparable" principles in section 254(b), Congress signaled its intent that the FCC retain its existing universal service policies after the opening of local telecommunications markets to competition.  *See TOPUC I*, 183 F.3d at 406.  Indeed, section 254(j), 47 U.S.C. § 254(j), specifically provides that "[n]othing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program," which the Commission was already administering under its pre-existing rules.  *See* footnote 2 above.

Petitioners contend that the section 254(b) principles are "non-binding," Br. 45, but the statute imposes "a mandatory duty on the FCC" to take the principles into account when designing its universal service policies.  *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) (*Qwest I*); *see* 47 U.S.C. § 254(b) ("the Commission *shall* base policies for the preservation and advancement of universal service on the [enumerated] principles" (emphasis added)).

In addition, several of the principles are codified as directives in other subsections of section 254.  For example, section 254(d) states that providers

of interstate telecommunications services "shall contribute, on an equitable and nondiscriminatory basis," to the FCC's universal service mechanisms. 47 U.S.C. § 254(d). Section 254(e) is "a direct statutory command" that the FCC ensure the "sufficiency of universal service support." *TOPUC I*, 183 F.3d at 412. And section 254(h) prescribes formulas for calculating discounts for services provided to health care providers, schools, and libraries. 47 U.S.C. § 254(h)(1)(A)-(B). *See* Sections I.B.3-5 below.

Moreover, while section 254(b) "allows the FCC a considerable amount of discretion" to "balance" the statutory principles, "that discretion is not absolute." *TOPUC I*, 183 F.3d at 434. The Commission may "balance the principles against one another when they conflict," but it "may not depart from them altogether to achieve some other goal." *Qwest I*, 258 F.3d at 1200; *see also Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1234 (10th Cir. 2005) (*Qwest II*). And it is "impermissible" for the Commission to "ignore[] all but one principle enumerated in [section] 254(b)" when assessing whether universal service support is "sufficient." *Qwest II*, 398 F.3d at 1234.

Indeed, the Tenth Circuit has twice reversed Commission orders for failing to explain how the agency's actions provided "sufficient" universal service support to satisfy the section 254(b) principles, including the goal of "reasonably comparable" service "in all regions of the Nation." *See Qwest I*,

258 F.3d at 1201-03; *Qwest II*, 398 F.3d at 1233-37.  That fact alone refutes petitioners' contention that section 254(b) is too "vague" to cabin the FCC's authority.  Br. 45.  *See Yakus*, 321 U.S. at 426 (a delegation is constitutional if Congress provides "sufficiently definite" standards "to enable … the courts … to ascertain" whether the executive branch's exercise of delegated authority follows Congress's guidance) (quoted in *Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting)).

More specifically, as this Court has recognized, section 254(b) provides standards for assessing whether the FCC's funding of universal service is excessive.  In *Rural Cellular I*, the FCC adopted an "emergency cap" to restrain the growth of high-cost universal service support, which had "skyrocketed" in the early 2000s.  588 F.3d at 1099-1100.  This Court concluded that the FCC's decision to cap universal service funding was not only reasonable, but effectively compelled by the statute:  "[I]t is hard to imagine how the Commission could achieve the overall goal of [section] 254—the 'preservation and advancement of universal service,' 47 U.S.C. § 254(b)—if [universal service funding] is 'sufficient' for purposes of [section] 254(b)(5), yet so large it actually makes telecommunications

31

services less 'affordable,' in contravention of [section] 254(b)(1)."  588 F.3d at 1103.[7]

Petitioners assert that the Court found in *Rural Cellular I* that "nothing in the statute" requires that "universal service support must equal the actual costs incurred."  Br. 47-48 (quoting *TOPUC I*, 183 F.3d at 412).  This Court made no such finding.  The language quoted by petitioners comes from *TOPUC I*, where the Fifth Circuit agreed with the FCC that "nothing in the statute defines 'sufficient' to mean that universal service support must equal the actual costs incurred by [carriers]."  183 F.3d at 412.  Petitioners cite that statement to support their claim that section 254 gives the FCC boundless authority to charge "above-cost" fees to support universal service.  But *TOPUC I* does not stand for that proposition.  In that case, carriers complained that the federal universal service subsidies they received for serving high-cost areas fell *below* their actual costs of providing service.  The Fifth Circuit rejected the carriers' argument that the FCC had provided

---

[7] The Fifth Circuit reached a similar conclusion in *Alenco Communications, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000).  The court there explained that "excessive funding" could "detract from universal service" and "violate the sufficiency requirements" of section 254 "by causing rates unnecessarily to rise, thereby pricing some consumers out of the market."  *Id*. at 620; *see Rural Cellular I*, 588 F.3d at 1102 (finding *Alenco* "instructive")

insufficient funding to support universal service by *under*collecting universal service contributions. *See id*. at 410-12.[8]

In addition to the six principles specified in the statute, section 254(b)(7) permits the FCC to base its universal service policies on "[s]uch other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest" and "consistent with" the Communications Act. 47 U.S.C. § 254(b)(7). Petitioners argue that this provision creates a "multi-layered delegation" by allowing the FCC "to perpetually amend and broaden" the list of universal service principles "at will." Br. 48. That claim is unfounded.

The Commission cannot unilaterally add principles "at will." A new principle can be adopted only if it serves Congress's goal of "preserv[ing] and advanc[ing] universal service," 47 U.S.C. § 254(b), and if *both* "the [Federal-State] Joint Board and the Commission determine" that it is "necessary" to protect the public interest and otherwise "consistent with" the Act, *id*. § 254(b)(7). And the FCC's authority to act in the "public interest" is

---

[8] There is no basis for petitioners' claim that "the Fifth Circuit has held that it cannot second-guess" any decision by the FCC "to balance revenue-raising with affordability of service." Br. 47 n.23 (citing *TOPUC II*, 265 F.3d at 322). The court in *TOPUC II* stated that the FCC cannot "ignore or contravene the goal of affordability." 265 F.3d at 322. Excessive revenue-raising could contravene that goal, as *Rural Cellular I* and *Alenco* make clear.

33

itself not "unlimited." *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940). Instead, "the words 'public interest' … take meaning from the purposes of the regulatory legislation." *Sprint Commc'ns Co. v. FCC*, 274 F.3d 549, 554 (D.C. Cir. 2001) (quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976)). Indeed, this Court "routinely judges the Commission's actions" against a public interest standard "to determine whether they are arbitrary or capricious." *Transp. Intel., Inc. v. FCC*, 336 F.3d 1058, 1064 (D.C. Cir. 2003). Even by itself, therefore, "the Communications Act's public interest standard is sufficiently definite to overcome a challenge under the nondelegation doctrine." *Id.* at 1064 n.7 (citing *Nat'l Broad. Co.*, 319 U.S. at 225-26).

### 2.    Section 254(c)'s Limits On Defining Eligible Services.

Beyond the section 254(b) principles that the FCC must take into account in developing universal service policies, other subsections of section 254 impose additional constraints on the Commission's discretion.

One such provision is section 254(c). The FCC's rules implementing section 254 must "include a definition of the services that are supported by Federal universal service support mechanisms," 47 U.S.C. § 254(a)(2), and section 254(c)(1) limits the FCC's discretion in defining such services. Under that provision, services that receive universal service funding must be

"telecommunications services" as defined by the Act.  *See id*. § 254(c)(1); *id*.

§ 153(53).  The Commission thus may not use universal service funds to

subsidize other FCC-regulated services, such as cable television or

broadcasting.

Moreover, for purposes of defining which telecommunications services

will receive support, section 254(c)(1) requires the Commission to "consider

the extent to which" (1) the services "are essential to education, public health,

or public safety," *id*. § 254(c)(1)(A); (2) "a substantial majority of residential

customers" subscribe to the services, *id*. § 254(c)(1)(B); (3) carriers have

"deployed" the services, *id*. § 254(c)(1)(C); and (4) the services "are

consistent with the public interest," *id*. § 254(c)(1)(D).  These statutory

factors, which the Commission *must* consider, provide sufficiently specific

guidance to defeat petitioners' nondelegation claim.  *See Mistretta*, 488 U.S.

at 375-76.  The first three of these factors require the Commission to consider

the state of the market in specific factual contexts.  The fourth ("public

interest") factor operates in concert with—not apart from—the first three, and

takes them into account.  *See Consumers' Rsch.*, 67 F.4th at 793.

Petitioners insist that section 254 allows the FCC to redefine universal

service "as often as it chooses."  Br. 48.  But that is not what the statute says.

Under section 254(c)(1), the Commission is authorized to revise its definition

35

of supported services only to account for "advances in telecommunications and information technologies and services."  47 U.S.C. § 254(c)(1).  In granting the FCC the flexibility to redefine universal service in response to technological change, Congress recognized that decisions regarding which services to subsidize involve "technical matters" that are "incapable of advance legislative definition."  *See* Br. 39.  It is precisely because "the telecommunications market" is "dynamic" and subject to "dramatic changes," *TOPUC II*, 265 F.3d at 322, that Congress granted the FCC the power to adapt its policies and rules "to keep pace with technological advancements, need, use, and the public interest."  *AT&T*, 886 F.3d at 1241.  As petitioners acknowledge, the Supreme Court "has granted Congress" substantial "leeway" to delegate resolution of such "technical matters" to federal agencies.  Br. 39; *see Nat'l Broad. Co.*, 319 U.S. at 215-19.[9]

---

[9]  Although section 254(c)(3) authorizes the Commission to "designate additional services for [the] support mechanisms for schools, libraries, and health care providers," 47 U.S.C. § 254(c)(3), that provision "restricts the FCC's authority" by specifying that such additional services may be designated for support only if they serve "'the purposes of [section 254(h)].'" *TOPUC I*, 183 F.3d at 441 (quoting 47 U.S.C. § 254(c)(3)).  Accordingly, the Fifth Circuit carefully considered—but ultimately rejected—a claim that the FCC exceeded its authority under section 254(c)(3) by designating internet access and internal connections provided to schools and libraries as "additional services" eligible for universal service support.  *See id*. at 440-43.

By limiting the FCC's discretion to designate the services eligible for universal service support, section 254(c) effectively limits the amount of money the agency is authorized to collect from carriers to fund universal service. Section 254 requires carriers to contribute to the "mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). The less money needed to support universal service, the less revenue the FCC must raise to finance those mechanisms. Thus, any limits that the statute places on the disbursement of universal service funds— including the constraints imposed by section 254(c)—will necessarily reduce the amount of money that the FCC is authorized to collect under section 254(d).

### 3. Section 254(d)'s Requirement That Contributions Be Equitable And Nondiscriminatory.

Section 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis," to the FCC's universal service support mechanisms. *Ibid*. By requiring "that all universal service contributions be 'equitable and nondiscriminatory,'" *TOPUC I*, 183 F.3d at 433, section 254(d) restricts the Commission's discretion in assessing universal service fees.

37

In *TOPUC I*, the Fifth Circuit held that the FCC violated section 254(d) by requiring all providers of interstate telecommunications services to contribute a percentage of their combined interstate and international revenues to universal service.  *Id*. at 433-35.  The court found that this contribution requirement "forced" carriers with minimal interstate revenues and large international revenues "to pay more in universal service contributions than [they] can generate in interstate revenues," effectively requiring them "to incur a loss to participate in" the "interstate service" market.  *Id*. at 434-35.  Given the disparate impact on these carriers, the Fifth Circuit concluded that such contribution obligations were inequitable and discriminatory, in violation of section 254(d).[10]

As *TOPUC I* demonstrates, the Commission's obligation to ensure that carriers make universal service payments "on an equitable and nondiscriminatory basis," 47 U.S.C. § 254(d), is another significant constraint on the Commission's power to collect fees to support universal service.

---

[10] In response to the remand in *TOPUC I*, the FCC "adopted a bright-line percentage rule" to determine "when a carrier's international revenues would be included in the base from which the agency calculates the carrier's universal service contribution."  *Comsat Corp. v. FCC*, 250 F.3d 931, 934 (5th Cir. 2001).  *See* 47 C.F.R. § 54.706(c) (if a carrier's interstate revenues "comprise less than 12 percent" of its combined interstate and international revenues, its international revenues are excluded from its contribution base).

38

### 4.   Section 254(e)'s Requirement That Support Be Sufficient.

Section 254(e) states that universal service "support should be explicit and sufficient to achieve the purposes of this section."  47 U.S.C. § 254(e). This "statutory command" directing the FCC to ensure the "sufficiency of universal service support," *TOPUC I*, 183 F.3d at 412, imposes yet another constraint on the FCC's discretion to increase the size of the universal service program and the level of funding necessary to sustain it.

As this Court has explained, "[t]oo-ample funding" of universal service can "violate the sufficiency requirements" of section 254 "by causing rates unnecessarily to rise, thereby pricing some consumers out of the market" and "detracting from universal service." *AT&T*, 886 F.3d at 1252 (cleaned up); *see also Rural Cellular I*, 588 F.3d at 1103; *Alenco*, 201 F.3d at 620. Consequently, this Court has held that under section 254, "'sufficient' funding" must reflect "'an appropriate balance between the interests of' consumers and industry." *AT&T*, 886 F.3d at 1252 (quoting *Rural Cellular I*, 588 F.3d at 1102); *see also Consumers' Rsch.*, 67 F.4th at 794 (the "'sufficiency' command" of section 254(e) limits "the size and budget of the [universal service] program, allowing growth no larger than what is 'sufficient to achieve the purposes of'" section 254).  To comply with the statute's "mandate to balance carrier compensation and consumer access," as

well as this Court's "guidance" in *Rural Cellular I*, the Commission must "take account of consumer access and affordability" when it decides how much funding is "sufficient" to preserve and advance universal service. *AT&T*, 886 F.3d at 1252.

The FCC has long understood what this Court recognized in *Rural Cellular I*: At some point, "excessive funding" of universal service "violate[s] the sufficiency requirements" of section 254 and thwarts achievement of the statute's "universal service" goal—the availability of affordable, reliable telecommunications service for all Americans—"by causing rates unnecessarily to rise" and "pricing some consumers out of the market." *Rural Cellular I*, 588 F.3d at 1103 (quoting *Alenco*, 201 F.3d at 620). For that reason, the FCC has repeatedly adopted measures to restrain spending on universal service. And several courts—including this one—have upheld those reasonable cost control measures. *See AT&T*, 886 F.3d at 1251-

53; *In re FCC 11-161*, 753 F.3d at 1079-83; *Rural Cellular I*, 588 F.3d at 1101-08; *Alenco*, 201 F.3d at 620-21.[11]

### 5. Section 254(h)'s Guidance For Calculating Support To Schools, Libraries, And Health Care Providers.

Finally, section 254(h) imposes further limits on the Commission's discretion to provide universal service support to schools, libraries, and health care providers. That provision mandates the use of discrete formulas to calculate discounts on services provided to these specific recipients. *See* 47 U.S.C. § 254(h)(1)(A)-(B).

Carriers that are required to provide telecommunications services to rural health care providers under section 254(h)(1)(A) "shall be entitled" to a subsidy in "an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the

---

[11] Petitioners' suggestion that the FCC has engaged in "skyrocketing" revenue-raising (Br. 15) to support universal service bears no resemblance to reality. Universal service disbursements "have remained relatively stable over the past decade." *Report to Congress* ¶92. "The contribution burden on households" also "has been relatively stable"—and even decreased—"in recent years." *Id.* ¶91, Table 2. While the contribution factor has recently grown substantially, that increase is "due in large part to a decline in the contributions revenue base," as providers report "a declining share of telecommunications revenues and an increasing share of non-telecommunications revenues." *Id.* ¶91.

41

rates for similar services provided to other customers in comparable rural areas in that State." *Id*. § 254(h)(1)(A).

Carriers that are required to provide services to schools and libraries at discounted rates under section 254(h)(1)(B) shall "have an amount equal to the amount of the discount treated as an offset to [their] obligation to contribute" to universal service funding. *Id.* § 254(h)(1)(B)(i). "The discount" for such services "shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by" elementary schools, secondary schools, and libraries. *Id*. § 254(h)(1)(B).

The formulas codified in section 254(h)(1) restrict the amount of universal service support that the FCC can provide to schools, libraries, and health care providers. As we explained in Section I.B.2 above, any such statutory restriction on the FCC's discretion to expand the size of its universal service subsidy programs also serves to limit the agency's authority to raise revenues to finance those programs.

\*\*\*\*\*

Whether considered separately or in combination, multiple provisions of section 254—including sections 254(b), (c), (d), (e), and (h)—intelligibly

limit the FCC's authority to increase the size and scope of the universal service program and the fees that carriers must pay to support universal service. These statutory provisions provide ample guidance to the FCC in administering the universal service program.

Because Congress "clearly delineate[d] its general policy, the public agency which is to apply it, and the boundaries of [the] delegated authority," *Am. Power & Light*, 329 U.S. at 105, the FCC's administration of the universal service program under the authority granted by section 254 of the Communications Act does not violate the constitutional separation of powers. *Accord Rural Cellular II*, 685 F.3d at 1091.

### C.  The Constitution Does Not Require Congress To Impose An Objective Limit On The Universal Service Program.

Petitioners contend that in the context of "revenue-raising" authority—unlike other types of delegations—the "intelligible principle" test can only be satisfied if Congress's statutory delegation imposes an "objective" (*i.e.*, quantitative or numerical) limit on the amount of funds an agency is authorized to raise under the statute. Br. 36-42. But petitioners fail to identify a single case in which the Supreme Court—or any other court—has adopted such a rule.

Relying on *Mistretta*, 488 U.S. 361, and *Whitman*, 531 U.S. 457, petitioners contend that "what suffices as an 'intelligible principle' varies

43

based on 'the extent and character' of the power sought to be delegated," Br. 36 (quoting *Mistretta*, 488 U.S. at 372), and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Ibid*. (quoting *Whitman*, 531 U.S. at 475).  But neither case involved agency fund raising, and neither holds that an objective limit is constitutionally required.

On the contrary, the Court in *Whitman* stated, in no uncertain terms, that "even in sweeping regulatory schemes, we have *never* demanded … that statutes provide a determinate criterion for saying how much … is too much." 531 U.S. at 475 (emphasis added).  Similarly, the Court in *Mistretta* emphasized that the Constitution does not confine Congress "to that method of executing its policy which involves the least possible delegation of discretion to administrative officers."  488 U.S. at 379 (quoting *Yakus*, 321 U.S. at 425-26).

Indeed, the Supreme Court has rejected nondelegation challenges to revenue-raising statutes that included no quantitative limit on the amount of revenue to be raised.  For example, in *Lichter v. United States*, 334 U.S. 742 (1948), when the Court upheld a statute that "authorized agencies to recoup 'excess profits' paid under wartime Government contracts," it "did not insist that Congress specify how much profit was too much."  *See Whitman*, 531

U.S. at 475 (citing *Lichter*, 334 U.S. at 783-86).  Instead, the Court found that it was "not necessary that Congress supply administrative officials with a specific formula" for determining when profits were excessive because "[t]he purpose" of the statute "and its factual background establish a sufficient meaning for 'excessive profits' as those words are used in practice." *Lichter*, 334 U.S. at 785.[12]

Similarly, in *Grimaud*, 220 U.S. at 521-23, the Supreme Court held that the Secretary of Agriculture did not exercise "legislative power" when he used delegated authority to assess fees on users of forest reserves, even though Congress set no numerical limit on the amount of such fees.[13]  In upholding this delegation, the Court noted that the Secretary "could not make rules and regulations" to assess fees "for any and every purpose." *Id*. at 522. Congress authorized the Secretary "to adopt rules 'regulating the use and

_____

[12] The statute at issue in *Lichter* delegated revenue-raising authority.  As the Supreme Court noted, "recovery by the Government of excessive profits received or receivable upon war contracts is in the nature of … the collection of excess profits taxes." *Lichter*, 334 U.S. at 787.  Such taxes are assessed "to raise funds for extraordinary wartime expenditures" and for "the needs of peace." *Id*. at 784.

[13] While the statute at issue in *Grimaud* imposed a $500 limit on any fine that a court could impose for violations of the Secretary's regulations, *see* 220 U.S. at 509, the statute placed *no* numerical cap on the fees that the Secretary could collect under those regulations.

occupancy' of public forests to protect them from 'destruction' and 'depredations.'" *See Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting) (quoting *Grimaud*, 220 U.S. at 522). The Court held that the Secretary's decision to charge fees for grazing sheep on forest reserves properly fell within the scope of this delegated authority. *Grimaud*, 220 U.S. at 522. Hence, there was no impermissible delegation of legislative power in *Grimaud*.

If petitioners are correct that the Constitution requires an "objective" quantitative limit for revenue-raising delegations, the Court in *Grimaud* should have invalidated the challenged statute for failing to impose any such limit. Instead, the Court upheld the delegation without even discussing the issue that petitioners claim is critical here: the absence of any numerical cap on revenue-raising in the challenged statute.

*Lichter* and *Grimaud* refute petitioners' claim that "the Supreme Court has upheld delegations of revenue-raising only when the statutes included an objective [*i.e.*, quantitative] limit on the authority to generate funds." Br. 38. Revenue-raising delegations—like other delegations—are permissible as long as Congress provides an "intelligible principle" to guide the agency's discretion in exercising its delegated authority. *See J.W. Hampton*, 276 U.S. at 409. The "intelligible principle" defining the scope of an agency's

revenue-raising authority need not take the form of a numerical cap or quantitative limit, as *Lichter* and *Grimaud* make clear.

None of the "revenue-raising precedents" cited by petitioners (Br. 41) applied the "objective limit" test that petitioners urge the Court to employ here. Contrary to petitioners' assertion (Br. 38), the statute in *J.W. Hampton* did not contain "a precise formula for objectively calculating" customs duties. Rather, the statute directed the President, "in so far as he finds it practicable," to "take into consideration" several factors when setting customs duties, including differences in "conditions in production," differences in "wholesale selling prices," "advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country," and "any other advantages or disadvantages in competition." *See J.W. Hampton*, 276 U.S. at 401-02 (quoting Tariff Act, § 315(c), 42 Stat. 858, 942-43 (1922)).[14]

Petitioners make much of the fact that the statute upheld in *Skinner* imposed a mathematical "ceiling on aggregate fees that may be collected" by

---

[14] Although the statute in *J.W. Hampton* "barred the executive from varying" customs duties "by more than 50%" from statutorily specified rates (Br. 38 (citing *J.W. Hampton*, 276 U.S. at 401)), the Court made no mention of that limitation when it analyzed the nondelegation issue, *see* 276 U.S. at 404-11.

47

the Secretary of Energy "in any fiscal year."  Br. 38 (quoting *Skinner*, 490

U.S. at 220).  But that ceiling was just one of "multiple restrictions" on the

Secretary's authority that the Supreme Court cited in rejecting a

nondelegation challenge to the statute.  *Skinner*, 490 U.S. at 220.  The Court

in *Skinner* "did not hold, or even imply, that an intelligible principle required

a price cap" or other type of quantitative limit.  *Consumers' Rsch.*, 67 F.4th at

789.  Nor did the Court suggest that the delegation in *Skinner* would have

been unconstitutional if the statute had *not* imposed a ceiling on fees.[15]

   The third "revenue-raising precedent" cited by petitioners—*National

Cable Television Association v. United States*, 415 U.S. 336 (1974)

(*NCTA*)—did not even "reach" the issue of nondelegation.  *See id.* at 342.  In

*NCTA*, the Supreme Court simply held that the FCC lacked authority to

assess certain regulatory fees on regulated entities because Congress did not

clearly grant such authority to the agency.  *Id.* at 342-44.  The Court

subsequently explained that *NCTA* "stand[s] only for the proposition that

Congress must indicate clearly its intention to delegate to the Executive the

---

   [15] Furthermore, the statute's "ceiling" provision was the last restriction that
the *Skinner* Court discussed in its nondelegation analysis.  If (as petitioners
claim) the Constitution requires an "objective" limit on revenue-raising
delegations, the Court's analysis presumably would have begun—and
ended—with the statutory "ceiling" on aggregate fees.

48

discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens … on those parties." *Skinner*, 490 U.S. at 224. In this case, Congress has clearly delegated to the FCC the authority to collect universal service fees from carriers under section 254. *See* 47 U.S.C. § 254(d).

In short, the Constitution does not require Congress to impose an objective limit or hard cap on revenue-raising delegations, and no case suggests otherwise. Petitioners "fault[ ] Congress for not providing a narrower standard" to constrain the Commission's collection of universal service fees; but to overcome a nondelegation challenge, "Congress must provide only an 'intelligible' standard," which "need not be utterly unambiguous." *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 33 (D.C. Cir. 2008). As we explained in Section I.B above, section 254

"intelligibly guides the [agency's] exercise of discretion, and that is all that the non-delegation doctrine requires." *Id*. at 33 n.8.[16]

### D. The Intelligible Principle Standard Applies Even If Universal Service Contributions Are Taxes (Which They Are Not).

Petitioners argue that the alleged nondelegation violation in this case is particularly "egregious" because the universal service contributions mandated by section 254(d) are "taxes." Br. 50-64. For purposes of the nondelegation doctrine, however, it makes no difference whether universal service contributions are taxes. Even assuming that such payments "are a form of taxation," the Supreme Court has held that "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that … applied to other nondelegation challenges." *Skinner*, 490 U.S. at 223; *see Rural Cellular II*, 685 F.3d at 1091. While Congress may "choose to be more circumspect in delegating authority under

---

[16] Petitioners suggest an additional constitutional infirmity in that the Commission's revenue-raising power is "perpetual." Br. 4, 29. This argument has been forfeited because it was not first presented to the Commission. *See* 47 U.S.C. § 405(a); *Nat'l Lifeline*, 983 F.3d at 509. In any event, permanence of authority does not pose a constitutional difficulty. There are many examples of permanent indefinite appropriations, including the Judgment Fund, 31 U.S.C. § 1304, and Congress remains free to amend or revise the Commission's authority at any time. Finally, the fact that an agency's authority is not time-limited has nothing to do with whether Congress has provided an intelligible principle to guide agency action.

the Taxing Clause" than under any of its other enumerated powers, this "heightened degree of prudence" is not "required by the Constitution." *Skinner*, 490 U.S. at 223.

Petitioners maintain that *Skinner*'s "discussion of the standards under which Congress could delegate the taxing power was likely *dicta*." Br. 50 n.24; *see also* Br. 42 n.22, 63. To the contrary, the Supreme Court expressly declared in *Skinner*: "*[W]e hold* that the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that we have applied to other nondelegation challenges." *Skinner*, 490 U.S. at 223 (emphasis added). The Court reached this conclusion after determining that neither "the text of the Constitution" nor "the practices of Congress" required "the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power." *Id*. at 222-23.

This Court has properly treated *Skinner*'s holding on this issue as binding. In rejecting an earlier nondelegation challenge to the FCC's assessment of universal service fees on carriers, the Court rightly reasoned that it did not matter "whether the assessment [was] deemed a tax," *Rural Cellular II*, 685 F.3d at 1091, because *Skinner* holds that taxing delegations are "subject to no [greater] constitutional scrutiny" than any other

51

delegations. *Ibid.* (quoting *Skinner*, 490 U.S. at 223). Under the applicable standard of review, "when Congress confers decisionmaking authority"—including taxing authority—"upon agencies," it "[need only] lay down by legislative act an intelligible principle to which" the authorized agency "is directed to conform." *Ibid.* (quoting *Whitman*, 531 U.S. at 472); *see also Consumers' Rsch.*, 67 F.4th at 788 (in reviewing nondelegation claims, courts "apply one universal intelligible-principle test regardless of the type of statute at issue"). This Court held in *Rural Cellular II* that section 254 "clearly provides an intelligible principle to guide the Commission's efforts" in collecting universal service contributions from carriers, "viz., 'to preserve and advance universal service.'" 685 F.3d at 1091. That precedent requires the Court to reach the same conclusion here.

In any event, even if the issue were relevant, universal service contributions are not taxes. As the Supreme Court explained in *NCTA*, a federal agency does not exercise taxing power if it requires regulated entities to pay a "fee" that "bestows a benefit on the [payor], not shared by other members of society." 415 U.S. at 340-41. Both this Court and the Fifth Circuit have concluded that universal service contributions are fees, not taxes, because the universal service program confers special benefits on contributing carriers by expanding the network such carriers can serve. *See*

52

*Rural Cellular II*, 685 F.3d at 1090-91 (because contributing carriers "provide Internet access over subscribers' telephone lines," they "will particularly benefit" from universal service, which increases the "utility of the Internet" by providing more users with "access to broadband"); *TOPUC I*, 183 F.3d at 427 n.52, 428 (each contributing carrier "directly benefits from" the "larger network" produced by "the provision of universal service").[17]

## II.    THE FCC HAS NOT IMPERMISSIBLY DELEGATED REGULATORY POWER TO USAC.

Petitioners also contend that the FCC impermissibly delegated its regulatory power to USAC, the private company that administers the universal service program as the FCC's agent.  Br. 64-67.  That argument fails for two reasons:  (1) it rests on the false premise that USAC exercises regulatory power, rather than providing administrative assistance; and (2) even if USAC's role were more substantial, the FCC retains final decisionmaking authority.

---

[17] This Court also held that the FCC did not exercise "taxing power" when it adopted cost allocation requirements to subsidize universal service in the 1980s.  *Rural Tel. Coal.*, 838 F.2d at 1314.  And state courts in Louisiana, Nebraska, and Kansas have all ruled that charges levied on carriers to fund state universal service programs are not taxes.  *See Voicestream GSM I Operating Co. v. La. Pub. Serv. Comm'n*, 943 So. 2d 349, 359-62 (La. 2006); *Schumacher v. Johanns*, 272 Neb. 346, 358-63, 722 N.W.2d 37, 47-51 (Neb. 2006); *Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 264 Kan. 363, 396-400, 956 P.2d 685, 708-10 (Kan. 1998).

### A.   USAC Merely Provides Administrative Support To The FCC.

1.  In asserting that the FCC has "effectively delegat[ed]" the task of raising universal service revenues "to USAC" (Br. 65), petitioners vastly overstate USAC's functions and role.  USAC is responsible for "billing" contributors, "collecting" universal service contributions, and "disbursing" universal service funds.  47 C.F.R. § 54.702(b).  In performing these tasks, USAC is subordinate to, and closely supervised by, the FCC.  Under FCC rules, USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress"; it must "seek guidance from the Commission" if the statute or rules "are unclear" or "do not address a particular situation."  *Id*. § 54.702(c).  And a party dissatisfied with a USAC decision may seek review at the FCC, *id*. § 54.719(b), which grants relief where appropriate.[18]

The FCC has not made an unlawful subdelegation to USAC because it has "never conferred on [USAC] any authority to make rules under section [254]."  *State of Cal.*, 72 F.4th at 316.  With respect to universal service

_____

[18] *See, e.g.*, *Streamlined Resolution of Requests Related to Actions by the Universal Service Administrative Company*, DA 22-448, 2022 WL 1302467 (WCB rel. April 29, 2022) (granting, dismissing, or denying numerous requests for review); *Alpaugh Unified Sch. Dist.*, 22 FCC Rcd 6035 (2007) (granting 78 appeals of USAC decisions).

contributions, only the Commission has power to adopt a quarterly

contribution factor.  USAC is simply tasked with providing the agency with

projections of "demand" and "administrative expenses" for the various

universal service mechanisms, as well as determinations of the "total

contribution base."  47 C.F.R. § 54.709(a)(3).  USAC calculates the projected

expenses for each quarter "subject to detailed and specific rules and

instructions" contained in "the Commission's regulations."  *Consumers'*

*Rsch*., 67 F.4th at 796 (cleaned up).  Those regulations establish detailed

eligibility requirements for recipients of universal service subsidies,[19] impose

caps on particular types of support,[20] and prescribe precise formulas for

---

[19] *See* 47 C.F.R. § 54.314 (requiring certification of carriers eligible to receive high-cost universal service support); *id*. § 54.410 (requirements for determining and certifying that subscribers are eligible to receive Lifeline services); *id*. §§ 54.503, 54.504 (requirements that schools and libraries must satisfy to be eligible to receive support under section 254(h)); *id*. §§ 54.622, 54.623 (requirements that rural health care providers must satisfy to be eligible to receive support under section 254(h)).

[20] *See* 47 C.F.R. § 54.302 (monthly per-line limit on high-cost support); *id*. § 54.403 (specifying the amount of support that eligible Lifeline subscribers will receive); *id*. § 54.507 (annual cap on federal universal service support for schools and libraries); *id*. § 54.619 (annual cap on federal universal service support for health care providers).

calculating available support.[21]  Any "policy and judgment calls" (Br. 66)

concerning the projected need for universal service funding in an upcoming

quarter are made by the FCC and are reflected in its rules.  USAC's

projections are based on, and must comply with, those rules.

2.  Courts have recognized that "a federal agency may use an outside

entity, such as … a private contractor, to provide the agency with factual

information."  *See USTA*, 359 F.3d at 567 (citing cases).  USAC provides the

FCC with the factual data that it needs to set the quarterly contribution factor.

In calculating projected expenses for each quarter, USAC is tightly

constrained by FCC rules that set eligibility requirements for recipients of

universal service funding, impose funding caps, and mandate the use of

complex formulas to calculate the amount of available funding.  *See* footnotes

19-21 above.  The Commission reviews and approves USAC's projections

"before they are used to calculate the quarterly contribution factor and

individual contributions."  47 C.F.R. § 54.709(a)(3).  And carriers self-report

their projected revenues to USAC.  *Id.* § 54.711(a).  The "fact gathering" that

---

[21] *See, e.g.*, 47 C.F.R. § 54.303(a)(1) (total eligible annual operating
expenses); *id.* § 54.505 (discounts for eligible schools and libraries); *id.*
§§ 54.604-54.606 (rules for calculating subsidies for services provided to
rural health care providers); *id.* § 54.901(a) (Connect America Fund
Broadband Loop Support); *id.* § 54.1304(b) (safety net additive support).

USAC performs for the FCC is a "legitimate outside party input into [the FCC's] decision-making processes." *USTA*, 359 F.3d at 566. *Cf. Pittston Co. v. United States*, 368 F.3d 385, 397 (4th Cir. 2004) (upholding a private entity's "ministerial task of doing calculations").

### B. The Commission Supervises USAC And Retains Final Decisionmaking Authority.

1. Even if USAC's role in determining the contribution factor were more substantial, there would be no impermissible delegation of regulatory power because the FCC retains "final reviewing authority." *See La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 671-73 (3d Cir. 2014); *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132-34 (2d Cir. 2008). In accordance with longstanding Supreme Court precedent, "[a]gencies may subdelegate to private entities so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over their activities.'" *State of Tex. v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021) (quoting *Sunshine Anthracite Coal*, 310 U.S. at 399)). Here, USAC simply applies the FCC's detailed regulations and calculates the projected demand, projected expenses, and contribution base for each quarter. 47 C.F.R. § 54.709(a)(3). The Commission approves the contribution factor,

which USAC then applies.  *Ibid.*[22]  And any "party aggrieved" by USAC
action may "seek review" from the FCC.  *Id.* § 54.719(b).

"[T]here has been no unlawful subdelegation" here because the FCC
exercises final "review authority" over USAC.  *La. Pub. Serv. Comm'n*, 860
F.3d at 696.  "USAC is subordinate to the FCC," which "is not bound by
USAC's projections."  *Consumers' Rsch.*, 67 F.4th at 795-96; *see also*
*Sunshine Anthracite Coal*, 310 U.S. at 388, 399 (a private entity may
permissibly propose policy as long as the proposal is "approved, disapproved,
or modified" by a government authority).

2.  Petitioners contend that the FCC "reflexively rubber stamp[s]"
USAC's proposals.  Br. 67 (quoting *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th
Cir. 1974)).  To the contrary, the FCC and its staff have revised USAC's
calculations on several occasions, including twice in 2023.  *See Proposed*
*Fourth Quarter 2023 Universal Service Contribution Factor*, DA 23-843,
2023 WL 6036237 (OMD rel. Sept. 13, 2023) (setting the fourth quarter 2023

---

[22] If USAC's projections turn out to be wrong, the Commission retains
additional control.  FCC rules provide that if "contributions for a particular
quarter exceed" universal service "disbursements" plus "USAC's
administrative costs for that quarter, the 'excess payments will be carried
forward,' thereby reducing the contribution factor for the subsequent
quarter."  *Rural Cellular II*, 685 F.3d at 1086 (quoting 47 C.F.R.
§ 54.709(b)).

contribution factor "below" the level indicated by "USAC's filings" to account for "unused funds from prior funding years," which will be used to "offset" projected expenses); *Proposed Third Quarter 2023 Universal Service Contribution Factor*, DA 23-507, 2023 WL 4012359 (OMD rel. June 14, 2023) (making a similar reduction in the third quarter 2023 contribution factor); *Revised Second Quarter 2003 Universal Service Contribution Factor*, 18 FCC Rcd 5097 (WCB 2003) (adjusting contribution factor from 9.0044% to 9.1%); *First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, 12 FCC Rcd 21881, 21886 (CCB 1997) (setting "the approved contribution factors").  These revisions belie petitioners' assertion that the timing of the approval process leaves the FCC with "no real choice but to accept whatever USAC proposes."  Br. 66.

It is unsurprising that the Commission's revisions are relatively infrequent, given USAC's limited role, the elaborate framework of governing rules, and the Commission's additional oversight in advance of contribution factor announcements.  On the last point, for example, the Commission has provided USAC with extensive directions regarding the administration of the universal service program for schools and libraries, including the reservation

of funds for potential disbursements.[23]  The FCC has "direct[ed]" USAC to retain certain funds "and not to take that amount into consideration when determining the contribution factor for the first quarter of 2018."[24]  And the agency has "direct[ed]" USAC "to carry forward" certain "unused funds from prior funding years" to fund the rural health care program in subsequent funding years.[25]  These examples demonstrate that the Commission engages in active oversight of the contribution factor process.  For all of these reasons, petitioners cannot plausibly claim that the FCC has failed to "participate actively and significantly" in the development of the quarterly universal service contribution factors.  *See Sierra Club*, 502 F.2d at 59.

---

[23] *See* Letter from Mark Stephens, FCC, to Chris Henderson, USAC, April 17, 2017, available at https://docs.fcc.gov/public/attachments/DA-17-367A1.pdf; Letter from Jon Wilkins, FCC, to Chris Henderson, USAC, Dec. 15, 2014, available at https://docs.fcc.gov/public/attachments/DA-14-1820A1.pdf.

[24] *See Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd 9243 (WCB 2017).

[25] *See Wireline Competition Bureau Announces the Availability of Unused Funds to Fully Satisfy Demand for Rural Health Care Program Funding for Funding Year 2022*, DA 22-792, 2022 WL 2965199 (WCB rel. July 22, 2022); *Wireline Competition Bureau Announces the Availability of Unused Funds to Increase Rural Health Care Program Funding for Funding Year 2021*, 36 FCC Rcd 10027 (WCB 2021).

Furthermore, the Commission's supervision of USAC does not end when the agency approves the contribution factor. A "party aggrieved by an action taken by" USAC may "seek review" from the FCC. 47 C.F.R. § 54.719(b). If a carrier believes that USAC is assessing excessive universal service fees, the carrier may appeal USAC's invoice to the FCC. *See inContact, Inc. v. FCC*, 495 F. App'x 95 (D.C. Cir. 2013). And if the FCC determines that USAC has overcharged the carrier, the Commission provides relief. *See, e.g.*, *Universal Service Contribution Methodology*, 31 FCC Rcd 13220 (WCB 2016) (ruling that USAC overcharged Cisco WebEx by improperly assessing universal service fees on non-telecommunications revenues).

USAC also frequently undergoes audits of its operations. FCC rules require USAC to "obtain and pay for an annual audit conducted by an independent auditor" to determine whether USAC "is properly administering the universal service support mechanisms to prevent fraud, waste, and abuse." 47 C.F.R. § 54.717. Additional independent audits of USAC are also conducted each year to evaluate the FCC's compliance with the Improper Payments Elimination and Recovery Act of 2010, Pub. L. No. 111-204, 124 Stat. 2224 (2010), and the Improper Payments Elimination and Recovery Improvement Act of 2012, Pub. L. No. 112-248, 126 Stat. 2390 (2013).

61

Based on the findings and recommendations of these audits, the Commission regularly directs USAC to take corrective action to improve the effectiveness and efficiency of the universal service program, including measures to identify and recover past improper payments and to eliminate such payments in the future.[26]

According to the latest budget estimates submitted to Congress by the FCC, the Commission estimates that it spends over $19 million annually in overseeing universal service activities, and that the equivalent of 80 full-time FCC employees work on universal service activities each year (including staff in the Wireline Competition Bureau, the Office of Managing Director, and a number of other FCC Bureaus and Offices). *Federal Communications*

---

[26] *See, e.g.*, Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Jan. 14, 2021, available at https://www.fcc.gov/sites/default/files/fcc-letter-to-usac-01142021.pdf.; Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Jan. 14, 2020, available at https://www.fcc.gov/sites/default/files/fcc-afr-findings-ltr-to-usac-01142020.pdf; Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Aug. 30, 2019, available at https://www.fcc.gov/sites/default/files/fcc-letter-to-usac-08302019.pdf; Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Dec. 13, 2018, available at https://www.fcc.gov/sites/default/files/fcc-letter-to-usac-12132018.pdf; Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Aug. 2, 2018, available at https://www.fcc.gov/sites/default/files/fcc-letter-to-usac-08022018.pdf; Letter from Mark Stephens, FCC, to Radha Sekar, USAC, Feb. 7, 2018, available at https://www.fcc.gov/sites/default/files/fcc-letter-to-usac-02072018.pdf.

*Commission 2024 Budget Estimates to Congress* (March 2023), at 23,

available at https://docs.fcc.gov/public/attachments/DOC-391605A1.pdf.

The Commission's extensive supervision of USAC leaves no doubt

that USAC "function[s] subordinately to" the FCC, which retains final

decisionmaking "authority and surveillance over [USAC's] activities."

*Sunshine Anthracite Coal*, 310 U.S. at 399; *see also Consumers' Rsch*., 67

F.4th at 795-97.  Thus, even if USAC exercised more substantive authority,

there would be no unlawful delegation of regulatory power.

63

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
PRINCIPAL DEPUTY ASSISTANT
  ATTORNEY GENERAL

SARAH E. HARRINGTON
DEPUTY ASSISTANT ATTORNEY
  GENERAL

MARK B. STERN
GERARD J. SINZDAK
ATTORNEYS

UNITED STATES
  DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

September 28, 2023

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

/s/ James M. Carr

JAMES M. CARR
COUNSEL

FEDERAL COMMUNICATIONS
  COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

64

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This document complies with the type-volume limit of Fed. R. App. P.
32(a)(7)(B) because, excluding the parts of the document exempted by Fed.
R. App. P. 32(f):

☒    this document contains <u>12,868</u> words, *or*

☐    this document uses a monospaced typeface and contains _ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒    this document has been prepared in a proportionally spaced typeface
using <u>Microsoft Word in Office 365</u> in <u>14-point Times New Roman</u>, *or*

☐    this document has been prepared in a monospaced spaced typeface using
_____ with _____.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

STATUTORY ADDENDUM

# Contents

47 U.S.C. § 254 ................................................................. 1

47 C.F.R. § 54.702 .......................................................... 6

47 C.F.R. § 54.703 .......................................................... 8

47 C.F.R. § 54.706 ........................................................ 11

47 C.F.R. § 54.709 ........................................................ 14

47 C.F.R. § 54.711 ........................................................ 17

47 C.F.R. § 54.717 ........................................................ 18

47 C.F.R. § 54.719 ........................................................ 21

# 47 U.S.C. § 254

## § 254. Universal service

### (a) Procedures to review universal service requirements

**(1) Federal-State Joint Board on universal service**
Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

**(2) Commission action**
The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

### (b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

1

**(1) Quality and rates**
Quality services should be available at just, reasonable, and affordable rates.

**(2) Access to advanced services**
Access to advanced telecommunications and information services should be provided in all regions of the Nation.

**(3) Access in rural and high cost areas**
Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

**(4) Equitable and nondiscriminatory contributions**
All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

**(5) Specific and predictable support mechanisms**
There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

**(6) Access to advanced telecommunications services for schools, health care, and libraries**
Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

**(7) Additional principles**
Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the

public interest, convenience, and necessity and are consistent with this chapter.

## (c) Definition

### (1) In general
Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services--

> **(A)** are essential to education, public health, or public safety;

> **(B)** have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

> **(C)** are being deployed in public telecommunications networks by telecommunications carriers; and

> **(D)** are consistent with the public interest, convenience, and necessity.

### (2) Alterations and modifications
The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

### (3) Special services
In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

**(d) Telecommunications carrier contribution**

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

**(e) Universal service support**

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

* * *

**(h) Telecommunications services for certain providers**

**(1) In general**

**(A) Health care providers for rural areas**

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier

4

providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

**(B) Educational providers and libraries**
All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall--

> **(i)** have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

> **(ii)** notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

* * *

**(i) Consumer protection**
The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

5

**(j) Lifeline assistance**
Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

\* \* \*

# 47 C.F.R. § 54.702
## § 54.702 Administrator's functions and responsibilities

(a) The Administrator, and the divisions therein, shall be responsible for administering the schools and libraries support mechanism, the rural health care support mechanism, the high-cost support mechanism, and the low income support mechanism.

(b) The Administrator shall be responsible for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds.

(c) The Administrator may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress. Where the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission.

(d) The Administrator may advocate positions before the Commission and its staff only on administrative matters relating to the universal service support mechanisms.

(e) The Administrator shall maintain books of account separate from those of the National Exchange Carrier Association, of which the Administrator is an independent subsidiary. The Administrator's books of account shall be maintained in accordance with generally accepted accounting principles. The Administrator may borrow start up funds from the National Exchange Carrier Association. Such funds may not be

6

drawn from the Telecommunications Relay Services (TRS) fund or TRS administrative expense accounts.

(f) The Administrator shall create and maintain a website, as defined in § 54.5, on which applications for services will be posted on behalf of schools, libraries and rural health care providers.

(g) The Administrator shall file with the Commission and Congress an annual report by March 31 of each year. The report shall detail the Administrator's operations, activities, and accomplishments for the prior year, including information about participation in each of the universal service support mechanisms and administrative action intended to prevent waste, fraud, and abuse. The report also shall include an assessment of subcontractors' performance, and an itemization of monthly administrative costs that shall include all expenses, receipts, and payments associated with the administration of the universal service support programs. The Administrator shall consult each year with Commission staff to determine the scope and content of the annual report.

(h) The Administrator shall report quarterly to the Commission on the disbursement of universal service support program funds. The Administrator shall keep separate accounts for the amounts of money collected and disbursed for eligible schools and libraries, rural health care providers, low-income consumers, and high-cost and insular areas.

(i) Information based on the Administrator's reports will be made public by the Commission at least once a year as part of a Monitoring Report.

(j) The Administrator shall provide the Commission full access to the data collected pursuant to the administration of the universal service support programs.

(k) Pursuant to § 64.903 of this chapter, the Administrator shall file with the Commission a cost allocation manual (CAM) that describes the accounts and procedures the Administrator will use to allocate the shared costs of administering the universal service support mechanisms and its other operations.

(l) The Administrator shall make available to whomever the Commission directs, free of charge, any and all intellectual property, including, but not limited to, all records and information generated by or resulting from its role in administering the support mechanisms, if its participation in administering the universal service support mechanisms ends.

(m) If its participation in administering the universal service support mechanisms ends, the Administrator shall be subject to close-out audits at the end of its term.

(n) The Administrator shall account for the financial transactions of the Universal Service Fund in accordance with generally accepted accounting principles for federal agencies and maintain the accounts of the Universal Service Fund in accordance with the United States Government Standard General Ledger. When the Administrator, or any independent auditor hired by the Administrator, conducts audits of the beneficiaries of the Universal Service Fund, contributors to the Universal Service Fund, or any other providers of services under the universal service support mechanisms, such audits shall be conducted in accordance with generally accepted government auditing standards. In administering the Universal Service Fund, the Administrator shall also comply with all relevant and applicable federal financial management and reporting statutes.

(o) The Administrator shall provide performance measurements pertaining to the universal service support mechanisms as requested by the Commission by order or otherwise.

# 47 C.F.R. § 54.703
## § 54.703 The Administrator's Board of Directors.
<Text of section effective until Sept. 29, 2023.>

(a) The Administrator shall have a Board of Directors separate from the Board of Directors of the National Exchange Carrier Association. The

National Exchange Carrier Association's Board of Directors shall be prohibited from participating in the functions of the Administrator.

(b) Board composition. The independent subsidiary's Board of Directors shall consist of nineteen (19) directors:

> (1) Three directors shall represent incumbent local exchange carriers, with one director representing the Bell Operating Companies and GTE, one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues in excess of $40 million, and one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues of $40 million or less;

> (2) Two directors shall represent interexchange carriers, with one director representing interexchange carriers with more than $3 billion in annual operating revenues and one director representing interexchange carriers with annual operating revenues of $3 billion or less;

> (3) One director shall represent commercial mobile radio service (CMRS) providers;

> (4) One director shall represent competitive local exchange carriers;

> (5) One director shall represent cable operators;

> (6) One director shall represent information service providers;

> (7) Three directors shall represent schools that are eligible to receive discounts pursuant to § 54.501;

> (8) One director shall represent libraries that are eligible to receive discounts pursuant to § 54.501;

> (9) Two directors shall represent rural health care providers that are eligible to receive supported services pursuant to § 54.601;

> (10) One director shall represent low-income consumers;

9

(11) One director shall represent state telecommunications regulators;

(12) One director shall represent state consumer advocates; and

(13) The Chief Executive Officer of the Administrator.

(c) Selection process for board of directors.

(1) Sixty (60) days prior to the expiration of a director's term, the industry or non-industry group that is represented by such director on the Administrator's Board of Directors, as specified in paragraph (b) of this section, shall nominate by consensus a new director. The industry or non-industry group shall submit the name of its nominee for a seat on the Administrator's Board of Directors, along with relevant professional and biographical information about the nominee, to the Chairman of the Federal Communications Commission. Only members of the industry or non-industry group that a Board member will represent may submit a nomination for that position.

(2) The name of an industry or non-industry group's nominee shall be filed with the Office of the Secretary of the Federal Communications Commission in accordance with part 1 of this chapter. The document nominating a candidate shall be captioned "In the matter of: Nomination for Universal Service Administrator's Board of Directors" and shall reference FCC Docket Nos. 97–21 and 96–45. Each nomination shall specify the position on the Board of Directors for which such nomination is submitted. Two copies of the document nominating a candidate shall be submitted to the Wireline Competition Bureau's Telecommunications Access Policy Division.

(3) The Chairman of the Federal Communications Commission shall review the nominations submitted by industry and non-industry groups and select each director of the Administrator's Board of Directors, as each director's term expires pursuant to paragraph (d) of this section. If an industry or non-industry group does not reach consensus on a nominee or fails to submit a

nomination for a position on the Administrator's Board of Directors, the Chairman of the Federal Communications Commission shall select an individual to represent such group on the Administrator's Board of Directors.

(d) Board member terms. The directors of the Administrator's Board shall be appointed for three-year terms, except that the Chief Executive Officer shall be a permanent member of the Board. Board member terms shall run from January 1 of the first year of the term to December 31 of the third year of the term, except that, for purposes of the term beginning on January 1, 1999, the terms of the six directors shall expire on December 31, 2000, the terms of another six directors on December 31, 2001, and the terms of the remaining six directors on December 31, 2002. Directors may be reappointed for subsequent terms pursuant to the initial nomination and appointment process described in paragraph (c) of this section. If a Board member vacates his or her seat prior to the completion of his or her term, the Administrator will notify the Wireline Competition Bureau of such vacancy, and a successor will be chosen pursuant to the nomination and appointment process described in paragraph (c) of this section.

(e) All meetings of the Administrator's Board of Directors shall be open to the public and held in Washington, D.C.

(f) Each member of the Administrator's Board of Directors shall be entitled to receive reimbursement for expenses directly incurred as a result of his or her participation on the Administrator's Board of Directors.

# 47 C.F.R. § 54.706
## § 54.706 Contributions

(a) Entities that provide interstate telecommunications to the public, or to such classes of users as to be effectively available to the public, for a fee will be considered telecommunications carriers providing interstate telecommunications services and must contribute to the universal

11

service support mechanisms. Certain other providers of interstate telecommunications, such as payphone providers that are aggregators, providers of interstate telecommunications for a fee on a non-common carrier basis, and interconnected VoIP providers, also must contribute to the universal service support mechanisms. Interstate telecommunications include, but are not limited to:

(1) Cellular telephone and paging services;

(2) Mobile radio services;

(3) Operator services;

(4) Personal communications services (PCS);

(5) Access to interexchange service;

(6) Special access service;

(7) WATS;

(8) Toll-free service;

(9) 900 service;

(10) Message telephone service (MTS);

(11) Private line service;

(12) Telex;

(13) [Reserved by 82 FR 48777]

(14) Video services;

(15) Satellite service;

(16) Resale of interstate services;

(17) Payphone services; and

(18) Interconnected VoIP services.

(19) Prepaid calling card providers.

12

(b) Except as provided in paragraph (c) of this section, every entity required to contribute to the federal universal service support mechanisms under paragraph (a) of this section shall contribute on the basis of its projected collected interstate and international end-user telecommunications revenues, net of projected contributions.

(c) Any entity required to contribute to the federal universal service support mechanisms whose projected collected interstate end-user telecommunications revenues comprise less than 12 percent of its combined projected collected interstate and international end-user telecommunications revenues shall contribute based only on such entity's projected collected interstate end-user telecommunications revenues, net of projected contributions. For purposes of this paragraph, an "entity" shall refer to the entity that is subject to the universal service reporting requirements in § 54.711 and shall include all of that entity's affiliated providers of interstate and international telecommunications and telecommunications services.

(d) Entities providing open video systems (OVS), cable leased access, or direct broadcast satellite (DBS) services are not required to contribute on the basis of revenues derived from those services. The following entities will not be required to contribute to universal service: non-profit health care providers; broadcasters; systems integrators that derive less than five percent of their systems integration revenues from the resale of telecommunications. Prepaid calling card providers are not required to contribute on the basis of revenues derived from prepaid calling cards sold by, to, or pursuant to contract with the Department of Defense (DoD) or a DoD entity.

(e) Any entity required to contribute to the federal universal service support mechanisms shall retain, for at least five years from the date of the contribution, all records that may be required to demonstrate to auditors that the contributions made were in compliance with the Commission's universal service rules. These records shall include without limitation the following: Financial statements and supporting documentation; accounting records; historical customer records; general ledgers; and any other relevant documentation. This document

13

retention requirement also applies to any contractor or consultant working on behalf of the contributor.

# 47 C.F.R. § 54.709

## § 54.709 Computations of required contributions to universal service support mechanisms

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

(1) For funding the federal universal service support mechanisms prior to April 1, 2003, the subject revenues will be contributors' interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of prior period actual contributions. Beginning April 1, 2003, the subject revenues will be contributors' projected collected interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of projected contributions.

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international

14

telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in § 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action

15

within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in § 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.

(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter. The Commission may instruct the Administrator to treat excess contributions in a manner other than as prescribed in this paragraph (b). Such instructions may be made in the form of a Commission Order or a public notice released by the Wireline Competition Bureau. Any such public notice will become effective fourteen days after release of the public notice, absent further Commission action.

(c) If the contributions received by the Administrator in a quarter are inadequate to meet the amount of universal service support program payments and administrative costs for that quarter, the Administrator shall request authority from the Commission to borrow funds commercially, with such debt secured by future contributions. Subsequent contribution factors will take into consideration the projected costs of the support mechanisms and the additional costs associated with borrowing funds.

(d) If a contributor fails to file a Telecommunications Reporting Worksheet by the date on which it is due, the Administrator shall bill that contributor based on whatever relevant data the Administrator has available, including, but not limited to, the number of lines

16

presubscribed to the contributor and data from previous years, taking into consideration any estimated changes in such data.

# 47 C.F.R. § 54.711
## § 54.711 Contributor reporting requirements

(a) Contributions shall be calculated and filed in accordance with the Telecommunications Reporting Worksheet which shall be published in the Federal Register. The Telecommunications Reporting Worksheet sets forth information that the contributor must submit to the Administrator on a quarterly and annual basis. The Commission shall announce by Public Notice published in the Federal Register and on its website the manner of payment and dates by which payments must be made. An executive officer of the contributor must certify to the truth and accuracy of historical data included in the Telecommunications Reporting Worksheet, and that any projections in the Telecommunications Reporting Worksheet represent a good-faith estimate based on the contributor's policies and procedures. The Commission or the Administrator may verify any information contained in the Telecommunications Reporting Worksheet. Contributors shall maintain records and documentation to justify information reported in the Telecommunications Reporting Worksheet, including the methodology used to determine projections, for three years and shall provide such records and documentation to the Commission or the Administrator upon request. Inaccurate or untruthful information contained in the Telecommunications Reporting Worksheet may lead to prosecution under the criminal provisions of Title 18 of the United States Code. The Administrator shall advise the Commission of any enforcement issues that arise and provide any suggested response.

(b) The Commission shall have access to all data reported to the Administrator. Contributors may make requests for Commission nondisclosure of company-specific revenue information under § 0.459 of this chapter by so indicating on the Telecommunications Reporting

17

Worksheet at the time that the subject data are submitted. The Commission shall make all decisions regarding nondisclosure of company-specific information. The Administrator shall keep confidential all data obtained from contributors, shall not use such data except for purposes of administering the universal service support programs, and shall not disclose such data in company-specific form unless directed to do so by the Commission. Subject to any restrictions imposed by the Chief of the Wireline Competition Bureau, the Universal Service Administrator may share data obtained from contributors with the administrators of the North American Numbering Plan administration cost recovery (See 47 CFR 52.16 of this chapter), the local number portability cost recovery (See 47 CFR 52.32 of this chapter), and the TRS Fund (See 47 CFR 64.604(c)(4)(iii)(H) of this chapter). The Administrator shall keep confidential all data obtained from other administrators and shall not use such data except for purposes of administering the universal service support mechanisms.

(c) The Bureau may waive, reduce, modify, or eliminate contributor reporting requirements that prove unnecessary and require additional reporting requirements that the Bureau deems necessary to the sound and efficient administration of the universal service support mechanisms.

# 47 C.F.R. § 54.717
## § 54.717 Audits of the Administrator

The Administrator shall obtain and pay for an annual audit conducted by an independent auditor to examine its operations and books of account to determine, among other things, whether the Administrator is properly administering the universal service support mechanisms to prevent fraud, waste, and abuse:

(a) Before selecting an independent auditor, the Administrator shall submit preliminary audit requirements, including the proposed scope of

the audit and the extent of compliance and substantive testing, to the Office of Managing Director.

(b) The Office of Managing Director shall review the preliminary audit requirements to determine whether they are adequate to meet the audit objectives. The Office of Managing Director shall prescribe modifications that shall be incorporated into the final audit requirements.

(c) After the audit requirements have been approved by the Office of Managing Director, the Administrator shall engage within thirty (30) calendar days an independent auditor to conduct the annual audit required by this paragraph. In making its selection, the Administrator shall not engage any independent auditor who has been involved in designing any of the accounting or reporting systems under review in the audit.

(d) The independent auditor selected by the Administrator to conduct the annual audit shall be instructed by the Administrator to develop a detailed audit program based on the final audit requirements and shall be instructed by the Administrator to submit the audit program to the Office of Managing Director. The Office of Managing Director shall review the audit program and make modifications, as needed, that shall be incorporated into the final audit program. During the course of the audit, the Office of Managing Director may direct the Administrator to direct the independent auditor to take any actions necessary to ensure compliance with the audit requirements.

(e) During the course of the audit, the Administrator shall instruct the independent auditor to:

> (1) Inform the Office of Managing Director of any revisions to the final audit program or to the scope of the audit;

> (2) Notify the Office of Managing Director of any meetings with the Administrator in which audit findings are discussed; and

> (3) Submit to the Chief of the Wireline Competition Bureau any accounting or rule interpretations necessary to complete the audit.

(f) Within 105 calendar days after the end of the audit period, but prior to discussing the audit findings with the Administrator, the independent auditor shall be instructed by the Administrator to submit a draft of the audit report to the Office of Managing Director Audit Staff.

(g) The Office of Managing Director shall review the audit findings and audit workpapers and offer its recommendations concerning the conduct of the audit or the audit findings to the independent auditor. Exceptions of the Office of Managing Director to the findings and conclusions of the independent auditor that remain unresolved shall be included in the final audit report.

(h) Within fifteen (15) calendar days after receiving the Office of Managing Director's recommendations and making any revisions to the audit report, the Administrator shall instruct the independent auditor to submit the audit report to the Administrator for its response to the audit findings. At this time the auditor also must send copies of its audit findings to the Office of Managing Director. The Administrator shall provide the independent auditor time to perform additional audit work recommended by the Office of Managing Director.

(i) Within thirty (30) calendar days after receiving the audit report, the Administrator shall respond to the audit findings and send copies of its response to the Office of Managing Director. The Administrator shall instruct the independent auditor that any reply that the independent auditor wishes to make to the Administrator's responses shall be sent to the Office of Managing Director as well as the Administrator. The Administrator's response and the independent auditor's replies shall be included in the final audit report;

(j) Within ten (10) calendar days after receiving the response of the Administrator, the independent auditor shall file with the Commission the final audit report.

(k) Based on the final audit report, the Managing Director may take any action necessary to ensure that the universal service support mechanisms operate in a manner consistent with the requirements of

this part, as well as such other action as is deemed necessary and in the public interest.

# 47 C.F.R. § 54.719

## § 54.719 Parties permitted to seek review of Administrator decision

(a) Any party aggrieved by an action taken by the Administrator, as defined in § 54.701, § 54.703, or § 54.705, must first seek review from the Administrator.

(b) Any party aggrieved by an action taken by the Administrator, after seeking review from the Administrator, may then seek review from the Federal Communications Commission, as set forth in § 54.722.

(c) Parties seeking waivers of the Commission's rules shall seek relief directly from the Commission.