No. 23-1091

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

---

CONSUMERS' RESEARCH, ET AL.,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
*Respondents.*

---

On Petition for Review of an Order of
the FCC; FCC-DA-23-216

---

**AMICUS CURIAE BRIEF OF ACADEMY AND EMERITUS
PROFESSOR OF TELECOMMUNICATIONS AND LAW
ROBERT FRIEDEN IN SUPPORT OF RESPONDENTS**

---

ERIC P. GOTTING
   *COUNSEL OF RECORD*
JAMES BALLER
KELLER AND HECKMAN LLP
1001 G ST., SUITE 500 WEST
WASHINGTON, D.C. 20001
(202) 434-4100 (PHONE)
(202) 434-4646 (FACSIMILE)
gotting@khlaw.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and amici appearing in this court; all rulings under review; and all related cases are listed in the Initial Brief for Petitioners (Doc. #2012628).

*/s/ Eric P. Gotting*

## CERTIFICATE AS TO CIRCUIT RULE 29(d)

Professor Frieden's amicus brief traces the history and purposes of universal service in the United States, examines the technological and market forces underlying changes in universal service, and discusses the advantages of relying on a non-governmental agency to administer universal service programs. While several other amicus briefs were filed in support of Respondents in similar cases pending in the Fifth, Sixth, and Eleventh Circuits, none of those focused on the historical underpinnings of universal service or the broad application in the United States and across the globe of universal service principles. Given the differences in focus among such amici, it would be impracticable to file a joint amici brief.

*/s/ Eric P. Gotting*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES.....................................................ii

GLOSSARY ......................................................................vi

INTEREST OF AMICUS CURIAE ..........................................1

SUMMARY OF ARGUMENT ................................................3

ARGUMENT ....................................................................5

    I.    The United States and Countries Throughout the
World Have Prioritized Universal Access to Affordable
Telecommunications on Par with Electricity, Water,
and Other Essentials. ...........................................5

    II.   The FCC's Current USF Program Evolved From
Universal Service Funding Occurring Prior to 1996...........13

    III.  The Universal Service Mission Spans Decades and Has
Changed in Terms of Scope, Technologies Supported,
Methods to Promote Widespread and Affordable
Access, Who Qualifies for Financial Support, and How
to Finance, Structure, and Manage the Subsidy
Process....................................................21

    IV.  Many National Governments have Created a Separate
or Affiliated Entity to Manage Universal Service Funds
Collection and Distribution, Subject to Oversight by
the National Regulatory Authority or Ministry. ................25

CONCLUSION ................................................................30

CERTIFICATE OF COMPLIANCE.....................................34

CERTIFICATE OF SERVICE.............................................35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alenco Communications, Inc. v. F.C.C.,*
 201 F.3d 608 (5th Cir. 2000) ............................................ 12, 17, 18

*AT&T, Inc. v. Federal Communication Commission,*
 886 F.3d 1236 (D.C. Cir. 2018) ...................................................... 24

*Duquesne Light Co. v. Barasch,*
 488 U.S. 299 (1989) ....................................................................... 17

*In re FCC 11-161,* 753 F.3d 1015 (10th Cir. 2014) ................................ 20

*Huawei Technologies USA, Incorporated v. Federal Communications
 Commission,* 2 F.4th 421 (5th Cir. 2021) ....................................... 9

*MCI Telecommunications Corp. v. F.C.C.,*
 712 F.2d 517 (D.C. Cir. 1983) ....................................................... 16

*National Ass'n of Regulatory Utility Com'rs v. F.C.C.,*
 737 F.2d 1095 (D.C. Cir. 1984) ..................................................... 16

*Rural Telephone Coalition v. F.C.C.,*
 838 F.2d 1307 (D.C. Cir. 1988) ................................................ 17, 20

## Statutes

Secure and Trusted Communications Networks Act of 2019, Pub. L.
 116-124, 133 Stat. 158 (2020) ......................................................... 6

## Other Authorities

Digital Regulation Platform, Indonesia's Universal Service
 Obligation Fund (Sep. 24, 2020) .................................................... 26

International Telecommunication Union, Development Sector,
 *Financing Universal Access to Digital Technologies and
 Services* (2021) ............................................................................... 13

International Telecommunication Union, *How broadband, digitization and ICT regulation impact the global economy: Global econometric modelling* (November 2020) ........................................................... 7

International Telecommunication Union, *The Missing Link Report of the Independent Commission for World Wide Telecommunications Development*, Chapter 10 (1985) ...................................................... 8

ITU and The World Bank, *Digital Regulation Platform; Universal access and service funds* ................................................................. 25

ITU, *Universal Service and Digital Inclusion for All* (2013) ............ 11, 31

ITU Universal Service Report, 2013 ................................................ 25, 26

John D. Burrows, et al., *National Regulatory Research Institute, Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08 (June, 1994) .......................................................... 5, 6

Milton L. Mueller, Jr., *Universal Service, Competition, Interconnection, and Monopoly in the Making of the American Telephone System* (1997) ...................................................................................... 8

Scott Wallsten, *Reverse Auctions and Universal Telecommunications Service: Lessons From Global Experience*, 61 Fed. Comm. L.J. 373 (March, 2009) .......................................................................... 5

The Organization of American States, Inter-American Telecommunication Commission (CITEL), *Initiatives to Expand Telecommunications/ICT in Rural, Unserved or Underserved Areas* ................................................................................... 7

United Nations, Department of Economic and Social Affairs, Poverty, *Information and communication technologies (ICTs)* ..................... 7

Universal Service Administrative Co., *Appeals and Audits* ........... 27, 30

Universal Service Administrative Co., *Board of Directors* ................... 27

Universal Service Administrative Co., *Datasets* ................................... 29

*Report on The Future of the Universal Service Fund,* WC Docket No. 21-476, Notice of Inquiry, FCC 21-127 (rel. Dec. 15, 2021) .... 28

Verizon, *Understanding Your Bill* ....................................................... 19

## FCC Materials

*American Broadband & Telecommunications Company, Jeffrey S. Ansted*, DA 22-421, Order (June 3, 2022) ...................................... 30

*Amendment to Part 69 of the Commission's Rules Relating to the Assessment of Charges for the Universal Service Fund and Lifeline Assistance*, CC Docket Nos. 78-72 and 80-286, Memorandum Opinion and Order, 4 FCC Rcd. 6134 (1989) ................................. 15

*Changes to the Board of Directors of the National Exchange Carrier Association, Inc. and Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order and Second Order on Reconsideration, 12 FCC Rcd. 18400 (1997) ............................ 26

*Changes to the Board of Directors of the National Exchange Carrier Ass'n, Inc. and Federal-State Joint Board on Universal Service,* CC Docket Nos. 97-21 and 96-45, Third Report and Order, Fourth Order on Reconsideration in CC Docket No. 97-21 and Eighth Order on Reconsideration in CC Docket No. 96-45, 13 FCC Rcd. 25058 (1998) ................................................................................... 27

*Connect America Fund, et al.*, WC Docket No. 10-90, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 (2011) .................................................................................... 22

*DataConnex, LLC*, FCC 18-9, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd. 1575 (2018) ............................................. 30

FCC, *Affordable Connectivity Program* .................................................. 28

*High-Cost Universal Service Support,* WC Docket No. 05-337, Order on Remand and Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd. 6475 (2008) ............................................ 5

*MTS and WATS Market Structure*, CC Docket Nos. 78-72 and 80-286, Report and Order, 2 FCC Rcd. 2953 (1987) ................................... 15

*Network Services Solutions, LLC, Scott Madison*, FCC 17-70, Amendment to Notice of Apparent Liability for Forfeiture and Order, 32 FCC Rcd. 5169 (2017) .................................................... 30

*Promoting Telehealth in Rural America*, WC Docket No. 17-310, Report and Order, 32 FCC Rcd. 7335 (2019) ..............................................30

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd. 14284 (2020) ...................6

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, Huawei Designation, ZTE Designation*, WC Docket No. 18-89, PS Docket Nos. 19-351, 19-352, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423 (2019) ..............................................9

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 35 FCC Rcd. 7821 (2020) ..............................................9

*Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Third Report and Order, 836 FCC Rcd. 11958 (rel. July 14, 2021) ........................................9

# GLOSSARY

FCC     Federal Communications Commission

ITU     International Telecommunication Union

USAC   Universal Service Administrative Company

USF     Universal Service Fund

## INTEREST OF AMICUS CURIAE[1]

Amicus Robert Frieden holds the rank of Academy and Emeritus Professor of Telecommunications and Law at Penn State University. His published work includes universal service funding reform with emphasis on new strategies for making access to voice and data services affordable and widely available. He has published four books, over one hundred articles, and numerous book chapters and monographs on telecommunications policy and law. He frequently makes pro bono contributions, including amicus briefs, filings in Federal Communications Commission ("FCC") proceedings, and participation in forums organized by the International Telecommunication Union, the United Nations, the World Bank, universities, and other institutions. *See Curriculum Vitae* (Attachment A).

Petitioners ask this Court, in one fell swoop, to eliminate entirely the FCC's longstanding Universal Service Fund ("USF"). Missing from

---

[1]    This brief is submitted with the consent of all parties and intervenors. Undersigned counsel for amicus curiae certifies that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for preparing or submitting this brief; and no one other than amicus curiae and his counsel have contributed money for preparing or submitting this brief.

Petitioners' opening brief, however, is virtually any historical context regarding universal service in this country, even before introduction of the USF program in 1996 and, in particular, almost a Century's worth of efforts by Congress, the FCC, and the telecommunications industry to ensure that rural areas, schools, libraries, healthcare facilities, and low-income segments of society have equal access to essential voice and data services.

Professor Frieden is well-positioned to provide this Court with the proper historical perspective about how universal service has played a crucial role in this country, including developments leading up to the formal establishment of the USF program in 1996. This filing briefly: (i) traces the purposes and goals of universal service, particularly in promoting access parity and affordability; (ii) summarizes the history of universal service in this country and abroad; (iii) identifies the technological and market forces underlying the significant expansion of the universal service mission for the benefit of residents everywhere in this country; and (iv) discusses the unappreciated advantages in relying on a non-governmental entity, in this case the Universal Service Administrative Company ("USAC"), to implement the USF program.

## SUMMARY OF ARGUMENT

Going back to the early 1900s, the federal government and telecommunications industry have worked to expand affordable voice and data services to those segments of society that might have been otherwise left behind.  Realizing that a fully connected citizenry is necessary to promote civil and political discourse, enhance the business environment, improve education, and support public health and safety, these efforts have evolved over time.  What began with AT&T supporting the expansion of telecommunication services using profits generated by long-distance service to subsidize local telephone service is now achieved through the FCC's Universal Service Fund ("USF") in which carriers pass through legislatively mandated subsidy contributions to telecommunications service subscribers.

Even today, new technological advances and ever-changing market forces require adjustments to the USF to meet the twin goals of affordable and ubiquitous access to telephone and broadband services. Indeed, with the explosion of broadband and wireless networks, the United States and countries around the world increasingly rely on universal service subsidies to bring much needed access to rural locales,

3

low-income subscribers, and schools, libraries, and healthcare facilities. Further, to manage this increasingly complex task of collecting funds and dispersing them to countless beneficiaries, Congress and other national governments have established private entities, like the Universal Service Administrative Company ("USAC"), to collect and disburse funds subject to appropriate government oversight.

The benefits of such arrangements clearly serve the public interest. Assigning administrative duties to an entity separate from the regulator allows for more efficient use of funds, ensures impartiality of the fund administrator, facilitates transparency and auditing, eliminates the need to hire more government employees, helps guard against waste, fraud, and abuse, and establishes a management system that is nimble and able to quickly adjust to changing circumstances. Although this approach has been subject to litigation in the past based on claims that Congress and/or the FCC have reached beyond their authority or acted in an unconstitutional manner, courts have roundly rejected such arguments and upheld the universal service ideal.

Accordingly, this Court should deny the petition for review.

**ARGUMENT**

**I.    The United States and Countries Throughout the World Have Prioritized Universal Access to Affordable Telecommunications on Par with Electricity, Water, and Other Essentials.**

In their zeal to wipe the FCC's current USF program completely off the books, Petitioners make little mention of the compelling reasons why most nations actively promote affordable and widely accessible voice and data services.[2]  Soon after the introduction of telephone service, telecommunications company executives, elected representatives, and the public largely supported the goal of ubiquitous and affordable service:

> It is commonly thought that schools, businesses, hospitals, units of government, families, neighborhoods, and public safety institutions benefit and function more efficiently and effectively if all of society has telecommunications service.  John D.

---

[2]    "Nearly every country in the world has universal service or access regulations in an attempt to ensure that everyone in the country can access telecommunications services at affordable prices…"  Scott Wallsten, *Reverse Auctions and Universal Telecommunications Service: Lessons From Global Experience*, 61 Fed. Comm. L.J. 373 (March, 2009) (tracking use of reverse auctions to achieve universal service goals at the lowest cost).  *See also High-Cost Universal Service Support,* WC Docket No. 05-337, Order on Remand and Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd. 6475 (2008) (early adoption in the U.S of reverse auctions to achieve more efficient disbursement of universal service funds).

Burrows, *et al.*, National Regulatory Research Institute, *Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08, 55 (June, 1994); retrieved from: https://pubs.naruc.org/pub/FA85D879-91E5-8025-F857-8CCD4395DC24.

Universal telephone service generates substantial societal, national security,[3] and economic dividends:

Universal access in the digital era goes beyond extending networks, addressing the use of those networks and framing broadband as a key enabler of digitalization.  Evidence of digitalization can be seen throughout society, whether in financial technology applications, such as mobile money and mobile wallets to ensure that anyone with a mobile phone can be banked, or in e-health and online education services, which have been transformative and had a significant economic impact.  *Financing universal access to digital technologies and services*, 8 (2021); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF-2021-ECO_FIN-PDF-E.pdf.

---

[3]     In light of newly identified risks that equipment manufactured by Chinese companies may support government ordered surveillance and service disruption, Congress allocated funds for carriers, receiving universal service funding, to extract and replace such plant.  Secure and Trusted Communications Networks Act of 2019, Pub. L. 116-124, 133 Stat. 158 (2020), *codified at* 47 U.S.C. § 1601 *et seq.  See also Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd. 14284 (2020).

Several global and regional intergovernmental organizations, including the International Telecommunication Union ("ITU"),[4] United Nations,[5] and the Organization of American States,[6] have declared universal access to both voice and broadband data services an essential,

---

[4]    *See, e.g.*, International Telecommunication Union, *How broadband, digitization and ICT regulation impact the global economy: Global econometric modelling* (November 2020); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF.BDR-2020-PDF-E.pdf.

[5]    "There is growing global consensus that the Information and communication technologies (ICTs), and particularly Internet are providing a new framework and huge opportunities for economic, political and social development.  The World Summit for Social Development (WSSD, Copenhagen, 1995) recognized that the new information technologies and new approaches to, access to, and use of technologies by people living in poverty can help in fulfilling social development goals; and therefore recognize the need to facilitate access to such technologies.  WSSD emphasized that promoting access for all to education, information, technology and know-how is an essential means for enhancing communication and participation in civil, political, economic, social and cultural life, and for ensuring respect for civil, political, economic, social and cultural rights."  United Nations, Department of Economic and Social Affairs, Poverty, *Information and communication technologies (ICTs)*; retrieved from: https://www.un.org/development/desa/socialperspectiveondevelopment/issues/information-and-communication-technologies-icts.html.

[6]    *See, e.g.,* The Organization of American States, Inter-American Telecommunication Commission (CITEL), *Initiatives to Expand Telecommunications/ICT in Rural, Unserved or Underserved Areas*; retrieved from: https://www.oas.org/ext/en/main/oas/our-structure/agencies-and-entities/citel.

core mission.[7]  In 1985, the ITU endorsed the goal to "bring all mankind

within easy reach of a telephone by the early part of the next century."[8]

Society benefits when residents in rural, high-cost areas can

accrue the same opportunities from accessing telecommunications and

information networks available to residents in densely populated areas

having much lower service costs.[9]  Telecommunications carriers and

governments long ago recognized the merits in generating a pool of

funds to stimulate greater geographical penetration of networks into

rural areas, beyond what marketplace resource allocation would

achieve.  Similarly, universal service funds defray the cost of

---

[7]      "Given the vital role telecommunications play not only in such
obvious fields as emergency, health and other social services,
administration and commerce, but also in stimulating economic growth
and enhancing the quality of life, creating effective networks world wide
will bring immense benefits."  International Telecommunication Union,
*The Missing Link Report of the Independent Commission for World Wide
Telecommunications Development*, Chapter 10, 65 (1985); retrieved
from: https://www.itu.int/en/history/Pages/MaitlandReport.aspx.

[8]      *Id*. at 6.

[9]      "The importance of rapid, widespread telecommunications to
government, business, and society can scarcely be overstated.  Because
communications infrastructure coordinates and unifies a country in
countless ways, the universal service concept spans the realms of
economic and social policy."  Milton L. Mueller, Jr., *Universal Service,
Competition, Interconnection, and Monopoly in the Making of the
American Telephone System*, 1 (1997).

subscribing to telecommunications services making it possible for more people to connect, including individuals whose financial circumstances would have foreclosed access, absent a financial subsidy.

In addition to supply-side financial support, many countries stimulate demand for services by partially defraying the cost of equipment needed for network access, now including wireless handsets, personal computers, modems, and routers. Such demand-side promotion helps existing and prospective subscribers acquire the digital literacy skills needed for accessing the variety of new services available via broadband digital networks. Safe, secure, affordable, and ubiquitous access to telecommunications also enhance societal wellbeing, including the ability to communicate and transact personal and business matters without foreign surveillance and disruption.[10]

---

[10]     *See, e.g.*, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, Huawei Designation, ZTE Designation*, WC Docket No. 18-89, PS Docket Nos. 19-351, 19-352, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423 (2019); *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 35 FCC Rcd. 7821 (2020), *petition for review denied, Huawei Technologies USA, Incorporated v. Federal Communications Commission*, 2 F.4th 421 (5th Cir. 2021); *Protecting Against National Security Threats to the*

Telecommunications networks increase in value as the number of connections and subscribers increase, what economists classify as a positive networking externality.[11]  Connectedness for all emphasizes parity, with less regard for the costs incurred in serving specific subscribers and locales.

To improve access, private actors, such as telephone companies and public actors, including legislatures and National Regulatory Authorities throughout the world, have relied on market countervailing or augmenting initiatives.  A key universal service strategy, used throughout many different phases and spanning decades, consists of subsidy funding, which creates a pool of funds available to support and

---

*Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Third Report and Order, 836 FCC Rcd. 11958 (rel. July 14, 2021).

[11]    "It is widely accepted that the value received by the users of the public switched telecommunications network [a common reference to voice telephone lines] is increased by the addition of new users.  An externality occurs because more value or service is received because more people can call or be called by the user.  Extension or outreach actions designed to attract or maintain users on the system are cost justified, in part, because of these received externalities," John D. Borrows, *et al.*, National Regulatory Research Institute, *Universal Service in the United States: Dimensions of the Debate*, NRRI 94-08, 55 (June, 1994); retrieved from: https://pubs.naruc.org/pub/FA85D879-91E5-8025-F857-8CCD4395DC24.

reduce the price of services deemed worthy of such promotional pricing. Subsidy beneficiaries include carriers operating in expensive-to-serve rural areas, schools, libraries, healthcare facilities, the elderly, and people with low incomes regardless of location.

Most nations, including the United States, create subsidy funding pools without taxation:

> USFs are typically funded via some form of contribution mechanism from telecommunication service providers/operators. In the majority of cases, the operator contributions are in the form of a levy based on a percentage of annual operating revenues. International Telecommunication Union, *Universal Service and Digital Inclusion for All*, 1 (2013); retrieved from: https://www.itu.int/en/ITU-D/Regulatory-Market/Documents/USF_final-en.pdf.

As discussed below, U.S. carriers initially opted to price interstate, long distance telephone service at rates sufficient to subsidize infrastructure buildouts into locales with low population densities and to offer intrastate, local telephone service at low rates with an eye toward stimulating subscribership. Later, governments and agencies, including the FCC, established rules, procedures, and regulations designed to achieve the same outcome:

> Universal service has been a fundamental goal of federal telecommunications regulation since the

11

passage of the Communications Act of 1934. Indeed, the FCC's very purpose is "to make available, so far as possible, to all the people of the United States ... a rapid, efficient, Nation-wide, and world-wide wire and communication service with adequate facilities at reasonable charges." *Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 613 (5th Cir. 2000), *quoting* 47 U.S.C. § 151 (as amended) and *citing Texas Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 405–06 & n. 2 (5th Cir. 1999).

The recent Covid-19 epidemic provides clear evidence of the harms resulting from inferior or nonexistent access to essential services available via telecommunications lines, such as education, government and commercial transactions, health care, self-expression, and entertainment. The need for unconnected people to seek a wireless broadband connection far from home dramatically evidences the importance of the universal service mission.[12]

---

[12] "COVID-19 has led to unprecedented limitations on people's mobility as governments have sought to curb the spread of the airborne virus and avert crises in unprepared health systems across the world. Following the varying levels of restrictions put in place globally at different periods throughout 2020 and into 2021, people have been forced to turn to e-learning, remote working, online shopping and even virtual funerals. The pandemic has opened the door to the use of digital technology in ways never before imagined and given real meaning to the prefixes 'e-,' 'remote,' 'virtual,' 'online' and 'distance.' During this time, digital technology has been crucial – for those with access. While on the one hand, the crisis has led to the fast-tracking of digital adoption in countries that already had some level of digitalization; on

## II.    The FCC's Current USF Program Evolved From Universal Service Funding Occurring Prior to 1996.

In their opening brief, Petitioners also give short shrift to the historical underpinnings of today's USF program.  In the U.S., universal service became a goal soon after the introduction of telephone service.  In 1907, AT&T President Theodore N. Vail highlighted the company's commitment with the phase "One Policy, One System, Universal Service."  In application, this goal included self-serving interests in promoting a Bell System "natural monopoly," bolstered by refusals to interconnect its network with other carriers and an aggressive campaign to acquire these independent companies.  On the other hand, AT&T expressed a commitment to serve the national interest by expanding service far and wide, thereby promoting economies of scale and accrual of positive network externalities.

---

the other, it has exposed digital inequalities, which are particularly large in less developed economies.  Never has the impact of the digital divide been so glaring."  International Telecommunication Union, Development Sector, *Financing universal access to digital technologies and services*, 1 (2021); retrieved from: https://www.itu.int/dms_pub/itu-d/opb/pref/D-PREF-EF-2021-ECO_FIN-PDF-E.pdf.

In settling the first of several antitrust lawsuits filed by the Justice Department, AT&T Vice President Nathan Kingsbury, in 1913, announced a commitment to stop acquiring independent companies, to divest the company's investment in Western Union, the primary provider of text-based services, and to permit independent telephone companies to connect their networks with AT&T's long-distance facilities.

As AT&T's revenues grew, so too did market penetration of basic telephone services, albeit primarily in urban locales. On its own accord, AT&T sought to bolster network expansion into rural areas by charging high long-distance rates and using some of the profits to maintain or reduce local phone service subscription fees. Eight years after its commitment not to acquire competitors, AT&T resumed acquisition of independent telephone companies as permitted by the Willis Graham Act of 1921. The federal government treated AT&T as a natural monopoly subject to oversight by the Interstate Commerce Commission.

Eventually, AT&T's privately conceived and implemented universal service subsidy mechanism became federal regulatory policy. Starting in the 1950s, the FCC established universal service policies

and rules based on a general mandate contained in Title I of the

Communications Act of 1934, 47 U.S.C. § 151 *et seq*., to promote the

wider use of wire and radio.  In consultation with the major telephone

industry trade association, and later a Federal-State Joint Board on

Universal Service, as authorized by 47 U.S.C. § 410(c), the FCC

established as federal policy AT&T's previously implemented strategy

of using long distant rates to subsidize local service and promote

universal service objectives.  *MTS and WATS Market Structure*, CC

Docket Nos. 78-72 and 80-286, Report and Order, 2 FCC Rcd. 2953

(1987); *Amendment to Part 69 of the Commission's Rules Relating to the*

*Assessment of Charges for the Universal Service Fund and Lifeline*

*Assistance*, CC Docket Nos. 78-72 and 80-286, Memorandum Opinion

and Order, 4 FCC Rcd. 6134 (1989).

     The FCC sought to make the process clear, uncontroversial, and

consistent with AT&T's prior decision to subsidize local rates.  The

Commission's new cost allocation methodology maintained the status

quo by assigning a disproportionate share of AT&T's network costs to

the interstate service sector.  The Commission's action matched existing

goals of incumbent telephone companies and took advantage of ample

flexibility in allocating plant costs because most telecommunications

capital expenditures constitute a "sunk cost" that does not vary with

usage.  A telephone company must invest in network infrastructure

capable of providing both intrastate and interstate services, and be able

to handle peak traffic volumes:

> Thus long-distance callers, charged on the basis of the frequency and distance of their calls, covered through their payments a significant portion of the costs of local subscriber plant.  Revenues paid in by long-distance callers were shared by AT & T with the local companies through a process called settlements and division of revenues.
>
> That basic system remains in effect today.  The FCC, working with a Federal-State Joint Board established pursuant to 47 U.S.C. § 410(c) (1976), allocates local plant costs between the interstate jurisdiction (FCC controls recovery of costs) and the intrastate jurisdiction (state commissions control recovery of costs).  This mode of allocation—the "separations process"—currently assigns roughly 26% of the costs of local exchange plant to the interstate jurisdiction.[13]

---

[13]    *National Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 737 F.2d 1095, 1105 (D.C. Cir. 1984), *citing* Amendment of Part 67, 89 F.C.C.2d 1, 5, *modified*, 90 F.C.C.2d 522, *recon. denied*, 91 F.C.C.2d 558 (1982); *MCI Telecommunications Corp. v. F.C.C.*, 712 F.2d 517, 523 & n. 4 (D.C. Cir.1983).

In close coordination with telephone companies, the FCC decided

to allocate 25% of non-traffic sensitive costs to interstate services, a

decision considered reasonable by a reviewing court:

> Allocating twenty-five percent of NTS costs to
> interstate jurisdiction in effect transfers those costs to
> the rate bases of interstate carriers, forces them to
> recover those costs through their rates, and reduces
> their profitability.  The Supreme Court, however, has
> reviewed statutorily authorized economic regulation
> with great deference. . . .
>
> In this case, nothing in the record suggests that the
> Commission's allocation of twenty-five percent of NTS
> costs to the interstate jurisdiction constitutes a
> confiscation of MCI's property. . . .
>
> [W]e can discern no difference rising to the level of a
> Takings Clause objection. *Rural Telephone Coalition v.
> F.C.C.*, 838 F.2d 1307, 1313-1314 (D.C. Cir. 1988).

The court in *Alenco Communications* also ruled that despite the

possible reduction in a carrier's profitability, compliance with FCC

universal service regulations did not constitute an unlawful confiscation

or taking of property:

> [P]etitioners do not present credible evidence that the
> Order ever will cause the drastic consequences for
> rural LEC's articulated in *Duquesne* [*Duquesne Light
> Co. v. Barasch*, 488 U.S. 299, 307 (1989)].  The mere
> fact that, "[f]or many rural carriers, universal service
> support provides a large share of the carriers'
> revenues," Order ¶ 294, is not enough to establish that

17

> the orders constitute a taking.  The Fifth Amendment
> protects against takings; it does not confer a
> constitutional right to government-subsidized
> profits.  *Alenco Communications*, 201 F.3d at 624.

The onset of long-distance telephone service competition

eliminated the continuing use of a simple cost allocation methodology to

create a subsidy mechanism to promote universal service.  When

companies, such as MCI, entered the long-distance market, AT&T could

no longer maintain the local service subsidy because MCI and other

market entrants offered much lower rates.  MCI forced long distance

rates closer to being cost-based, despite having to interconnect with the

Bell System on terms, conditions, and rates designed by AT&T to

thwart competition.  Then, with the 1984 divestiture of the Bell

Operating Companies, AT&T lost control over the terms and conditions

regarding access to the local exchanges used to originate and terminate

long distance calls.  The newly independent Bell companies established

cost-based access charges applicable to both AT&T and its competitors.

As a result, between 1984 and enactment of the

Telecommunications Act of 1996, the FCC initiated numerous

regulatory proceedings to structure access pricing in a fair, transparent,

and cost-based manner.  No longer able to rely on high long-distance

rates to generate a source for subsidization, the FCC shifted much of the financial burden on accessing long distance networks via local telephone exchanges directly onto consumers.  The Commission opted to apply flat-rate "access charges" that appeared on customers' local telephone service bills as new line items, such as the Subscriber Line Charge.[14]  This fee replaces retail long distance rates as the primary source of compensation to local exchange carriers for their so-called first mile delivery of long-distance calls to an interexchange carrier, such as MCI and AT&T, and the last mile delivery from an interexchange carrier to the intended call recipient.

Throughout this transition from monopoly to competitive marketplace, the FCC adjusted universal service funding procedures making it clear that consumers would directly compensate local

---

[14]    Verizon, a major U.S. Local Exchange Carrier, offers the following description of this monthly charge: "The FCC has mandated an access charge (known as the FCC Line Charge) to partially reimburse telephone service providers for the cost of routing long distance calls made by local customers.  This charge is applied to all customers who have telephone lines in their home or business, whether they make long distance calls or not.  This is also known as the Federal Subscriber Line Charge and the Federal Line Cost Charge. Verizon, *Understanding Your Bill*; retrieved from https://www.verizon.com/business/support/billing/understanding-billing-charges/.

exchange carriers for the costs of providing access to their networks. Reviewing courts largely deferred to the Commission's expertise and determination that it needed to establish a multi-year transition from long distance revenues, serving as the primary source of universal service subsidies, to new billing line items on subscribers' bills: "[I]t is reasonable to conclude that Congress left a gap to be filled by the FCC, i.e., for the FCC to determine and specify precisely how USF funds may or must be used." *In re FCC 11-161*, 753 F.3d 1015, 1046 (10th Cir. 2014).

Likewise, no court has embraced Petitioners' assertion that universal service contributions from carriers and their subscribers constitute an unconstitutional taking or tax: "We also find unacceptable MCI's argument that the twenty-five percent allocation [of carriers' non traffic sensitive plant investment] is an exercise of taxing power that Congress has not delegated to the Commission." *Rural Telephone Coalition*, 838 F.2d at 1314.

### III. The Universal Service Mission Spans Decades and Has Changed in Terms of Scope, Technologies Supported, Methods to Promote Widespread and Affordable Access, Who Qualifies for Financial Support, and How to Finance, Structure, and Manage the Subsidy Process.

While Petitioners characterize the growth of universal programs as largely a power grab by the FCC, in reality, legitimate technological and market forces have resulted in the broad USF program we see today. Achieving progress in terms of broader geographical reach, affordability, and demand requires both creative thinking and skillful accounting. Telecommunications networks typically require very high initial capital expenditures in infrastructure that carriers must install and activate before accruing any revenues. Having made these sunk investments, carriers can accrue positive networking externalities because low incremental cost to add a subscriber creates opportunities to expand subscriber numbers quickly and inexpensively. Universal service subsidies help carriers extend their networks into rural areas, where incremental costs remain high because of low population density, difficult terrain, harsh climate, and other factors.

Over time, universal service goals and funding strategies have changed because of technological innovations, diversifying consumer

requirements and interests, identification of new subsidy beneficiaries, such as schools and healthcare facilities, and disruptions to the ability of carriers to generate sufficient funds for subsidies due to the onset of competition. These factors collectively have made the universal service mission more comprehensive, diversified, and expensive.

Even as universal service funding continues to improve subscribership of voice telephone service, many nations have expanded the mission to include broadband network access and the variety of services available via the Internet: "The universal service challenge of our time is to ensure that all Americans are served by networks that support high-speed Internet access—in addition to basic voice service—where they live, work, and travel." *Connect America Fund, et al.*, WC Docket No. 10-90, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, 17668 (2011).

Expanding the number and type of subsidy recipients greatly complicates the process of collecting and dispersing funds, and increases the total amount of necessary subsidies, because carriers must upgrade and eventually replace existing networks to provide broadband

connections.  Additionally, broadband subscribers need to rent or purchase new equipment to secure network access.

Conventional marketplace forces create incentives for telephone companies to install new wireless networks, and to retrofit, and later, to use new fiber optic lines to provide broadband service.  However, these so-called next generation networks, equipped to handle ever increasing demand for broadband services, such as video and high-speed Internet access, first appear in densely populated areas where ample numbers of prospective subscribers desire such enhanced service and are willing, and able, to pay higher rates for them.

Additionally, most legacy wireline carriers, such as AT&T, Verizon, CenturyLink, and Frontier, currently maintain two separate networks: legacy voice telephone networks and newly installed broadband networks.  The D.C. Circuit Court of Appeals rejected telephone company assertions that they should not have to maintain their legacy copper wire network, because new wireless networks offer better service:

> [W]e owe deference to the FCC's decision to hold a
> preexisting regime in place for an interim period, so as
> to avoid commandeering agency resources and to
> respect the agency's judgments about how to maintain

baseline universal service in the context of
uncertainties attending a major regulatory transition.
Second, in response to Petitioners' generalized
allegations that vulnerable consumers do not need the
disputed services and that the existing program leaves
Petitioners with underfunded obligations, the FCC has
made clear that it will grant case-by-case forbearance
or supplemental funding in areas where providers can
meet their burden to show that their services are not
required or that they need additional financial help.
Especially in the context of this systemic regulatory
transition, no more is required. *AT&T, Inc. v. Federal
Communication Commission*, 886 F.3d 1236, 1241
(D.C. Cir. 2018).

Telecommunications carriers and their subscribers

understandably have concerns about increasing universal service

funding requirements, occurring at the same time as other costs rise.

However, a significant portion are either transitory or occasional.

Carriers soon will retire their terrestrial, wireline networks as more

subscribers migrate to wireless networks. Subscribers of broadband

services can expect their newly acquired modems and routers to last for

several years. Additionally, both Congress and the FCC can devise

remedies to growing universal service financial burdens borne by

telecommunications subscribers by expanding what types of services

and service providers should be subject to the contribution requirement.

24

However, the need for timely and effective reforms to the universal service funding process does not justify abandonment of the mission.

## IV.    Many National Governments have Created a Separate or Affiliated Entity to Manage Universal Service Funds Collection and Distribution, Subject to Oversight by the National Regulatory Authority or Ministry.

Petitioners criticize the use of a separate non-governmental entity for managing universal service programs, but ignore the numerous benefits of such arrangements.  A list of best practices in universal service funding and management, compiled by the International Telecommunication Union, recommends "[e]stablishment of the USF as [a] separate, independent (autonomous) entity."  2013 ITU Universal Service Report at 21.  Creating an independent and well-qualified fund administrator promotes efficiency, impartiality, and professionalism.[15]

Because of the complexity in collecting and disbursing universal service funds among a diverse and expanding array of beneficiaries, most national governments have opted to rely on an organization

---

[15]    A joint program of the ITU and The World Bank recommends "autonomous UASFs in administrative budgeting and allocation of resources."  ITU and The World Bank, *Digital Regulation Platform*; *Universal access and service funds*, retrieved from: https://digitalregulation.org/access-for-all/.

unaffiliated with the National Regulatory Authority or Ministry, but subject to its oversight. *See, e.g.*, 2013 ITU Universal Service Report at 24-117; Digital Regulation Platform, Indonesia's Universal Service Obligation Fund (Sep. 24, 2020); retrieved from:

https://digitalregulation.org/indonesias-universal-service-obligation-fund/ (a public service institution separate from the Directorate General of Posts and Telecommunications regulator manages the Universal Service Obligation Fund). Such a separate entity can secure the services of people with the necessary expertise, but not at the expense of adding hundreds, or even thousands more federal government employees.

Having a separate organization, such as the Universal Service Administrative Company in the United States, promotes greater transparency, accountability, and efficiency in the collection and disbursements of funds.[16] Additionally, such an organization can

---

[16]     The FCC designated USAC as the interim USF Administrator in 1997. USAC became the permanent Fund Administrator in 1998. *See Changes to the Board of Directors of the National Exchange Carrier Association, Inc. and Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order and Second Order on Reconsideration, 12 FCC Rcd. 18400 (1997); *Changes to the Board of Directors of the National Exchange Carrier Ass'n, Inc. and Federal-State*

maintain its independence from specific stakeholders and funding

beneficiaries that might attempt to lobby the telecommunications

regulator with an eye toward thwarting reforms.[17]  Similarly, an

independent body can offer unbiased forensic assessments whether a

carrier has achieved progress in reaching universal service goals,

conduct periodic audits of beneficiaries' use of funds,[18] and offer focused

diligence to identify waste, fraud, and other abuses.

---

*Joint Board on Universal Service,* CC Docket Nos. 97-21 and 96-45, Third Report and Order, Fourth Order on Reconsideration in CC Docket No. 97-21 and Eighth Order on Reconsideration in CC Docket No. 96-45, 13 FCC Rcd. 25058 (1998).

[17]    The composition of USAC's nineteen Board of Directors represents a wide array of stakeholders including three directors from schools eligible to receive subsidies, one director from an eligible library, and two directors from eligible rural health care providers that are eligible to receive discounts.  Additionally, seven directors must represent one of the following constituencies: eligible consumers, state telecommunications regulators, state consumer advocates, wireless providers, competitive local exchange carriers, cable operators, and information service providers.  Universal Service Administrative Co., *Board of Directors*; retrieved from: https://www.usac.org/about/leadership/board-of-directors/.

[18]    *See* Universal Service Administrative Co., *Appeals and Audits*; retrieved from: https://www.usac.org/lifeline/rules-and-requirements/appeals-audits/.

As technology evolves and existing or prospective consumer requirements change, an independent universal service funding organization can readily adapt to new circumstances and implement administrative refinements.[19]  Congress recently validated the importance of having the USAC available to manage new universal service funding initiatives in response to the Covid-19 pandemic.  The 2021 Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) authorizes the FCC to rely on USAC for implementation of the Affordable Connectivity Program that allocates $14.2 billion[20] in additional universal service funding support during the Covid-19 pandemic. USF Reform NOI at ¶48, *citing* Infrastructure Investment and Jobs Act, div. F, title V, §§ 60502(a)(2)(C), (a)(2)(E); Consolidated Appropriations Act, div. N, tit. IX, § 904(i)(5) (2021).

---

[19]    On its own accord and at the direction of Congress, the FCC regularly seeks to improve the universal service funding program, with an eye toward reducing waste and adapting to changed circumstances. *See, e.g.*, *Report on The Future of the Universal Service Fund,* WC Docket No. 21-476, Notice of Inquiry, FCC 21-127 (rel. Dec. 15, 2021) [hereinafter cited as USF Reform NOI].

[20]    *See*, FCC, *Affordable Connectivity Program*; retrieved from: https://www.fcc.gov/acp; Universal Service Administrative Co.*, Affordable Connectivity Program*; retrieved from: https://www.usac.org/about/affordable-connectivity-program/.

Additionally, the Consolidated Appropriations Act recognizes the merits in having USAC evaluate and authenticate applicant qualifications for new universal service funding. The Act "includes language specifying that the Secretary of Agriculture, the Secretary of Education, and the Secretary of Health and Human Services shall enter into a memorandum of understanding with USAC to provide for the expeditious sharing of data through the National Verifier, or any successor system, for the purposes of verifying consumer eligibility for the program. *Id*. at n. 79, *citing* Infrastructure Act, div. F, title V, § 60502(e).

USAC serves an ever-increasing number of beneficiaries, including 8.1 million individuals, 1.2 million households qualifying for discounted telecommunications and broadband service, 128,147 schools and libraries, and 9,050 rural health care facilities.[21] Predictably, the amount of funds available and a large group of subsidy candidates

---

[21]    Universal Service Administrative Co., *Datasets*; retrieved from: https://opendata.usac.org/.

create incentives for criminal conduct and uncertainty about who

qualifies and how much they should receive.  Both USAC[22]

and the FCC[23] conscientiously work to identify and sanction abuses

through audits and investigations.

## CONCLUSION

Throughout the sequence of private, regulatory agency, and

legislative initiatives, the United States has led the world in developing

---

[22]     *See* Universal Service Administrative Co., *Appeals & Audits*; retrieved from: https://www.usac.org/about/appeals-audits/.

[23]     "[I]ncreased demand and resulting administrative challenges [have] required us to take a closer look at whether the current rules and procedures are cost-effective and efficient and adequately protect the Universal Service Fund against waste, fraud, and abuse." *Promoting Telehealth in Rural America*, WC Docket No. 17-310, Report and Order, 32 FCC Rcd. 7335, 7336 (2019). *See also American Broadband & Telecommunications Company, Jeffrey S. Ansted*, DA 22-421, Order (rel. June 3, 2022) (recovering $16,618,235.44 for, *inter alia*, failing to maintain proper procedures to ensure compliance with the Commission's rules, and seeking subsidies for ineligible and duplicate accounts and deceased individuals); *DataConnex, LLC*, FCC 18-9, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd. 1575 (2018) (proposing an approximately $19 million forfeiture for filing forged, false, misleading, and unsubstantiated information to increase funding); *Network Services Solutions, LLC, Scott Madison*, FCC 17-70, Amendment to Notice of Apparent Liability for Forfeiture and Order, 32 FCC Rcd. 5169 (2017) (proposing an approximately $22 million forfeiture for alleged violations including preparing and transmitting forged and false documents).

a funding and management system to achieve universal service goals.

Private and public sector initiatives have made it possible for this

nation to accrue economic development and societal benefits. Because

circumstances change, the ongoing accrual of such benefits has required

frequent reassessments and modifications of the universal service

funding system. Reviewing courts have evaluated both the baseline

foundations for creating a funding mechanism, as well as the many

modifications and refinements undertaken by the FCC over decades.

The Commission's initiatives have been affirmed, based on the prudent

determination that a legislative mandate exists, and the FCC has

reasonably interpreted how to generate the best outcomes consistent

with congressional guidance.

 Reviewing courts have rejected as misguided and illogical claims

that the FCC has exceeded its statutory authority and has engaged in

unconstitutional activities. The United States universal service funding

system comports with global best practices.[24] When it becomes

---

[24] An important comparative study of national universal service
funding regimes ranked the United States in the highest category for
engagement and performance, a top designation assigned to only 38% of
the 69 mostly developed nations studied. ITU, *Universal Service and
Digital Inclusion for All* at 4, 112.

apparent that it must fine-tune and revise the funding and disbursement process, the FCC has made timely corrections. Such midcourse corrections have occurred because of changed circumstances, and occasionally, in response to newly enacted statutory requirements.

Surely the FCC must confront chronic and emerging challenges to the universal service regime, including inefficiency, fraud, declining subscriptions to services subject to a funding requirement, and an expanded mission that now includes broadband access. But none of this justifies a wholesale elimination of the USF program, or a credible basis for challenging the lawfulness of the mission and recommending its abandonment.

Based on the foregoing, this Court should deny the petition for review and affirm as lawful the order of approval issued by the FCC authorizing the Universal Service Contribution Factor for the Second Quarter of 2023, CC Dkt. No. 96-45, DA 23-216 (March 14, 2023).

Respectfully submitted,


/s/ *Eric P. Gotting*
Eric P. Gotting
   *Counsel of Record*
James Baller
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C.  20001
(202) 434-4100 (Phone)
(202) 434-4646 (Facsimile)
gotting@khlaw.com

*Counsel for Amicus Curiae*

Dated: October 2, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,250 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook (14-point).

Dated: October 2, 2023

/s/ *Eric P. Gotting*

**CERTIFICATE OF SERVICE**

I certify that, on October 2, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia through the CM/ECF system, which will serve all parties, intervenors, and amici electronically.

Dated: October 2, 2023

*/s/ Eric P. Gotting*

# ATTACHMENT A

## Curriculum Vitae of Rob Frieden

**Contact Information**

105 Skytop Lane
Port Matilda, PA  16870
(814) 867-2545; email: rmf5@psu.edu
Web page: http://www.personal.psu.edu/rmf5/

**Education Background**

B.A., University of Pennsylvania, 1977 (cum laude with distinction in the major)

J.D. University of Virginia, 1980

**Professional Background**

2021-2022          **WILSON CENTER FELLOW**, Smithsonian Institute, Washington, D.C. Explored the risks and rewards in global spectrum planning at the International Telecommunication Union at the nation's key non-partisan policy forum for tackling global issues through independent research and open dialogue to inform actionable ideas for the policy community.

1992-2021:         **PIONEERS CHAIR AND PROFESSOR OF TELECOMMUNICATIONS AND LAW**, Pennsylvania State University, University Park, Pennsylvania

Teach courses and research issues in the law, regulation, and business of, cybersecurity, electronic commerce, information technologies, intellectual property, outer space, privacy, and telecommunications.  Actively engaged in grant seeking, consulting, outreach, public policy advocacy and in administrative duties which have included serving as Department Head and Chair, promotion and tenure and graduate studies.  Published four books and over one hundred articles in law reviews and other academic journals. Emeritus Professor status conferred July, 2021; Academy Professor status conferred July, 2023 in recognition of continuing excellence in scholarship.

1991-1992:         **DEPUTY DIRECTOR-INTERNATIONAL RELATIONS**, Motorola Satellite Communications, Inc. Washington, D.C. and Chandler, Arizona

Primary manager for spectrum allocation, business development, strategic planning, and international regulatory liaison efforts of the IRIDIUM™ mobile satellite venture.

| | |
|---|---|
| 1989-1991: | **CONSULTANT** |

Sole practitioner providing legal, regulatory and strategic counsel on telecommunications and information management issues including network interconnection, national regulatory policy, carrier disputes and next generation network development.

| | |
|---|---|
| 1988-1989: | **ASSISTANT GENERAL COUNSEL**, Private Trans-Atlantic Telecommunications System, Inc. McLean, Virginia |

Primary in-house counsel for resolving corporate, legal, transactional and regulatory problems affecting construction and operation of the first private international fiber optic cable in the U.S.; Principal negotiator for sale or lease of transmission capacity and for terrestrial backhaul facility contracts to link the cable with urban centers.

| | |
|---|---|
| 1986-1988: | **PROGRAM MANAGER FOR INTERNATIONAL FACILITY AND SERVICE POLICY**, National Telecommunications and Information Administration, Washington, D.C. |

Chief liaison with other federal government agencies for executing international telecommunications treaties and for multilateral coordination on satellite and spectrum policies.  Managed Executive Branch filings at the Federal Communications Commission.

| | |
|---|---|
| 1982-1986: | **ATTORNEY** |

Associate in the communications departments of three prominent Washington, D.C. law firms.  Performed transactional and regulatory services for satellite, fiber optic and wireless carriers, cable television systems and broadcasters.  Prepared pleadings in FCC and judicial cases; briefed clients and Congressional staff on communications policy issues.

| | |
|---|---|
| 1980-1982: | **ATTORNEY ADVISOR,** Federal Communications Commission, Washington, D.C. |

Drafted international telecommunications policies and regulations for public vote by FCC Commissioners. Presided over carrier facility interconnection negotiations.

**Publications**

**Books or Parts of Books**

Rob Frieden, *Operations of Internet Platform Intermediaries*, in APPLIED ECONOMICS IN THE DIGITAL ERA: ESSAYS IN HONOR OF GARY MADDEN, James Alleman, Mohsen Hamoudia & Paul Rappoport (eds.) (New York: Palgrave Macmillan, 2020).

Rob Frieden, *An Introduction to Data Property Ownership Rights and Data Protection Responsibilities*, in RESEARCH ON COMPREHENSIVE NETWORK GOVERNANCE IN THE ERA OF DIGITAL ECONOMY, Bin Zhang, ed. (Beijing: BUPT Press, 2019).

Rob Frieden, *Achieving a Level Competitive Playing Field in a Convergent and Concentrating Telecommunications Marketplace*, in Jorge Pérez Martínez and Zoraida Frías Barroso, eds. A LEVEL PLAYING FIELD FOR THE DIGITAL ECOSYSTEM, 165- 196 (Madrid: Fundación Telefónica, 2016).

Rob Frieden, *Next-Generation Television and the Migration from Channels to Platforms*, in POLICY AND MARKETING STRATEGIES FOR DIGITAL MEDIA, Yu-li Liu and Robert G. Picard, eds., 60-72 (New York: Routledge, 2014).

Rob Frieden, *The Debate Over Network Neutrality in the United States*, in NET NEUTRALITY IN EUROPE, Alain Strowel, ed., 24-45 (Brussels: Bruylant, 2013).

Rob Frieden, *Case Studies in Results-Driven Decision Making at the FCC*, in BEYOND BROADBAND ACCESS, DEVELOPING DATA-BASED INFORMATION POLICY STRATEGIES, Richard D. Taylor and Amit M. Schejter eds., 143-157 (New York: Fordham University Press, 2013).

Rob Frieden, *Government Oversight of Next Generation Wireless Networks*, in REGULATION AND THE PERFORMANCE OF COMMUNICATION AND INFORMATION NETWORKS, Gerald R. Faulhaber, Gary Madden  and Jeffrey Petchey eds. 55-84 (Cheltenham, U.K.: Edward Elgar, 2012).

Rob Frieden, WINNING THE SILICON SWEEPSTAKES: CAN THE UNITED STATES COMPETE IN GLOBAL TELECOMMUNICATIONS?, (New Haven: Yale University Press 2010).

Rob Frieden, *The Way Forward for Wireless*, in … AND COMMUNICATIONS FOR ALL—A POLICY AGENDA FOR A NEW ADMINISTRATION, Amit M. Schejter, ed., 153-166 (Lanham, MD: Lexington Books 2009).

Rob Frieden, *Network Neutrality and Its Potential Impact on Digital Content Platforms*, in THE ECONOMICS OF DIGITAL MARKETS, Gary Madden and Russel Cooper, eds. 265-281(Cheltenham, U.K.: Edward Elgar Publishing 2009).

4

Rob Frieden, *Balancing Equity and Efficiency in Global Spectrum Management*, in GOVERNING GLOBAL ELECTRONIC NETWORKS—INTERNATIONAL PERSPECTIVES ON POLICY AND POWER, William J. Drake and Ernest J. Wilson III, eds., 127-148 (Cambridge, MA.: MIT Press 2008).

Rob Frieden, *Institutional Framework and Competitiveness of the U.S. Telecommunications Market*, in COMPETITIVENESS OF NEW INDUSTRIES-- INSTITUTIONAL FRAMEWORK AND LEARNING IN INFORMATION TECHNOLOGY IN JAPAN, THE U.S AND GERMANY, Cornelia Storz and Andreas Moerke, eds., 103-123 (New York, N.Y.: Routledge 2007).

James Goodale & Rob Frieden, ALL ABOUT CABLE AND BROADBAND, (New York: Law Journal Press 2004-present)(bi-annual updates); https://www.lawcatalog.com/all-about-cable-and-broadband.html.

Rob Frieden, *Satellite Broadcasting*, in ENCYCLOPEDIA OF INTERNATIONAL MEDIA AND COMMUNICATIONS, Donald H. Johnston, ed., Vol. 4, 115-126 (San Diego, CA: Academic Press 2003).

Rob Frieden, *Regulation of Internet-mediated communication and commerce*, in Gary Madden, ed., EMERGING TELECOMMUNICATIONS NETWORKS, Vol. II, 107-128 (Cheltenham, U.K.: Edward Elgar 2003) (web promotion of this two volume work available at http://www.e-elgar.co.uk/.

Rob Frieden, MANAGING INTERNET-DRIVEN CHANGE IN INTERNATIONAL TELECOMMUNICATIONS, (Norwood, MA: Artech House, 2001).

Rob Frieden, *The Potential for Scrutiny of Internet Peering Policies in Multilateral Forums*, in Benjamin M. Compaine and Shane Greenstein, eds., COMMUNICATIONS POLICY IN TRANSITION: THE INTERNET AND BEYOND, 159-193(Cambridge, MA: MIT Press, 2001).

Robert M. Frieden, *Satellite Technology and Regulation*, in Kornel Terplan, ed., THE TELECOMMUNICATIONS HANDBOOK, 92-101 (Boca Raton, Florida: CRC Press, 2000).

Harvey Zuckman, Robert Corn-Revere, Robert M. Frieden & Charles Kennedy, MODERN COMMUNICATIONS LAW, (St. Paul, Minn.: West Publishing Co. 1999)(chapters on international telecommunications, spectrum management and common and private carriage, plus pocket part updates 2000-2006).

Robert M. Frieden, *Winning and Losing the Telecommunications Sweepstakes of 1996*, in E. Bohlin and S. Levin, eds., TELECOMMUNICATIONS TRANSFORMATION: TECHNOLOGY, STRATEGY AND POLICY, 373-396 (Washington, D.C.: IOS Press, 1998).

Patrick R. Parsons & Robert M. Frieden, THE CABLE AND SATELLITE TELEVISION INDUSTRIES, (Needham Heights, Ma.: Allyn & Bacon, 1998) (1999 Cable Book Award-National Cable Television Center and Museum, University of Denver).

Robert M. Frieden, *Satisfying the Radio Spectrum and Capital Requirements of Satellite Power Systems*, in P.E. Glaser, F.P. Davidson and K.I. Csigi, eds., SOLAR POWER SATELLITES, (New York: John Wiley & Sons, 1998).

Robert M. Frieden, *The Global Information Infrastructure*, in A GUIDE TO NEW TELECOMMUNICATIONS TECHNOLOGIES, (Washington, D.C.: United States Information Agency, 1997).

Robert M. Frieden, *Can and Should the FCC Regulate Internet Telephony?*, in D. Waterman and G. Reston, eds., SELECTED PAPERS OF TPRC 1996, 183-204 (Mahwah, N.J.: L. Erlbaum, 1997).

Robert M Frieden, INTERNATIONAL TELECOMMUNICATIONS HANDBOOK, (Norwood, MA: Artech House, 1996) (an extensive overview of international telecommunications from a number of perspectives including law, policy, economics and technology).

Robert M. Frieden, *Satellite Phones and Cross-Border Cellular Service: New Challenges for Incumbent Carriers*, in G. Staple, ed. TELEGEOGRAPHY 1993, (Washington, D.C.: International Inst. of Communications, 1993).

**Refereed and Law Review Articles**

Rob Frieden, *How to Remedy Post Covid Pandemic Setbacks In Bridging The Digital Divide*, 24 NORTH CAROLINA JOURNAL OF LAW AND TECHNOLOGY, Issue 4 (2023) (in production).

Rob Frieden, *Remedies for Universal Service Funding Compassion Fatigue*, 40 SANTA CLARA HIGH TECH LAW JOURNAL __ (2023)(in production).

Rob Frieden, *Why has multilateral space and spectrum resource management become more difficult?* 46 TELECOMMUNICATIONS POLICY, Issue 10, Article 102426 (Nov. 2022); available at: https://doi.org/10.1016/j.telpol.2022.102426.

Rob Frieden, *Challenges to the Conventional Wisdom About Mergers and Consumer Welfare in a Converging Internet Marketplace*, 65 VILLANOVA LAW REVIEW, 479-521 (2020); https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=3456&context=vlr.

Rob Frieden, *The evolving 5G case study in United States unilateral spectrum planning and policy*, 44 TELECOMMUNICATIONS POLICY (2020); available at: https://doi.org/10.1016/j.telpol.2020.102011.

6

Rob Frieden, Krishna Jayakar, and Eun-A Park, *There's Probably a Blackout in Your Television Future: Tracking New Carriage Negotiation Strategies Between Video Content Programmers and Distributors*, 43 COLUMBIA JOURNAL OF LAW AND THE ARTS, 487-515 (2020); https://journals.library.columbia.edu/index.php/lawandarts/article/view/6128.

Rob Frieden, *The evolving 5G case study in spectrum management and industrial policy*, 43 TELECOMMUNICATIONS POLICY, No. 6, 49-62 (July, 2019); available at: https://www.sciencedirect.com/science/article/pii/S0308596119300783?via%3Dihub.

Rob Frieden, *Two-sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, 68 AMERICAN UNIVERSITY LAW REVIEW 713-760 (2019); http://www.aulawreview.org/two-sided-internet-markets-and-the-need-to-assess-both-upstream-and-downstream-impacts/.

Rob Frieden, *How Internet Platforms Intermediaries Affect Competition and Consumers*, 20 NETWORK INDUSTRIES QUARTERLY, No. 3, 3-8 (June, 2018).

Rob Frieden, *The Internet of Platforms and Two-Sided Markets: Implications for Competition and Consumers*, 63 VILLANOVA LAW REVIEW 269-320 (2018); https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=3373&context=vlr.

Rob Frieden, *Freedom to Discriminate: Assessing the Lawfulness and Utility of Biased Broadband Networks*, 20 VANDERBILT JOURNAL OF ENTERTAINMENT AND TECHNOLOGY LAW, 655-708 (2018).

Rob Frieden, *The Mixed Blessing in Subsidized Internet Access*, 15 COLORADO TECHNOLOGY LAW JOURNAL 269-306 (2017); http://ctlj.colorado.edu/wp-content/uploads/2017/09/2-Frieden.pdf.

Rob Frieden, *Grey nuances in the black and white debate over subsidized Internet access*, 41 TELECOMMUNICATIONS POLICY 1017-1026 (2017); http://dx.doi.org/10.1016/j.telpol.2016.10.002.

Rob Frieden, *Conflict in the Network of Networks: How Internet Service Providers Have Shifted from Partners to Adversaries*, 38 COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 63-90 (Winter, 2016); https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol38/iss1/3/.

Rob Frieden, *Network Neutrality and Consumer Demand for "Better Than Best Efforts" Traffic Management*, 26 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL, 71-102 (Fall, 2015); available at: http://www.fordhamiplj.org/publications/network-neutrality-and-consumer-demand-for-better-than-best-efforts-traffic-management/.

Rob Frieden, *Ex Ante Versus Ex Post Approaches to Network Neutrality: A Comparative Assessment*, 30 BERKELEY TECHNOLOGY LAW JOURNAL, No. 2, 1562-1612 (2015); http://btlj.org/data/articles2015/vol30/30_2/1561-1612_Frieden.pdf.

Rob Frieden, *Déjà vu All Over Again: Questions and a Few Suggestions on How the FCC Can Lawfully Regulate Internet Access*, 67 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, 325-376 (2015); http://www.fclj.org/wp-content/uploads/2016/01/67.3.1-Frieden.pdf.

Rob Frieden, *What's New in the Network Neutrality Debate*, 2015  MICHIGAN STATE LAW REVIEW 739-786. http://digitalcommons.law.msu.edu/cgi/viewcontent.cgi?article=1123&context=lr.

Rob Frieden, *Internet Protocol Television and the Challenge of "Mission  Critical" Bits*, 33 CARDOZO ARTS & ENTERTAINMENT LAW    JOURNAL, No. 1, 47-87 (2015);http://www.cardozoaelj.com/wp-content/uploads/2014/01/Frieden-FINAL.pdf.

Rob Frieden, *The Costs and Benefits of Regulatory Intervention in Internet Disputes: Lessons from Broadcast Signal Retransmission Consent Negotiations*, 37 COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 1-36 (Winter, 2015); https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol37/iss1/1/.

Rob Frieden, *New models and conflicts in the interconnection and delivery of Internet-mediated content*, 38 TELECOMMUNICATIONS POLICY,  No. 11, 970-978 (Dec. 2014); https://doi.org/10.1016/j.telpol.2014.04.004.

Rob Frieden, *The Impact of Next Generation Television on Consumers and the First Amendment*, 24 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL. No. 1, 61-95 (2014); https://ir.lawnet.fordham.edu/iplj/vol24/iss1/2/.

Rob Frieden, *The Rise of Quasi-Common Carriers and Conduit Convergence*, 9 I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY, No. 3, 471-496 (2014); https://kb.osu.edu/handle/1811/73344.

Rob Frieden, *Identifying Best Practices in Financing Next Generation Networks*, 29 THE INFORMATION SOCIETY: AN INTERNATIONAL JOURNAL, No.4, 234-247 (2013); https://www.tandfonline.com/doi/abs/10.1080/01972243.2013.792305.

Rob Frieden, *The Mixed Blessing of a Deregulatory Endpoint for the Public Switched Telephone Network*, 37 TELECOMMUNICATIONS POLICY, No. 4-5, 400-412 (May, 2013); https://doi.org/10.1016/j.telpol.2012.05.003.

Rob Frieden, *Do Conduit Neutrality Mandates Promote or Hinder Trust in Internet-mediated Transactions?*, 28 COMPUTER, LAW & SECURITY REVIEW, 560-567 (2012); https://doi.org/10.1016/j.clsr.2012.07.004.

Rob Frieden, *Rationales For and Against Regulatory Involvement in Resolving Internet Interconnection Disputes*, 14 YALE JOURNAL OF LAW AND TECHNOLOGY 266-313 (2012); https://digitalcommons.law.yale.edu/yjolt/vol14/iss1/1/.

Rob Frieden, *From Bad to Worse: Assessing the Long Term Consequences of Four Controversial FCC Decisions*, 77 BROOKLYN LAW REVIEW, No. 3 959-1013 (2012); https://brooklynworks.brooklaw.edu/blr/vol77/iss3/3/.

Rob Frieden, *Assessing the Need for More Incentives to Stimulate Next Generation Network Investment*, 7 I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY, No. 2, 207-256 (2012); https://kb.osu.edu/handle/1811/72988.

Rob Frieden, *Legislative and Regulatory Strategies for Providing Consumer Safeguards in a Convergent Information and Communications Marketplace*, 33 HASTINGS COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 207-248 (Winter, 2011); https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol33/iss2/3/.

Rob Frieden, *Assessing the Merits of Network Neutrality Obligations at Low, Medium and High Network Layers*, 115 PENN STATE LAW REVIEW, No. 1, 49-82 (Summer, 2010); http://www.pennstatelawreview.org/115/1/115%20Penn%20St.%20L.%20Rev.%2049.pdf.

Rob Frieden, *Invoking and Avoiding the First Amendment: How Internet Service Providers Leverage Their Status as Both Content Creators and Neutral Conduits*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF CONSTITUTIONAL LAW, No. 5, 1279-1323 (June, 2010); https://scholarship.law.upenn.edu/jcl/vol12/iss5/1/.

Rob Frieden, *Case Studies in Abandoned Empiricism and the Lack of Peer Review at the Federal Communications Commission*, 8 JOURNAL ON TELECOMMUNICATIONS & HIGH TECHNOLOGY LAW 277-312 (2010); http://www.jthtl.org/content/articles/V8I2/JTHTLv8i2_Frieden.PDF.

Rob Frieden, *Lock Down on the Third Screen: How Wireless Carriers Evade Regulation of Their Video Services*, 24 BERKELEY TECHNOLOGY LAW JOURNAL, No. 2 819-849 (Spring, 2009); https://btlj.org/data/articles2015/vol24/24_2/24-berkeley-tech-l-j-0819-0850.pdf.

Rob Frieden, *Lies, Damn Lies and Statistics: Developing a Clearer Assessment of Market Penetration and Broadband Competition in the United States*, 14 VIRGINIA JOURNAL OF LAW AND TECHNOLOGY 100- 125(Summer, 2009); http://www.vjolt.net/vol14/issue2/v14i2_100%20-%20Frieden.pdf.

Rob Frieden, *Hold the Phone: Assessing the Rights of Wireless Handset Owners and Carriers*, 69 PITTSBURGH LAW REVIEW, No. 4, 675-725 (2008); https://lawreview.law.pitt.edu/ojs/index.php/lawreview/article/view/97.

Rob Frieden, *Neither Fish Nor Fowl:  New Strategies for Selective Regulation of Information Services*, 6 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW, No. 2 373-423 (2008); http://www.jthtl.org/content/articles/V6I2/JTHTLv6i2_Frieden.PDF.

Rob Frieden, *Internet Packet Sniffing and Its Impact on the Network Neutrality Debate and the Balance of Power Between Intellectual Property Creators and Consumers*, 18 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT LAW JOURNAL, No. 3. 633-675 (2008); https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1406&context=iplj.

Rob Frieden, *A Primer on Network Neutrality*, 43 INTERECONOMICS REVIEW OF EUROPEAN ECONOMIC POLICY, No. 1, 4-15 (Jan./Feb. 2008); https://www.researchgate.net/publication/24055959_A_Primer_on_Network_Neutrality.

Rob Frieden, *Keeping the Internet Neutral?: A Response to the Wu-Yoo Debate*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, Forum (2007); http://www.law.indiana.edu/fclj/pubs/forum/Frieden_v59i3_forum.pdf.

Rob Frieden, *Internet 3.0: Identifying Problems and Solutions to the Network Neutrality Debate*, 1 INTERNATIONAL JOURNAL OF COMMUNICATIONS, 461-492 (2007); http://ijoc.org/ojs/index.php/ijoc/article/view/160/86.

Rob Frieden, *Network Neutrality or Bias?--Handicapping the Odds for a Tiered and Branded Internet*, 29 HASTINGS COMMUNICATIONS AND ENTERTAINMENT LAW JOURNAL, No. 2, 171-216 (2007); https://repository.uchastings.edu/cgi/viewcontent.cgi?article=1637&context=hastings_comm_ent_law_journal.

Rob Frieden, *What Do Pizza Delivery and Information Services Have in Common? Lessons From Recent Judicial and Regulatory Struggles with Convergence*, 32 RUTGERS COMPUTER AND TECHNOLOGY LAW JOURNAL, No. 2, 247-296 (2006); https://www.researchgate.net/publication/285323815_What_do_Pizza_delivery_and_information_services_have_in_common_Lessons_from_recent_judicial_and_regulatory_struggles_with_convergence.

Rob Frieden, *Killing With Kindness: Fatal Flaws in the $6.5 Billion Universal Service Funding Mission and What Should be Done to Narrow the Digital Divide*, 24 CARDOZO ARTS AND ENTERTAINMENT LAW JOURNAL, No. 2, 447-490 (2006); https://cardozoaelj.com/wp-content/uploads/Journal%20Issues/Volume%2024/Issue%202/Frieden.pdf.

Rob Frieden, *Analog and Digital Must-Carry Obligations of Cable and Satellite Television Operators in the United States*, in European Audiovisual Observatory, IRIS SPECIAL, TO HAVE OR NOT TO HAVE—MUST CARRY RULES, 21-28 (2005); 15 MEDIA LAW & POLICY, No. 2, 230-246 (2005-06); https://rm.coe.int/168078349b.

Rob Frieden, *Unbundling the Local Loop: A Cost/Benefit Analysis for Developing Nations*, 7 INFO, No. 4, 3-15 (2005); https://www.researchgate.net/publication/238325109_Unbundling_the_local_loop_A_costbenefit _analysis_for_developing_nations.

Rob Frieden, *Lessons From Broadband Development in Canada, Japan, Korea and the United States*, 29 TELECOMMUNICATIONS POLICY, No. 8, 595-613 (Sept. 2005); doi:10.1016/j.telpol.2005.06.002.

Rob Frieden, *The FCC's Name Game: How Shifting Regulatory Classifications Affect Competition*, 19 BERKELEY TECHNOLOGY LAW JOURNAL, No. 4, 1275-1314 (Fall, 2004); https://btlj.org/data/articles2015/vol19_4/19-berkeley-tech-l-j-1275-1314.pdf.

Rob Frieden, *Regulatory Arbitrage Strategies and Tactics in Telecommunications*, 5 NORTH CAROLINA JOURNAL OF LAW & TECHNOLOGY, No. 2, 227-275 (2004); http://www.jolt.unc.edu/Vol5_I2/pdf/Frieden%20v5i2.pdf.

Rob Frieden, *Balancing Equity and Efficiency Issues in the Management of Shared Global Radiocommunication Resources*, 24 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW, No. 2, 289-327 (Summer, 2003); https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=1253&context=jil.

Rob Frieden, *Fear and Loathing in Information and Telecommunications Industries: Reasons for and Solutions to the Current Financial Meltdown and Regulatory Quagmire*, 5 THE INTERNATIONAL JOURNAL ON MEDIA MANAGEMENT, No. 1, 25-38 (Spring, 2003).

Rob Frieden, *Adjusting the Horizontal and Vertical in Telecommunications Regulation: A Comparison of the Traditional and a New Layered Approach*, 55 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2, 207-250 (March, 2003); https://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=1325&context=fclj.

Rob Frieden, *Revenge of the Bellheads: How the Netheads Lost Control of the Internet*, 26 TELECOMMUNICATIONS POLICY, No. 7-8, 425-444 (Sep./Oct. 2002); https://doi.org/10.1016/S0308-5961(02)00025-3.

Rob Frieden, *Wither Convergence: Legal, Regulatory, and Trade Opportunism in Telecommunications*, 18 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL, No. 2, 171-205 (May, 2002); https://digitalcommons.law.scu.edu/chtlj/vol18/iss2/1/.

Rob Frieden, *Does a Hierarchical Internet Necessitate Multilateral Intervention?*, 26 NORTH CAROLINA JOURNAL OF INTERNATIONAL LAW AND COMMERCIAL REGULATION, No. 2, 361-405 (Spring, 2001);https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1697&context=ncilj.

Rob Frieden, *Regulatory Opportunism in Telecommunications: The Unlevel Competitive Playing Field*, 10 COMMLAW CONSPECTUS, No. 1, 81-102 (2001); https://scholarship.law.edu/cgi/viewcontent.cgi?article=1234&context=commlaw.

Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARVARD JOURNAL OF LAW & TECHNOLOGY, No. 3, 395-433 (Summer, 2000); http://jolt.law.harvard.edu/articles/pdf/v13/13HarvJLTech395.pdf.

Robert M. Frieden, M., *Last Days of the Free Ride?  The Consequences of Settlement-Based Interconnection for the Internet*, 1 INFO, No. 3, 225-238 (June, 1999).

Robert M. Frieden, *Falling Through the Cracks: International Accounting Rate Reform at the ITU and WTO*, 22 TELECOMMUNICATIONS POLICY, No. 11, 963-975 (December 1998); https://doi.org/10.1016/S0308-5961(98)00057-3.

Robert M. Frieden, *Without Public Peer: The Potential Regulatory and Universal Service Consequences of Internet Balkanization*, 3 VIRGINIA JOURNAL OF LAW & TECHNOLOGY, 8 (Fall, 1998); http://vjolt.student.virginia.edu/graphics/vol3/homeart8.html.

Robert M. Frieden, *That Pesky Last Mile: Call Termination Strategies for Mobile Satellite Systems*, 22 TELECOMMUNICATIONS POLICY, No. 2, 133-143. (1998); https://doi.org/10.1016/S0308-5961(97)00064-5.

Robert M. Frieden, *The Telecommunications Act of 1996: Predicting the Winners and Losers*, 20 HASTINGS COMMUNICATIONS & ENTERTAINMENT LAW JOURNAL, No. 1, 11-57 (Fall, 1997); https://repository.uchastings.edu/hastings_comm_ent_law_journal/vol20/iss1/2/.

Robert M. Frieden, *The Impact of Call-Back and Arbitrage on the Accounting Rate Regime*, 21 TELECOMMUNICATIONS POLICY, No. 9-10, 819-827 (1997);https://doi.org/10.1016/S0308-5961(97)00049-9.

Robert M. Frieden, *Widespread Deployment of Wireless Telephony: Business, Legal, Regulatory and Spectrum Challenges*, 21 TELECOMMUNICATIONS POLICY, No. 5, 451-459 (June, 1997); https://doi.org/10.1016/S0308-5961(97)00020-7.

Robert M. Frieden, *Dialing for Dollars: Will the FCC Regulate Internet Telephony?*, 23 RUTGERS COMPUTER AND TECHNOLOGY LAW JOURNAL, 47-79 (1997); https://www.questia.com/library/journal/1G1-19541572/dialing-for-dollars-should-the-fcc-regulate-internet.

Robert M. Frieden, *Schizophrenia Among Carriers: How Common Carriers and Private Carriers Trade Places*, 3 MICHIGAN TELECOMMUNICATIONS AND TECHNOLOGY LAW REVIEW, (1997); http://www.mttlr.org/volthree/frieden.html.

Robert M. Frieden, *Privatization of Satellite Cooperatives: Smothering a Golden Goose?*, 36 VIRGINIA JOURNAL OF INTERNATIONAL LAW, No. 4 1001-1019 (Summer, 1996).

Robert M. Frieden, *Contamination of the Common Carrier Concept in Telecommunications*, 19 TELECOMMUNICATIONS POLICY, No. 9, 685-697 (December, 1995); https://doi.org/10.1016/0308-5961(95)00047-X.

Robert M. Frieden, *Universal Personal Communications in the New Telecommunications World Order--Access to Wireline Networks*, 19 TELECOMMUNICATIONS POLICY, No. 1, 43-49 (January, 1995); https://doi.org/10.1016/0308-5961(94)00006-E.

Robert M. Frieden, *Should Intelsat and Inmarsat Privatize?*, 18 TELECOMMUNICATIONS POLICY, No. 9, 679-686 (December, 1994); https://doi.org/10.1016/0308-5961(94)90022-1.

Robert M. Frieden, *International Toll Revenue Division--Tackling the Inequities and Inefficiencies*, 17 TELECOMMUNICATIONS POLICY, No. 3, 221-233 (April, 1993); https://doi.org/10.1016/0308-5961(93)90004-M.

Robert M. Frieden, *Strategies for Market Entry by Private International Satellite Systems*, 16 TELECOMMUNICATIONS POLICY, No. 4, 354-363 (May/June 1992); https://doi.org/10.1016/0308-5961(92)90043-O.

Robert M. Frieden, *Open Network Policies for the United States and Europe: Visions and Realities*, 31 JURIMETRICS JOURNAL, 319-328 (Spring 1991); https://www.jstor.org/stable/29762223?seq=1.

Robert M. Frieden, *Accounting Rates: The Business of International Telecommunications and the Incentive to Cheat*, 43 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2, 111-139 (1991).

Robert M. Frieden, *The Third Computer Inquiry: A Deregulatory Dilemma*, 38 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 3, 383-410 (1987).

Robert M. Frieden, *Getting Closer to the Source: New Policies for International Satellite Access*, 37 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 2. 293-323 (1985).

Robert M. Frieden, *The International Application of the Second Computer Inquiry*, 5 MICHIGAN YEARBOOK OF INTERNATIONAL LEGAL STUDIES, 189-218 (1984).

Robert M. Frieden, *International Telecommunications and the Federal Communications Commission*, 21 COLUMBIA JOURNAL OF TRANSNATIONAL LAW, No. 3, 423-485 (1983).

Robert M. Frieden, *The Computer Inquiries: Mapping the Communications/Information Processing Terrain*, 33 FEDERAL COMMUNICATIONS LAW JOURNAL, No. 1, 55-115 (1981).

**Refereed Proceedings and Referred Letters**

Rob Frieden, *An Introduction to Data Property Ownership Rights and Data Protection Responsibilities*, monograph prepared for the Network Comprehensive Governance Capability Seminar, Beijing University of Posts and Telecommunications, School of Economics and Management (June 13, 2019).

Robert M. Frieden, *Lessons From Broadband Development in Canada, Japan and Korea*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-SEVENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2005).

Robert M. Frieden, *Assessing the Regulatory Consequences When Content and Conduit Converge*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIFTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 2003).

Robert M. Frieden, *Bellheads Rule: How the Netheads Lost Control of the Internet*, in PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FOURTH ANNUAL CONFERENCE,  (Honolulu: Pacific Telecommunications  Council, 2002).

Robert M. Frieden, *The Potential Regulatory and Universal Service Consequences of Internet-Mediated Accounting Rate Arbitrage*, in Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIRST ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications  Council, 2000).

Robert M. Frieden, *Variations on a Theme: The Three Phases of Competition Policy*, in PROCEEDINGS AND WHO IS WHO TELECOM 99/INTER@CTIVE99, (Geneva: International Telecommunication Union, 1999).

Robert M. Frieden, *The Potential Regulatory and Universal Service Consequences of Internet Balkanization*, in Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTY-FIRST ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1999).

Robert M. Frieden, *Call Origination and Termination Strategies for Mobile Satellite Systems*, in D. Wedemeyer and R. Nickelson, eds. PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWENTIETH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1998).

Robert M. Frieden, *New Opportunities and Challenges When Regulators Change Course*, in D. Wedemeyer and R. Nickelson, eds., PROCEEDINGS OF THE PACIFIC

TELECOMMUNICATIONS COUNCIL NINETEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1997).

Robert M. Frieden, *The Impact of Boomerang Boxes and Callback Services on the Accounting Rate Regime*, in D. Wedemeyer and R. Nickelson, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL EIGHTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1996).

Robert M. Frieden, *Social, Logistical and Developmental Issues in the Global Information Infrastructure*, in SPEAKERS PAPERS, 7TH WORLD TELECOMMUNICATION FORUM, Strategies Summit, Vol. 1, Session 5, 14 (Geneva: International Telecommunication Union, 1995).

Robert M. Frieden, *The Privatization Sweepstakes for Intelsat and Inmarsat*, in D. Wedemeyer, ed., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL SEVENTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1995).

Robert M. Frieden, *Assessing the Scope of Global Personal Communication Services*, in J. Savage and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL SIXTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1994).

Robert M. Frieden, *Legal and Regulatory Challenges to Universal Personal Communication Services Provided by Low Earth Orbiting Satellites*, in PROCEEDINGS OF THE ANNUAL CONFERENCE OF THE AMERICAN INSTITUTE OF AERONAUTICS AND ASTRONAUTICS, (Washington, D.C., 1994).

Robert M. Frieden, *WARC-92 and Low Earth Orbiting Satellites: A Case Study of the Process for Accommodating Spectrum Requirements of New Technologies*, in J. Savage and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL FIFTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1993).

Robert M. Frieden, *Strategies For Market Entry By International Separate Systems*, in M. Lofstrom  and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL FOURTEENTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1992).

Robert M. Frieden, *A Primer on International Accounting Rates*, in M. Lofstrom and D. Wedemeyer, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL THIRTEENTH ANNUAL CONFERENCE , (Honolulu: Pacific Telecommunications Council, 1992).

Robert M. Frieden, *User Benefits From Private International Carriers*, in D. Wedemeyer and M. Lofstrom, eds., PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL TWELTH ANNUAL CONFERENCE (Honolulu: Pacific Telecommunications Council, 1990). Robert M. Frieden, *There's An ISDN in Your Telecommunications Future*, PROCEEDINGS OF THE PACIFIC TELECOMMUNICATIONS COUNCIL EIGHTH ANNUAL CONFERENCE, (Honolulu: Pacific Telecommunications Council, 1985).

**Other Publications**

*Letter from America—Network Neutrality in the EU, Canada and the U.S.*, 50 INTERECONOMICS No.6, 363-364 (Nov./Dec. 2015).

*Verizon could learn a thing or two from Comcast about how to make most of its new cash cow*, THE CONVERSATION (May, 2015); https://theconversation.com/profiles/rob-frieden-169813/articles.

Helped edit and co-signed an Amicus Brief from Law Professors commenting on the merits of Verizon's appeal of the FCC's Open Access rules.

*Threats and Opportunities From Next Generation Television*, 40 intermedia, No. 1, 18-25 (March, 2012).

Revised materials on telecommunications topics for the *World Book* encyclopedia (2008).

*Locking Down the Third Screen: How Wireless Firms Thwart Users' Access to Content*, 36 intermedia, No. 2, 18-21 (Spring, 2008).

*Wireless Carterfone--A Long Overdue Policy Promoting Consumer Choice and Competition*, New America Foundation, Wireless Future Program, Working Paper No. 20 (Jan. 2008);: http://www.newamerica.net/events/2008/free_my_phone.

*Internet 3.0: Assessing the Scope of a Non-Neutral and Tiered Web*, presented at the 29th Annual Conference of the Pacific Telecommunications Council (Honolulu, HI 2007).

Rapporteur, The Museum of Television and Radio, Media Center Dialogue, *Digital Rights Management*, Briefing Summary, Issue 1/2004 (2004).

Rapporteur, *Innovations in Customer Loyalty, Retention, And Advocacy: Powered By Technology*, Philadelphia, Pennsylvania (May 14-15, 2003).

Rapporteur, *Accelerating Global Commerce Through Technology and Policy* National Press Club, Washington, D.C. (September 20th, 2002).

Robert M. Frieden, *New World, New Realities–The Remaining Roles Of Government In International Telecommunications, A Report of the Fifth Annual Aspen Institute Roundtable on*

16

*International Telecommunications*, Aspen, Colorado, ISBN 0-89843-277-4 (Feb., 2000). https://assets.aspeninstitute.org/content/uploads/files/content/docs/cands/C&SNEW_WORLD.PDF. Revised materials on several telecommunications topics for the Microsoft ENCARTA compact disk encyclopedia (2000-present).

Robert M. Frieden, Conference Report, *Real Convergence and Real Uncertainty*, 1 INFO, No. 6 (December 1999).

Rapporteur for Corporation for Public Broadcasting, *The Role of Public Service Media in the Digital Telecommunications Age*, Bethesda, Maryland (June, 1999). Report available at: http://nc.psu.edu/progress.html.

Robert M. Frieden, Conference Report, *Telecom Inter@ctive 97*, 22 TELECOMMUNICATIONS POLICY, No. 2 (March 1998).

Robert M. Frieden, Book Review of William Melody, ed., *Telecom Reform Policies, Policies and Regulatory Practices*, 21 TELECOMMUNICATIONS POLICY, No. 8 (Oct. 1997).

Senior Consultant on World Bank InfoDev and International Telecommunication Union ICT Regulation Toolkit project; see http://www.ictregulationtoolkit.org/; (extensive coverage of Voice over the Internet Protocol telephony and Internet network interconnection).

**Representative Research Projects, Grants, and Contracts**

Sole preparer of a 200 page primer on broadband technologies primer included in *Broadband Strategies Toolkit* created by InfoDev, a global partnership program of the World Bank (2012-13);https://documents.worldbank.org/en/publication/documents-reports/documentdetail/825001507011053469/main-report.

Prepared sections on best practices in information and communications technology regulation and broadband development in *ICT Regulation Toolkit*; http://www.ictregulationtoolkit.org/index; and *Broadband Strategies Handbook*, https://elibrary.worldbank.org/doi/book/10.1596/978-0-8213-8945-4; created by InfoDev, a global partnership program of the World Bank (2011).

Developed a template identifying best practices in broadband development and generated studies on national efforts for six nations, prepared for The World Bank (2010). See *Building broadband: Strategies and policies for the developing world*; https://www.infodev.org/infodev-files/resource/InfodevDocuments_756.pdf.

Contributor on wireless telecommunications regulatory reform for a book entitled . . . *And Communications for All: A Policy Agenda for the New Administration* (2008); supported by the Social Science Research Council.

Rob Frieden, *Strategies for Repairing the Universal Service Fund* (2007), funded by the Benton Foundation.

Senior Consultant on Ford Foundation grant to the East-West Center for research on technology parks and technology incubation in China and Singapore (2003).

Robert M. Frieden, *The Wired Village: Building Communities and Improving Government Services Through Advanced Telecommunications and Information Networks*, White Paper prepared for Nortel Networks, Inc. (February, 2001).

Timothy Denton, Rob Frieden and James Savage, *International Charging Arrangements for Internet Services*, Issues Paper prepared for the Asia Pacific Economic Cooperation organization. (March, 1999); Phase Two Data Collection and Analysis (January, 2000).

**Representative Consulting and Pro Bono Work**

Primary author of a Friend of the Court brief in Consumers' Research v. FCC, 5th Circuit Court Case No. 22-60008.

Primary author of a Friend of the Court brief in FCC v. Prometheus Radio Project, Supreme Court Docket No. 19-1231; https://www.supremecourt.gov/docket/docketfiles/html/public/19-1231.html (review of FCC reductions in broadcast media ownership limitations).

Serving as a Panel Member of the Belgium FWO Review College for 2021-2023.  This organization evaluates grant proposals much like the U.S. National Science Foundation.

Pro bono background provided the U.S. Government Accountability Office staff authoring: *5G Deployment FCC Needs Comprehensive Strategic Planning To Guide Its Efforts* (June, 2020); available at: https://www.gao.gov/assets/710/707530.pdf.

Prepared an analysis of California legislation mandating network neutrality for a major U.S. telecommunications carrier.

Briefed the California-based staff of a major U.S. telecommunications carrier on developments in next generation network law and regulation.

Provided background and perspective on U.S. antitrust policy for a report entitled *Challenges of competition policy in a digitalised economy*, prepared for the European Parliament, Directorate General for Internal Policies.

Sole developer for a module on broadband technologies contained in a toolkit on broadband strategies commissioned by The World Bank.

Provided infoDev an analysis of broadband universal service policies in six representative nations.

Advised the ministry responsible for telecommunications policy in Trinidad and Tobago on a wide range of legislative, regulatory and organizational matters, including revising the existing telecommunications law, universal service policy, broadband development, the regulator's proposed costing methodology, a regulatory framework for "convergence," and ICT development incentives.

Co-directed regulatory toolkit on competition, interconnection and pricing for World Bank (infoDev) and ITU; lead author of VoIP sections of the toolkit as well as those dealing with international telephone charge settlements.
Advised regulators in Bermuda, Dominican Republic, Israel, Jamaica, Mexico, Northern Mariana Islands, Qatar, South Africa, Tanzania, Asia Pacific Economic Cooperation Group nations and the Caribbean Telecommunications Union on competition policy, interconnection and Internet peering, regulatory and legislative reform, international traffic settlements, telephone number portability, VoIP, etc.

Advised a Bermuda and Cayman Islands telecommunications service provider on VoIP service and interconnection strategies.

Predicted the impact of network neutrality policies on a major fabricator of deep packet inspection chips.

**Participation in Conferences, Seminars and Workshops (last four years)**

*Post Covid Pandemic Setbacks in Bridging the Digital Divide*, A presentation at the 51st Telecommunications Policy Research Conference, American University School of Law, Washington, D.C. (Sep. 22, 2023).

*Rising Stress in Multilateral Space and Spectrum Resource Planning*, A presentation at PTC'23, Honolulu, Hawaii (Jan. 18, 2023).

*Lessons from Facebook's Recurring Violations of E.U. and U.S. Data Protection and Privacy Safeguards*, A Virtual Presentation at the Beijing University of Posts and Telecommunications, October, 2022; available at: BUPT Data Protection Presentation 2022.

*Why Has Multilateral Space and Spectrum Resource Management Become More Difficult?*, A Presentation at the 50th Telecommunications Policy Research Conference, American University, Washington, D.C. (September 16, 2022);

*Interconnection, Interoperability, and Universal Access to the Internet and Next Generation Networks*, presented virtually to the Penn State Policy Innovation Lab of Tomorrow (2022).

*Platforms in the Courts of Public Opinion and Law*, presented virtually to students at Chalmers University of Technology, Göteborg, Sweden (2021).

*Win, Lose and Draw: Outcomes and Lessons from the 2019 World Radio Conference*, presented virtually at the 2021 Conference of the International Telecommunications Society (2021).

*The Risks and Rewards From Weaponizing Spectrum Planning at the International Telecommunication Union*, presented virtually at the 49th Annual Research Conference on Communications, Information and Internet Policy, American University, Washington, D.C. (2021).

*Section 230 of the Communications Decency Act: A Cost/Benefit Analysis*, presented virtually at the University of Tennessee, College of Communication and Information (2021).

*There's Probably a Blackout in Your Television Future: Tracking New Carriage Negotiation Strategies Between Video Content Programmers and Distributors*, presented virtually at the 48th Annual Research Conference on Communications, Information and Internet Policy, American University, Washington, D.C. (2021).  *Challenges to the Conventional Wisdom About Mergers and Consumer Welfare in a Converging Internet Marketplace*, presented virtually at the 48th Annual Research Conference on Communications, Information and Internet Policy, American University, Washington, D.C. (2021).

*Spectrum Planning at the ITU: A Brief  Introduction*, presented virtually at PTC'21, Honolulu, HI (2021).

*Research on Improving Comprehensive Network Governance Ability under the Background of Digital Economy Development: Adapting Economic and Legal Models for Unicorn Digital Platform Intermediaries, A collaborative presentation for students and faculty*, presented virtually at the Beijing University of Posts and Telecommunications (2020); available at: BUPT Platforms Presentation.

*Challenges to the Conventional Wisdom About Mergers and Consumer Welfare in a Converging Internet Marketplace*, presented at AEJMC 2020 (Aug. 7, 2020). Awarded Best Faculty Paper in the Law and Policy Division.

Panelist, *Legal and Policy,* presented at the 42d annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 20, 2020); Panelist, *Industrial Policy and Competition Driving 5G* (Jan. 21, 2019); *World Radiocommunication Conference (WRC-19): Implications for the 5G World* (Jan. 21, 2020).

*WRC-19 and 5G Spectrum Planning*, A presentation at the 47th Annual Research Conference on Communications, Information and Internet Policy American University, Washington, D.C. (September 20, 2019).

*An Introduction to Data Property Rights*, A presentation at the Beijing University of Posts and Telecommunications (June 13, 2019).

*Platforms in the Courts of Public Opinion and Law*, A presentation at the 69th annual conference of the International Communications Association, Washington, D.C. (May 25, 2019).

*Two-sided Internet Markets in Courts of Law and Public Opinion*, presented at 9th annual Internet Law Works in Progress conference, Santa Clara Law School (March 2, 2019).

Panelist, *Update on current Legal Issues,* presented at the 41st annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 21, 2019); Panelist, The International Telecommunications Union: Three Sectors at a Crossroad (Jan. 22, 2019).

*Two-sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, a presentation at the 46th annual Telecommunications Policy Research Conference, Washington College of Law, American University, Washington, D.C. (September 21, 2018); also presented at the 41st annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan 20, 2019).

*How Internet Platforms Intermediaries Affect Competition and Consumers*, a presentation at the European Union Institute 7th Conference on the Regulation of Infrastructures. New network structures: decentralization, prosumers and the role of online platforms, Florence, ITALY (June 21, 2018)(publication forthcoming in NETWORK INDUSTRIES QUARTERLY; 22nd Biennial Conference of the International Telecommunications Society, Seoul SOUTH KOREA (June 25, 2018).

*The Internet of Platforms and Two-Sided Markets: Implications for Competition and Consumers*, a presentation at the 40th annual conference of the Pacific Telecommunications Council, Honolulu, HI (Jan. 22, 2018); Internet Law Works-in-Progress, New York Law School, New York, N.Y. (March 24, 2018); State of Telecom 2017, Columbia Institute for Tele-Information, web-based event (Nov. 17, 2017); 45th annual Telecommunications Policy Research Conference Antonin Scalia Law School George Mason University, Arlington, VA (September 8, 2017).

*Zero Rating and the Potential for Enhanced Digital Literacy and Stimulated Broadband Demand*, a presentation at Broadband Research in a Changing World:  New Technologies, Ideologies and Priorities American University Washington College of Law, Washington, D.C. (September 10, 2017).

*Freedom to Discriminate: Assessing the Lawfulness and Utility of Biased Broadband Networks*, a presentation at the 28th European Regional Conference of the International Telecommunications Society, Passau, GERMANY (Aug. 1, 2017).

*Can Internet Service Providers Enhance, or Degrade Third Party Content?*, a presentation at: 4th TILEC Workshop on Competition Policy and Regulation in Media and Telecommunications: Bridging Law and Economics, Tilburg, THE NETHERLANDS (June 1, 2017)(via teleconference).
*Standards Prospective: Big Data and Internet of Things—Promoting Interoperability via Open Standards and Semantic Technologies*, ITU Workshop on Internet of Things Applications for Development Port of Spain, TRINIDAD and TOBAGO (April 25, 2017).

Northern Kentucky Law Review Symposium on Controversies and Issues in Internet Law, *The Open Internet's Future, U.S. and Worldwide*, Newport, KY (March 3, 2017).

**Speaking Engagements or Other Activities in Which There Was Significant Use of Expertise**

Quoted in Jennifer Hiller, *Why America Doesn't Have Enough EV Charging Stations*, THE WALL STREET JOURNAL (Nov. 29, 2022); available at: https://www.wsj.com/articles/ev-charging-stations-electric-vehicles-11669737656.

Interviewed on American Public Media's *Marketplace* piece on network neutrality and broadband access in the United States, June 11, 2018; see *Why the end of net neutrality might look good ... at first*; https://www.marketplace.org/2018/06/11/tech/end-net-neutrality-could-give-consumers-options-while-hurting-competition/.

Interviewed on National Public Radio's *All Things Considered* piece on the elimination of conventional copper wire telephone service, Nov. 18, 2013; https://www.npr.org/sections/alltechconsidered/2013/11/18/246001725/have-we-reached-the-end-of-the-landline.

Interviewed on several American Public Media Marketplace programs regarding telecommunications and Internet issues; https://www.marketplace.org/?s=Rob%20Frieden.

Testified before the United States Senate, Commerce Committee on wireless telecommunications issues, June 17, 2009; https://www.commerce.senate.gov/2009/6/the-consumer-wireless-experience.

Interviewed on Public Broadcasting System's *News Hour With Jim Lehrer* piece  on the Global Crossing bankruptcy (February 13, 2002).

Interviewed on National Public Radio's *Morning Edition* piece on trouble in the telecommunications marketplace (February 8, 2002).

Testified before the Pennsylvania House of Representatives, Judiciary Committee on House Bill 10, The Child Internet Protection Act (June 7, 2001).

Frequent source for dozens of newspaper, magazine and World Wide Web articles on telecommunications, including American Public Media Marketplace, Arstechnica, the Associated Press, Atlanta Constitution, Bloomberg News, BusinessWeek, CBS Market Watch, CNBC, Chicago Tribune, China Central Television, Christian Science Monitor, Communications Daily, Christian Science Monitor, Congressional Quarterly, Dow Jones News Retrieval Service, Forbes, Fort Lauderdale Sun-Sentinel, KYW Radio, Minnesota Public Radio, National Public Radio, Parade magazine, Philadelphia Inquirer, USA Today, Wharton Business on Sirius/XM, Wired, and the Wall Street Journal.

**New Courses or Cooperative Extension Programs Developed**

Maintain an active blog site TeleFrieden; [http://telefrieden.blogspot.com/](http://telefrieden.blogspot.com/). This blog seeks to offer a provocative, unsponsored assessment of current legal, regulatory, marketplace and cultural issues affecting the information, communications and entertainment ("ICE") industries.

Developed and taught at the Dickinson School of Law and Penn State Law courses on Internet law and policy, telecommunications law and regulation and international telecommunications and space law.

Developed new graduate and undergraduate courses in media and democracy, telecommunication policy analysis, telecommunications and information processing technologies, and international telecommunications and trade policy.

**Honors or Awards for Scholarship of Professional Activity**

Pacific Telecommunications Council, Honorary Individual Lifetime Membership (2023) (recognizing the value of a PTC Member, PTC staff, or volunteer who has provided exceptional service to the organization over a significant period of time – 25 years or more).

Association for Education in Journalism and Mass Communications, Law and Policy Division, Best Faculty Paper at AEJMC 2020.

Pacific Telecommunications Council, Meheroo Jussawalla Research Paper Prize (2017, 2008).

Penn State, College of Communications, Dean's Excellence Award for Research (2016, 2012, 2004, 2000)

Academic Fellow, Harvard Berkman Center for Internet and Society (2015-16).

2014 ITERA Distinguished Research Award, Information and Telecommunications Education and Research Association.

Top Three Faculty Paper, Association for Education in Journalism and Mass Communications, Law and Policy Division (2013, 2009).

Top Three Faculty Paper, International Communications Association, Communications Law and Policy Division (2011, 2007).

Fulbright Specialist Program Registrant (2008-2009)(2021-2023)
see http://www.cies.org/specialists/ProgramDescription.htm).

Winner, 1999 Cable Book Award, National Cable Television Center.

Penn State, College of Communications, Alumni Society Excellence in Teaching Award (1995).

Who's Who in America (various years).

Who's Who in American Education (various years).

Who's Who in American Law (various years).

Who's Who in Communications and the Mass Media (various years).

Who's Who in the World (various years).

**Membership and Active Participation in Professional and Learned Societies**

Appointed International Expert, at the Review College of the Research Foundation – Flanders Belgium (FWO).

Associate Editor, *Telecommunications Policy* (July, 2019-2023); Advisory Editor (July, 2023-present).

Faculty Associate, Berkman Center for Internet and Society at Harvard University (2015-2016).

Fellow, Columbia Institute for Tele-Information, Columbia University, School of Business (2012-present).

Pacific Telecommunications Council, elected to the Advisory Council (2005-2009); Program Committee (numerous years).

Telecommunications Policy Research Conference, Program Committee for the 29th, 30th, 34th, 35th and 36th Annual Conferences.

Fellow, Center for Strategic and International Studies, International Communications Studies Program (1999-2001).

Editorial Board, *Info: the journal of policy regulation and strategy for telecommunications information and media* (1998-present).

Editorial Board, *Telecommunications Policy* (1997-present).

Associate, Program on Information Resources Policy, Harvard University (1992-2011).

American Bar Association; Vice Chair, Communications Committee of the International Law Section (1992-1994).

Member Virginia, Supreme Court and 4th Circuit Court of Appeals Bars.

**Courses Taught**

**Undergraduate**

Case Studies in Information, Communications and Entertainment

Analysis of Broadcast-Cable Policy

Digital Literacy (Freshman Seminar)

Emerging Telecommunications and Information Processing Technologies

International Telecommunications and Trade Policy

Internet Law and Policy

Introduction to Broadcast/Cable Management

Law of Mass Communications (Honors and regular)

Media and Democracy

**Graduate**

Case Studies in Information, Communications and Entertainment

Colloquium

Constitutional Problems of the News Media

International Telecommunications and Trade Policy

Internet Law and Policy (cross-listed as a Penn State Law School course)

Media and Democracy

Telecommunications Law and Regulation (cross-listed as a Penn State Law School course)

International Telecommunications and Space (cross-listed as a Penn State Law and School of International Affairs course)