Case No. 23-1091

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC.,
EDWARD J. BLUM, KERSTEN CONWAY, SUZANNE BETTAC; ROBERT
KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH BAYLY; JEREMY
ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA
THOMAS,**

*Petitioners*,

v.

**FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,**

*Respondents*.

---

Petition for Review of an Order of the
Federal Communications Commission

---

**JOINT BRIEF OF INTERVENORS USTELECOM, NTCA, CCA, SHLB,
BENTON INSTITUTE, NDIA, AND MEDIAJUSTICE IN
SUPPORT OF RESPONDENTS**

Jason Neal
HWG LLP
1919 M Street NW, Eighth Floor
Washington, DC  20036-3537
(202) 730-1300
jneal@hwglaw.com
*Counsel for SHLB*

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC  20004
(202) 241-2408
AndySchwartzman@gmail.com
*Counsel for Benton Institute,
 NDIA, MediaJustice*

Jennifer Tatel
Daniel H. Kahn
Morgan O. Schick
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
dkahn@wbklaw.com
mschick@wbklaw.com
*Counsel for USTelecom, NTCA, CCA*

October 5, 2023

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A.       **PARTIES AND AMICI**

All parties and intervenors in this case are listed in the Brief for Petitioners.  Amici for Respondent are Robert Frieden, Academy and Emeritus Professor of Telecommunications and Law, Pennsylvania State University, and Public Knowledge.

B.       **RULING UNDER REVIEW**

Petitioners challenge the Federal Communication Commission's deemed approval of the universal service contribution factor for the second quarter of 2023. That contribution factor was proposed in a public notice issued on March 14, 2023. *See Proposed Second Quarter 2023 Universal Service Contribution Factor*, DA 23-216 (rel. Mar. 14, 2023) (JA ___).

C.       **RELATED CASES**

This case has not previously been before this Court.  Petitioners have challenged the FCC's deemed approval of universal service contribution factors for several other calendar quarters in cases in the Fifth, Sixth, and Eleventh Circuits. Those cases are listed in the Brief for Petitioners.

## CORPORATE DISCLOSURE STATEMENT

USTelecom is a non-profit association representing service providers and suppliers for the telecom industry.  USTelecom members provide a full array of services, including broadband, voice, data, and video over wireline and wireless networks.  Its diverse member base ranges from large publicly traded communications corporations to local and regional companies and cooperatives—providing advanced communications services to both consumers and businesses across the country.

NTCA is a general cooperative association whose membership is composed of approximately 850 independent, family-owned and community-based telecommunications companies providing voice and broadband services in rural areas.  NTCA's members build and deliver connectivity and operate essential services in rural and small-town communities across the United States.  NTCA's members use universal service funds to serve customers who would otherwise go unserved or who would face the prospect of paying rates for services far exceeding those available in urban areas.

CCA is the nation's leading association for competitive wireless providers and stakeholders across the United States.  Members range from small, rural carriers serving fewer than 5,000 customers to regional and national providers serving millions of customers, as well as vendors and suppliers that provide products and

services throughout the wireless communications ecosystem.  CCA's members use universal service funds to serve customers who would otherwise go unserved.

The Schools, Health & Libraries Broadband (SHLB) Coalition is an incorporated 501(c)(3) public interest organization with over 300 members who share the goal of promoting open, affordable, high-quality broadband for anchor institutions and their communities.  Petitioners challenge the funding mechanism for the Universal Service Fund, which funds longstanding, vitally important programs that support affordable telecommunications and internet access service for rural health care providers, schools, and libraries, i.e., "anchor institutions", nationwide. Many of SHLB Coalition's members participate in and benefit from these programs. The Petition, if successful, would do great harm to the interests and goals of SHLB Coalition and its members.

The Benton Institute for Broadband & Society (Benton) is a 41-year-old, 501(c)(3) private operating foundation that conducts research and engages in advocacy to bring open, affordable, high-performance broadband to all people in the U.S. to ensure a thriving democracy.  Benton provides information and analyses about broadband policy.  Maintaining, funding and improving the program at issue in this case, the Universal Service Fund, is among its highest priorities.  Benton's mission would be significantly impaired if the Fund were abolished or otherwise impaired.  Benton would incur significant expenses revising its publications and

iii

educational materials and substantial personnel expenses in devising alternative mechanisms to ensure that all Americans have access to affordable broadband service.

The National Digital Inclusion Alliance (NDIA) is a non-profit 501(c)(3) organization supporting a community of digital inclusion practitioners and advocates who engage in local and state-level efforts across the United States to promote equitable internet access, adoption, and use for low- and moderate-income households and communities, whether urban, rural, or Tribal. NDIA acts on behalf of its affiliates in various policy proceedings relating to broadband deployment and connectivity, including programs funded by the Universal Service Fund. It also advances digital equity by supporting and promoting the work of organizations engaged in digital inclusion work and educating policymakers and the public about digital equity. NDIA has 625 affiliate organizations in 46 states. Many of NDIA's affiliates directly support people and institutions who use programs that enable users to obtain more affordable access to communications services and technology, such as Lifeline and E-Rate, which are funded by the Universal Service Fund. Accordingly, NDIA and its affiliates will incur significant injury if this Court were to grant the relief requested by Petitioners.

The Center for Media Justice dba MediaJustice is a non-profit, 501(c)(3) organization organized in 2009. It is dedicated to democratizing the economy,

government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, universal media and technology access at affordable prices. MediaJustice has a network of over one hundred local, regional, or statewide affiliate social-justice organizations. Through research, the publishing and dissemination of reports, trainings, and strategic convenings and technical support, MediaJustice seeks to build a movement for a more just and participatory digital world. MediaJustice and its affiliates directly support programs that enable users to obtain more affordable access to communications services and technology, including the Lifeline and E-Rate programs funded by the Universal Service Fund. MediaJustice and its affiliates will suffer severe harm if the people they serve no longer have access to universal service-funded programs. In addition, MediaJustice and its affiliates will incur significant expense if they have to revise their programs and publications.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ............................................................ vii

GLOSSARY ............................................................................ xii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE .........................................................1

SUMMARY OF ARGUMENT ........................................................5

ARGUMENT ...........................................................................6

I.      SECTION 254 IS NOT AN UNCONSTITUTIONAL DELEGATION. .......6

        A.      Section 254 Satisfies the Intelligible Principle Test. ...........................7

        B.      This Case is Distinguishable From *Panama* or *Schechter Poultry*.....17

        C.      The Court Should Reject Petitioners' False Distinctions Regarding
                Application of the Intelligible Principle Test.....................................19

        D.      Section 254's Delegation Must Be Analyzed Under Governing
                Precedent. ............................................................................21

        E.      Section 254 Would Be Constitutional Under a Broadened Intelligible
                Principle Standard. ...................................................................22

II.     PETITIONERS' TAX CLAIMS ARE WRONG ON THE LAW AND
        IRRELEVANT UNDER BINDING PRECEDENT. ...................................27

III.    USAC'S ROLE IS NARROWLY CONFINED AND PETITIONERS
        EXAGGERATE USAC'S AUTHORITY....................................................28

IV.     STRIKING DOWN SECTION 254 WOULD DISRUPT THE ECONOMY
        AND DISCONNECT MILLIONS OF AMERICANS AND ANCHOR
        INSTITUTIONS. ........................................................................32

V.      CONCLUSION.........................................................................40

# TABLE OF AUTHORITIES

## C<small>ASES</small>

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ...................18

*ALC Commc'ns Corp. v. FCC*, 925 F.2d 487 (D.C. Cir. 1991) ................................2

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) .........................12, 25

*Altagracia Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388 (D.C. Cir. 2022)...........................................................................................................8

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ........................14

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ................................1, 2, 16, 24

*Blanca Tel. Co. v. FCC*, 991 F.3d 1097 (10th Cir. 2021)........................................14

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).............................................13

*Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068 (8th Cir. 1997) .................15

*Consumers' Rsch. v. FCC*, 67 4th 773 (6th Cir. 2023)............................................27

*Direct Commc'ns Cedar Valley, LLC v. FCC (In re FCC 11-161)*, 753 F.3d 1015 (10th Cir. 2014) .....................................................................................................26

*FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944).......................................................8

*Gen. Tel. Co. of the Sw. v. United States*, 449 F.2d 846 (5th Cir. 1971).................16

*Gundy v. United States*, 139 S. Ct. 2116 (2019).......................7, 9, 15, 23, 24, 25, 26

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ...............................26

*In re Incomnet*, 463 F.3d 1064 (9th Cir. 2006)........................................................31

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .................7, 20, 21

*Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533 (D.C. Cir. 2019) ..................22

*Mistretta v. United States*, 488 U.S. 361 (1989).....................................................7, 8

*Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019)...................................9

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) .......................................8

*NAACP v. FPC*, 425 U.S. 662 (1976).......................................................................13

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ......................................8, 13

*Nat'l Fed. of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022).......................................25

*Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400 (D.C. Cir. 1990)......9

*Owens v. Republic of the Sudan*, 531 F.3d 884 (D.C. Cir. 2008)............................12

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ..............................................17, 18

*Qwest Comm'ns. Int'l, Inc. v. FCC*, 398 F.3d 1222 (10th Cir. 2005) ...............11, 27

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ......................................11, 27

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989)..............21

*Rural Cellular Ass'n & Universal Serv. v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012) .....
.......................................................................................................................27, 28

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) .........................12, 13

*Rural Tel. Coal. v. FCC*, 838 F.2d 1307 (D.C. Cir. 1988) ........................1, 2, 15, 27

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974)....................................................31

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989) ..............................19, 20, 28

*Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999).....10, 11, 16, 27

*Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313 (5th Cir. 2001).......2, 10, 25, 26

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982)...................................1

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007)...........9, 16, 17, 24

*Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54 (D.C. Cir. 2011)............................................4

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457 (2001) ...............................8, 15, 21

*Wireless World, LLC v. Virgin Islands Pub. Servs. Comm'n*, No. Civ. A. 02-0061STT, 2005 U.S. Dist. LEXIS 15061 (D.V.I. 2008)........................................26

*Yakus v. United States*, 321 U.S. 414 (1944).....................................23, 26

<u>STATUTES</u>

34 U.S.C. § 20913 ...............................................................................23

47 U.S.C. § 151 ....................................................................................1

47 U.S.C. § 153 ..................................................................................14

47 U.S.C. § 214 ..................................................................................14

47 U.S.C. § 254 ................................. 2, 3, 9, 10, 11, 14, 15, 18, 19, 26, 32, 34, 36, 38

<u>RULES</u>

47 C.F.R. § 54.500 .............................................................................32

47 C.F.R. § 54.503 .............................................................................33

47 C.F.R. § 54.505 .............................................................................33

47 C.F.R. § 54.523 .............................................................................32

47 C.F.R. § 54.600 .............................................................................35

47 C.F.R. § 54.620 .............................................................................36

47 C.F.R. § 54.633 .............................................................................35

47 C.F.R. § 54.701 ...............................................................................3

47 C.F.R. § 54.702 .............................................................................30

47 C.F.R. § 54.725 ...............................................................................3

47 C.F.R.. § 54.709 .....................................................................3, 4, 12, 29

## ADMINISTRATIVE MATERIALS

*Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. Fed.-State Bd. on Universal Serv.*, 12 FCC Rcd 18400 (1997) ...........................................................3

*Connect Am. Fund: A Nat'l Broadband Plan for Our Future High-Cost Universal Service Support et al.*, FCC 23-60 (rel. July 24, 2023) .........................................29

*Establishing a 5G Fund for Rural Am.*, FCC 23-74 (rel. Sep. 22, 2023) .................29

*Inquiry Concerning Deployment of Advanced Telecomms. Capability to All Ams. in a Reasonable and Timely Fashion*, 35 FCC Rcd 8986 (2020) .............................33

*Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd 3962 (2016)..........37

*Promoting Telehealth in Rural Am.*, 34 FCC Rcd 7335 (2019) ...............................35

*Promoting Telehealth in Rural Am.*, FCC 23-6 (rel. Jan. 27, 2023)........................29

*Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Public Notice, DA 22-946, CC Docket No. 96-45 (rel. Sept. 13, 2022).................4, 5, 29

*Rural Digit. Opportunity Fund Phase I Auction (Auction 904) Closes*, 35 FCC Rcd 13888 (2020)..........................................................................................................38

*Wireline Competition Bureau Seeks Comment on Proposed Eligible Services List for the E-Rate Program*, DA 23-819 (rel. Sept. 12, 2023)....................................29

## OTHER AUTHORITIES

Comments and Objections of Consumers' Research et al., CC Docket No. 96-45 (filed Feb. 7, 2023) .................................................................................................5

Comments of Consumers' Research et al., CC Docket No. 96-45 (filed Mar. 21, 2023).............................................................................................................................5

Federal Communications Commission, *E-Rate – Schools and Libraries USF Program* ...................................................................................................................33

Federal Communications Commission, *E-Rate: Universal Service Program for Schools and Libraries* .......................................................................................33

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1555 (2021) ......
.........................................................................................................................22

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121
    Colum. L. Rev. 277 (2021).................................................................22

Letter from AARP et al. to Ajit Pai, Chairman, FCC, et al., WC Docket No. 17-287
    (filed May 23, 2018)....................................................................37

Letter from Michael J. Dunleavy, Governor, Alaska, to Marlene H. Dortch,
    Secretary, FCC, WC Docket No. 17-310 (filed Nov. 12, 2019).........................36

Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline Program*,
    BroadbandNow (Dec. 7, 2021)...........................................................37

Universal Service Administrative Company, *2022 Annual Report* (2022) ................
    ..............................................................................33, 35, 37, 38

Wireline Competition Bureau, FCC, *Report on the State of the Lifeline
    Marketplace*, WC Docket No. 20-437 (rel. July 2, 2021)...............................37

# GLOSSARY

| | |
|---|---|
| FCC | Federal Communications Commission |
| USF | Universal Service Fund |
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) |
| USAC | Universal Service Administrative Company |
| VoIP | Voice over Internet Protocol |

## JURISDICTIONAL STATEMENT

Intervenors adopt the jurisdictional statement made by Respondents the Federal Communications Commission ("FCC") and the United States.

## STATEMENT OF THE ISSUES

Intervenors adopt the statement of issues made by Respondents.

## STATEMENT OF THE CASE

Congress established the FCC in part "to make available . . . to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex. . . communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Since its inception, the FCC has aimed to achieve that end.

Until the late 1990s, the FCC "achieved universal service by authorizing rates to monopoly providers sufficient to enable revenue from easy-to-reach customers, such as city dwellers, to implicitly subsidize service to those in areas that were hard to reach." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1242 (D.C. Cir. 2018) (citation omitted). With the breakup of AT&T, *see United States v. AT&T Co.*, 552 F. Supp. 131, 170 (D.D.C. 1982), such implicit subsidies became harder to maintain.

To begin to replace implicit subsidies, the FCC created the Universal Service Fund to ensure universal service in high-cost areas. *See Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1311-12 (D.C. Cir. 1988). As this Court explained, the Universal Service Fund "was proposed in order to further the objective of making

1

communication service available to all Americans at reasonable charges . . . ." *Id.* at 1315. This Court found that establishing the Fund was within the FCC's authority. *Id*. In addition to support for service to high-cost areas, the FCC established the Link Up America and Lifeline programs to assist low-income households with telephone installation and service charges. *See ALC Commc'ns Corp. v. FCC*, 925 F.2d 487 (D.C. Cir. 1991) (unpublished).

Against this backdrop, and with increasing technological change, Congress enacted the Telecommunications Act of 1996 ("1996 Act"). Implicit subsidies "no longer sufficed once the 1996 Act amended the Communications Act to create competition in local telephone markets, eliminating the monopolies." *AT&T, Inc.*, 886 F.3d at 1242 (citation omitted). Because competition and implicit subsidies operated in tension with each other, Congress "required that the implicit subsidy system of rate manipulation be replaced with explicit subsidies for universal service." *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 318 (5th Cir. 2001) (*TOPUC II*).

Congress did so through 47 U.S.C. § 254, which provided for the "preservation and advancement of universal service," and directed the FCC to make support for universal service "explicit." 47 U.S.C. §§ 254(b), (e). Congress mandated in Section 254(d) that every telecommunications carrier "shall contribute, on an equitable and nondiscriminatory basis," to mechanisms supporting universal

2

service. *Id.* § 254(d). Congress directed that those mechanisms "shall" be based on principles it identified, it defined universal service, and it established standards for updating relevant policies. *Id.* § 254(b)-(c). In addition to codifying the preservation and advancement of existing universal service mechanisms, Congress also directed the FCC to establish new mechanisms to support telecommunications service to rural health care providers as well as to schools and libraries. *See id*. § 254(h).

Pursuant to Section 254's directive, the FCC promulgated implementing regulations to delineate in detail the mechanics of the universal service mechanisms and contributions to fund them. *See Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc.*, 12 FCC Rcd 18400, 18461 (1997). These regulations established the Universal Service Administrative Company ("USAC") to aid the FCC with administration of universal service programs. *See* 47 C.F.R. §§ 54.701-725. As relevant here, the FCC provided that contributions to universal support "be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission." *Id.* § 54.709(a). To assist with these calculations, the FCC charged USAC with submitting to it, at least 60 days prior to the start of the quarter, projections of demand for the universal service mechanisms based upon the FCC's rules for each universal service program and administrative expenses for the upcoming quarter. *See id.* § 54.709(a)(3). USAC also must submit the total expected revenue

3

contribution base to the FCC at least 30 days prior to the start of each quarter.  The FCC then issues a public notice announcing these figures and proposing a contribution factor based on those projections.  If the FCC takes no further action within 14 days after release of the public notice, then the FCC's contribution factor is deemed approved.  However, the FCC "reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest."  *Id.*

Once the FCC approves the contribution factor, USAC applies it to calculate each telecommunications carrier's quarterly assessment.  *Id*.  The universal service program thus is "financed by fees charged to telephone companies and other providers of interstate telecommunications services."  *Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 57 (D.C. Cir. 2011) (citation omitted).  This system of determining and collecting contributions has remained in place for a quarter century.

In accord with this regulatory regime, USAC submitted its projections of demand and administrative expenses for the second quarter 2023 to the FCC on January 31, 2023.  *See Proposed Second Quarter 2023 Universal Service Contribution Factor*, DA 23-216 (rel. Mar. 14, 2023) ("Public Notice") (JA__).  Petitioners filed comments challenging the legality of the Fund on February 7, 2023, that mirrored challenges it began filing in multiple circuits in 2021.  *See* Comments and Objections of Consumers' Research et al., CC Docket No. 96-45 (filed Feb. 7,

4

2023) (JA__).  On March 14, 2023, the FCC's Office of Managing Director issued the Public Notice, which sets forth the projections that USAC had estimated and the associated "quarterly contribution factor calculated by the [FCC]."  Public Notice at 1.  Petitioners filed comments again on March 21, 2023, raising the same arguments as in their February 2023 filing.  *See* Comments of Consumers' Research et al., CC Docket No. 96-45 (filed Mar. 21, 2023) (JA__).  The proposed contribution factor was deemed approved by the FCC on March 28, 2023.

## SUMMARY OF ARGUMENT

Section 254's directive that the FCC assess and collect contributions to preserve and advance universal service is constitutional.  Under the Supreme Court's approach for reviewing nondelegation challenges, Section 254 falls well within constitutional bounds.  Section 254 prescribes far more detailed directions than other statutes that repeatedly have been upheld by the Supreme Court over the past century.  Even under a more searching standard—which could be adopted only by the Supreme Court—Section 254 still would pass constitutional muster.  In addition, this Court has conclusively held that the contributions collected in furtherance of Section 254 are fees and not taxes.  Even if they were taxes, however, the nondelegation analysis remains the same.

Furthermore, USAC's role in administering the universal service programs is constitutional because USAC plays only a ministerial role in helping to calculate the

contribution factor and is expressly precluded from exercising decision-making authority, including but not limited to the establishment of program objectives or rules, or setting the budgets for them. The only role USAC played in this case was the accounting exercise of projecting demand and administrative expenses for the relevant quarter. The FCC calculated the contribution factor based on those projections.

Finally, a decision in favor of Petitioners would create disruption and chaos across the country. It would (1) abruptly cut off the connections of schools, libraries, health care providers, and those students and patients who connect to them; (2) remove rural and low-income consumers' ability to access emergency services, education, health care, job opportunities, e-commerce, and civic engagement; and (3) upend business plans and capital investments throughout the communications sector. This Court should reject Petitioners' arguments.

## ARGUMENT

### I.    SECTION 254 IS NOT AN UNCONSTITUTIONAL DELEGATION.

Section 254 complies with both the "modern intelligible-principle test" and, though foreclosed by precedent, Petitioners' claimed "original understanding of nondelegation." Pet. Br. 29. Under either test, Section 254's decades-old direction to the FCC to collect contributions from providers of telecommunications services for universal service passes constitutional muster.

6

Applying the intelligible principle test, the Supreme Court repeatedly has affirmed directives from Congress to agencies that are brief and standard-based. *See Mistretta v. United States*, 488 U.S. 361, 373 (1989) (collecting cases). Moreover, Petitioners' claims that the intelligible principle test applies heightened scrutiny to "revenue-raising" statutes incorrectly attempts to tie cases' holdings to facts that were not material to their outcome and ignores the reasoning in Supreme Court delegation cases.

Petitioners' claims about the original understanding of the nondelegation doctrine similarly are without merit. Those claims are contrary to this Court's and Supreme Court precedent. And even if this Court were to analyze Section 254 under such an approach, Section 254 complies with the factors set forth in Justice Gorsuch's dissent in *Gundy v. United States*, 139 S. Ct. 2116 (2019).

### A.    Section 254 Satisfies the Intelligible Principle Test.

Under the intelligible principle test, "a statutory delegation is constitutional as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Id.* at 2123 (plurality) (alterations omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Consistent with this test, the Supreme Court has affirmed broad congressional delegations to agencies, explaining that "Congress simply cannot do its job absent an ability to delegate power under

7

broad general directives." *Mistretta*, 488 U.S. at 372 (citation omitted). For instance, the Supreme Court has upheld multiple delegations to agencies to take regulatory action in the "public interest." *See Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943) (upholding delegation to the FCC to regulate broadcast licensing in the "public interest"); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932) (upholding delegation to the Interstate Commerce Commission to approve railroad consolidations that are in the "public interest"); *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001) (citation omitted) (upholding delegation to the Environmental Protection Agency to regulate ambient air quality standards "which in the judgment of the Administrator . . . are requisite to protect the public health"); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600-01 (1944) (upholding delegation to the Federal Power Commission to ensure "just and reasonable" rates).

Indeed, the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting). In turn, this Court has upheld statutes with broad delegations where limited by an intelligible principle.[1]

---

[1] *See, e.g.*, *Altagracia Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388, 402 (D.C. Cir. 2022) (upholding delegation for the D.C. Office of the State Superintendent of Education to "set minimum qualifications for daycare workers to ensure their fitness to take care of small children"); *Murray Energy Corp. v. EPA*,

A "nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Gundy*, 139 S. Ct. at 2123 (plurality). The text of Section 254 provides far more guidance than a "public interest," "just and reasonable," or other broad standard that has passed constitutional muster. First, Section 254(d) mandates that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Thus, Congress answered the threshold question of who would be required to contribute. Although Section 254(d) permits the FCC to require contributions from "[a]ny other provider of interstate telecommunications . . . if the public interest so requires," this flexibility to adapt to technological and marketplace changes falls squarely within the discretion permitted by the nondelegation standard. *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1239-41 (D.C. Cir. 2007) (analyzing statutory definitions and voice over Internet Protocol service to conclude that the FCC "has section 254(d) authority to require interconnected VoIP providers to make" contributions).

---

936 F.3d 597 (D.C. Cir. 2019) (upholding statutory directive for the EPA to set air quality standards "requisite to protect public health"); *Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 404 (D.C. Cir. 1990) (upholding a "terse but understandable standard" as adequately constraining administrative action by the Secretary of Defense).

Further, Congress set forth explicit principles that the FCC "shall" follow in implementing Section 254. 47 U.S.C. § 254(b). These six universal service principles include that "[q]uality services should be available at just, reasonable, and affordable rates," "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service," and that "[e]lementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services." *Id.*[2]

Petitioners nonetheless claim these principles fail to meaningfully limit FCC authority because they are no more than "tautologies" and aspirational only. Pet. Br. 45. However, Petitioners misapprehend the impact of *TOPUC II* in making this claim. *TOPUC II* was decided under the deferential *Chevron* standard that applies to agency interpretations of ambiguous statutes. *TOPUC II*, 265 F.3d at 321-22 ("Under this deferential review, we have approved the FCC's interpretation of the statutory principles as aspirational only" (citing *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 421 (5th Cir. 1999) (*TOPUC I*)). The *TOPUC II* court was analyzing just how tightly the Section 254 statutory principles constrain the FCC—not whether they constrain the FCC at all.

---

[2] Although Section 254(b) permits the creation of additional principles, such principles must be "necessary and appropriate for the protection of the public interest, convenience, and necessity and [be] consistent with this [Act]." 47 U.S.C. § 254(b)(7).

10

Underscoring that the FCC's discretion is limited by these principles, the Tenth Circuit twice has concluded that the FCC did not properly interpret them. *See Qwest Corp. v. FCC*, 258 F.3d 1191, 1201, 1205 (10th Cir. 2001) (*Qwest I*) (concluding the FCC had inadequately explained how its decision was related to the statutory requirements provided in Section 254); *Qwest Comm'ns. Int'l, Inc. v. FCC*, 398 F.3d 1222, 1234 (10th Cir. 2005) (*Qwest II*) (concluding the FCC had erred in its constructions of "sufficient" and "reasonably comparable" by ignoring other universal service principles). Further demonstrating that Section 254 constrains the FCC, the Fifth Circuit has concluded that the principles in Section 254(b) may be overcome by other mandatory provisions in Section 254. *See TOPUC I*, 183 F.3d at 412 ("[T]he plain language of § 254(e) makes sufficiency of universal service support a direct statutory command rather than a statement of one of several principles.").

In applying the statute, the FCC first determines what constitutes universal service pursuant to Section 254(c). From there, the FCC determines "sufficient" mechanisms and support levels "to preserve and advance universal service" in accordance with the principles established by Congress. 47 U.S.C. § 254(b)(5), (d); *see also id.* § 254(e) (stating that universal support "should be explicit and sufficient to achieve the purposes of this section"). The level of support therefore is directed by what is sufficient to support universal service and by market demand. *See* 47

11

C.F.R. § 54.709(a)(3) (basing total contribution amount on projections of demand). As this Court observed, "it is hard to imagine how the Commission could achieve the overall goal of § 254 . . . if the USF is 'sufficient' for purposes of § 254(b)(5), yet so large it actually makes telecommunications services less 'affordable,' in contravention of § 254(b)(1)." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (*Rural Cellular I*).   Similarly, the Fifth Circuit has noted that "excessive funding may itself violate the sufficiency requirements of the Act" if it undermines "universal service by causing rates unnecessarily to rise, thereby pricing consumers out of the market." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000).   These precedents establish that Section 254 limits total contributions.[3]

Petitioners also claim that the FCC may redefine its own statutory mission under Section 254(b)(7), Pet. Br. 48-49, supposedly pulling the statute away from its constitutional moorings, but this criticism again misses the mark.  Congress has guided and constrained the FCC at each step, and that is what the intelligible principle test requires.[4]   Section 254(b)(7) only permits the FCC to rely on other

---

[3] Petitioners' arguments that the universal service budget has expanded over time also are misplaced. *See* Pet. Br. 34-35.  Budget expansion has little probative value in assessing the scope of delegation, and growth in budget alone, whether due to inflation, program growth, or otherwise, does not render a program unconstitutional.

[4] *Owens v. Republic of the Sudan*, 531 F.3d 884, 890 (D.C. Cir. 2008) (declining to apply a "delegation standard more exacting than" the intelligible principle test).

principles that are "necessary and appropriate for the protection of the public interest, convenience, necessity and are consistent with" the 1996 Act when developing the universal service program. Even if this were the sole guidepost, it would be permissible under the intelligible principle test. *See Nat'l Broad. Co.*, 319 U.S. at 225-26 (finding that FCC authority to regulate in the "public interest" is permissible). Moreover, Petitioners ignore the long-established *ejusdem generis* canon that residual clauses are "controlled and defined by reference to the enumerated categories . . . which are recited just before it." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001); *see also NAACP v. FPC*, 425 U.S. 662, 669 (1976) (holding that use of "public interest" in a regulatory statute "is not a broad license to promote the general public welfare" and instead "take[s] meaning from the purposes of the regulatory legislation"). Consistent with this limitation, the FCC has only infrequently developed additional universal service principles under Section 254(b)(7). For example, the FCC has adopted a seventh principle, that universal service mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, *Rural Cellular I*, 588 F.3d at 1098, which is an outgrowth of the principle that contributions should be equitable and nondiscriminatory under Section 254(b)(4).

Petitioners further claim that the definition of "universal service" provides no limit on the FCC's discretion, Pet. Br. 41, but then fail to analyze Section 254(c)'s

13

guidance on the meaning of universal service. Section 254(c) limits the FCC to supporting "telecommunications services." 47 U.S.C. § 254(c); *id.* § 153(53). Section 254(c)(1) prescribes factors that the FCC "shall consider" in determining whether to support a service. Significantly, Section 254(c)(1) instructs the FCC to discern whether a telecommunications service is "essential" or has "been subscribed to by a substantial majority of residential customers." The former is a high bar, and the latter is an objective measure. Moreover, Section 254(c)(3)'s provision for designating additional services for support mechanisms for schools, libraries, and health care providers demonstrates Congress's intent that Section 254(c)(1) cannot be read so broadly as to include the services identified in Section 254(c)(3). Section 254(c)(3) would be superfluous otherwise. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (citation omitted) ("we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof").

Petitioners also ignore that Section 254(e) limits the recipients of universal service funds to "eligible telecommunications carrier[s]"[5] and that such funds may only be used for "the provision, maintenance, and upgrading of facilities and services for which such support is intended." *See Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105-06 (10th Cir. 2021). Just as the Clean Air Act applies to a discrete set of

---

[5] An "eligible telecommunications carrier" is a telecommunications carrier that has been designated as eligible to receive universal service support by a state utility commission or, in some cases, by the FCC. 47 U.S.C. § 214(e).

14

pollutants, *Whitman*, 531 U.S. at 473, Section 254 only allows for the funding of a discrete set of communications services.

Not only does Section 254's textual guidance clearly pass the delegation test, its purpose and history further limit the FCC's discretion. Courts employ additional tools of statutory interpretation in the intelligible principle analysis that extend beyond examining the text of the provision in question. *Gundy*, 139 S. Ct. at 2123 (plurality) (interpreting the "text . . . alongside its context, purpose, and history"). There is no dispute that Congress included Section 254 in the 1996 Act to preserve and advance universal service that had existed under the earlier non-competitive framework that allowed for implicit subsidies for high-cost service. Pet. Br. 10-12; *see also* 47 U.S.C. § 254(b) (providing for "preservation and advancement of universal service"). The pre-1996 Act universal service program was not meant for "solving the problems of the poor" but instead was meant for "the more limited purpose of ensuring that 'telephone rates are within the means of the average subscriber.'" *Rural Tel. Coal.*, 838 F.2d at 1315 (citation omitted). Section 254 preserved aspects of the existing regime while requiring changes, such as the complete transition to explicit support. By reflecting Congress's choices to retain or alter pre-1996 Act practices, Section 254 guides and constrains the FCC.

As an example of how Congress modified pre-1996 Act universal service, Section 254(h) established universal service support for rural healthcare and schools

15

and libraries. The statutory directives to the FCC in Section 254(h) are even more prescriptive than those in the rest of Section 254. Thus, Section 254(h) satisfies the intelligible principle test with respect to rural healthcare and school and library support even more easily than the remainder of Section 254. Further, the addition of subsection (h) indicates that Congress contemplated that existing universal service programs would guide and constrain the interpretation of the remainder of Section 254. *See, e.g.*, *TOPUC I*, 183 F.3d at 405-06; *AT&T Inc.*, 886 F.3d at 1241-42.

While the text, purpose, and history of Section 254 show that Congress established an intelligible principle that constrains the FCC's discretion, *Vonage* demonstrates Congress's wisdom in leaving some regulatory flexibility to accommodate technological changes. With this flexibility, the FCC can determine contribution levels and mechanisms that reflect market dynamics in the fast-changing technological area of telecommunications.[6]  In *Vonage*, the FCC was confronted with a new technology, voice over Internet Protocol services, that was in its most nascent form when the 1996 Act was passed. The FCC determined that such services should contribute to universal service as an "other provider of interstate telecommunications." *Vonage*, 489 F.3d at 1238-41. This determination

---

[6] *See Gen. Tel. Co. of the Sw. v. United States*, 449 F.2d 846, 853 (5th Cir. 1971) ("The Communications Act was designed to endow the Commission with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications.").

required a technical analysis about the types of services that Vonage provided and their similarities to those provided by telecommunications carriers. *See id.* at 1236. Notably, the FCC's calculation of contribution amounts from such providers was necessarily informed by technical aspects of the services provided. *See id.* at 1237.

**B.    This Case is Distinguishable From *Panama* or *Schechter Poultry*.**

The Supreme Court's only two decisions striking down statutes on nondelegation grounds—*Panama* and *Schechter Poultry*—involved statutes that utterly failed to constrain executive discretion. Petitioners' attempt to compare Section 254's extensive guidance to the FCC to the National Industrial Recovery Act provisions at issue in those cases fails. Pet. Br. 46-49.

In *Panama*, the Supreme Court determined that Congress "provided literally no guidance for the exercise of discretion." *Whitman*, 531 U.S. at 474 (discussing *Panama*). Petitioners wrongly suggest that Section 254(b) "resembles" the National Industrial Recovery Act. Pet. Br. 46. In *Panama*, the Supreme Court reviewed the constitutionality of delegated actions taken under Title I, Section 1 of the National Industrial Recovery Act, which it found contained only general policy declarations but no directions to act. *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 417 (1935) (instructing the President to "remove obstructions to the free flow of … commerce," "eliminate unfair competitive practices," and "improve standards of labor."). The Supreme Court held that Title I, Section 1 of the National Industrial Recovery Act

17

was "simply an introduction of the Act, leaving the legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections." *Id.* at 418. In contrast, Congress made clear that Section 254(b) directs the FCC to act. *See* 47 U.S.C. § 254(b) ("the Commission *shall* base policies . . . on the following principles") (emphasis added). Moreover, consistent with its function as a legislative constraint on agency guidance, all of the principles in Section 254(b) serve and explicate a unified goal—"the preservation and advancement of universal service." 47 U.S.C. § 254(b).

Petitioners' comparison to *Schechter Poultry* is similarly unconvincing. Pet. Br. 46-47. The relevant provisions of the National Industrial Recovery Act in *Schechter Poultry* stated that the President may "impose no inequitable restrictions on admission" and must "find that the code is not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them," and that it will "tend to effectuate the policy" of Title I of the statute. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538 (1935) (cleaned up). The first two such provisions only proscribed steps the President could *not* take, and left the President unfettered discretion regarding steps he could take. *Id.* (stating that the first provision at issue "relates only to the status of the initiators of the new laws and not to the permissible scope of such laws" and that the second leaves the President free to "approve or disapprove . . . proposals as he may see fit"). The Court

18

found that the statute's direction to the President to determine if the code would "tend to effectuate the policy of this title" called merely for an "opinion" and left the President free to "roam at will." *Id.* Section 254(b)'s principles, meanwhile, are an affirmative mandate that the FCC "shall base" its policies upon. 47 U.S.C. § 254(b). Moreover, Section 254's focus on universal service in telecommunications is much more limited than the National Industrial Recovery Act's "authority to regulate the entire economy." *Whitman*, 531 U.S. at 474.

### C.    The Court Should Reject Petitioners' False Distinctions Regarding Application of the Intelligible Principle Test.

Petitioners avoid relevant precedent by creating false lines delineating when courts should apply different standards of the intelligible principle test, asserting that "revenue-raising precedents" are subject to a more stringent standard and those involving statutes that regulate "variegated technical matters" are subject to a more relaxed standard. Pet. Br. 39, 42. No such lines exist.

Petitioners overstate the stringency of the intelligible principle standard in the fee context. For example, the Supreme Court in *Skinner* upheld a statute directing the Secretary of Transportation to "establish a schedule of fees based on the usage, in reasonable relationship to volume-miles, miles, revenues, *or an appropriate combination thereof.*" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989) (emphasis added). The statute set a cap on "the aggregate of fees received for any fiscal year." *Id.* at 215. But *Skinner* noted, "[i]n enacting [the statute], Congress

delimited the scope of the Secretary's discretion with much greater specificity than in delegations that we have upheld in the past." *Id.* at 219 (collecting cases).[7] Petitioners suggest that *Skinner* establishes a *de facto* standard requiring limitations such as a cap and specific metrics for setting fees. However, *Skinner* never said such statutory factors were necessary to pass muster as an intelligible principle and, indeed, noted that instances of lesser specificity had been upheld in the past. *Id.*

Petitioners also claim that "objective limits" on the amount of revenue to be raised are required because *Hampton* reviewed a statute that provided for customs duties to be collected according to a "precise formula for objectively calculating such revenues." Pet. Br. 38. But Petitioners overstate the precision of the statutory formula in *Hampton*. The relevant statute provided a list of considerations for the President to weigh in ascertaining differences in production cost "in so far as he finds it practicable." *Hampton*, 276 U.S. at 401-02. Notably, the last of these considerations was "any other advantages or disadvantages in competition." *Id.* at 402. More fundamentally, *Hampton* explained that Congress cannot police every detail in a regulatory scheme. Rather, Congress may lay down the general approach

---

[7] The Court also concluded that "[e]ven if the user fees are a form of taxation . . . the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that we have applied to other nondelegation challenges." *Skinner*, 490 U.S. at 223.

20

for an agency to follow and the agency may implement the details. *Id.* at 407-11. This is consistent with the way in which Congress approached Section 254.

Finally, Petitioners note that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." Pet. Br. 36 (quoting *Whitman*, 531 U.S. at 475). Petitioners, however, do not acknowledge the breadth of the congressional delegation at issue in *Whitman*, which involved a "sweeping regulatory scheme[]" for "air standards that affect *the entire national economy*." 531 U.S. at 475 (emphasis added). Even in such a sweeping scheme, the congressional directive to set air quality standards requisite to protect the public health "fits comfortably within the scope of discretion permitted by our precedent." *Id.* at 476. In contrast, Section 254 is targeted at a single sector of the national economy.

### D. Section 254's Delegation Must Be Analyzed Under Governing Precedent.

Petitioners urge this Court to analyze Section 254's delegation to the FCC under Petitioners' conception of the original understanding of nondelegation, *see* Pet. Br. 35, but such an approach is foreclosed by Supreme Court precedent and the precedent of this Court. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own

21

decisions."); *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 549 (D.C. Cir. 2019).

Even if this Court were not bound by Supreme Court precedent, Petitioners offer a one-sided, selective reading of historical sources.  *See* Pet. Br. 30-31.  Recent academic research exhaustively reviewing legislation from before and after ratification of the Constitution undercuts Petitioners' isolated references.  *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 293, 332 (2021) (surveying historical evidence and finding that "contemporary political theory and practice before the Founding both confirm that broad delegations of all kinds of legislative authority were not only constitutionally tolerable, but commonplace" and that after the Founding "[r]egulatory delegations were limited only by the will and judgment of the legislature").[8]

## E.  Section 254 Would Be Constitutional Under a Broadened Intelligible Principle Standard.

Section 254 easily passes muster under the long-established intelligible principle standard *and* would be constitutional under a broadened standard based on the factors in Justice Gorsuch's *Gundy* dissent.

---

[8] Professor Ilan Wurman responds to Mortenson and Bagley in *Nondelegation at the Founding*, but even under his analysis of Founding Era practice, Section 254 would likely pass muster because it "expressly authorize[s]" the FCC to act, the category of conduct is narrow, and the standards for the FCC's actions are "relatively precise in context."  130 Yale L.J. 1490, 1555 (2021).

In *Gundy*, Justice Gorsuch stated that although Congress must make policy decisions, Congress still may direct agencies to "fill in even a large number of details" and to "find facts that trigger the generally applicable rule of conduct specified in a statute." *Gundy*, 139 S. Ct. at 2145 (Gorsuch, J., dissenting). Similarly, Justice Gorsuch explained in evaluating cases from before the era of the intelligible principle: "Through all these cases, small or large, runs the theme that Congress must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Id.* at 2136 (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). Reflecting on past cases, Justice Gorsuch stated that the Court must ask: "Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And . . . did Congress, and not the Executive Branch, make the policy judgments?" *Id.* at 1241 (Gorsuch, J., dissenting).

The statute at issue in *Gundy* provides: "The Attorney General shall have the authority to specify the applicability of the requirements of this [title] to sex offenders convicted before the enactment of this [Act]." 34 U.S.C. § 20913(d). Justice Gorsuch described the statute as "giving the nation's chief prosecutor the power to write a criminal code," giving "the discretion to apply or not apply any or

all of [the act]'s requirements," and "allow[ing] the nation's chief law enforcement officer to write the criminal laws he is charged with enforcing." *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Justice Gorsuch asserted that to make the law permissible Congress could have "required all pre-Act offenders to register, but then given the Attorney General the authority to make case-by-case exceptions," and "set criteria to inform that determination." *Id.* at 2143 (Gorsuch, J., dissenting). This standard still leaves discretion to the executive in the same way that Section 254(d) does.

Here, Congress has made "the policy decisions," and the FCC is filling in the details. *Id.* at 2136 (Gorsuch, J., dissenting). Section 254(a) directs that the FCC "shall" implement a universal service program, and Section 254(d) requires that every telecommunications carrier that provides interstate telecommunications "shall" contribute.[9] Sections 254(b)(5), (d), and (e) direct the FCC to provide "sufficient" support, establishing outer bounds for universal service support. *See AT&T Inc.*, 886 F.3d at 1252. Thus, Congress "resolve[d the] important policy

---

[9] Although Section 254(d) goes on to permit the FCC to exempt a carrier or class of carriers, this is simply a conditional obligation subject to agency fact-finding. Similarly, Section 254(d)'s provision allowing for contribution from "[a]ny other provider of interstate telecommunications" likewise falls into the gap-filling category, where Congress has provided the policy, but agency gap-filling is required. *See Vonage*, 489 F.3d at 1236 (upholding the FCC decision to require providers of VoIP services that did not exist broadly in 1996 to make contributions).

questions." *Nat'l Fed. of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring).

The statement in *TOPUC II* that Congress "delegate[d] difficult policy choices to the Commission's discretion" is not inconsistent with concluding that Section 254 conforms to the standard in the *Gundy* dissent. 265 F.3d at 321 (quoting *Alenco Commc'ns, Inc*, 201 F.3d at 615). *Alenco*'s and *TOPUC II*'s statements did not suggest that Congress delegated the *constitutionally* important policy choices. Congress merely delegated the gap-filling policy choices—e.g., how to properly balance universal service principles while also moving to a competitive market structure in a rapidly evolving technological field. Balancing between Section 254(b)'s principles while the industry undergoes a tectonic shift might present difficult choices, but such choices are not the threshold policy choices that Justice Gorsuch suggests cannot be left to the executive.

In addition, Section 254(c)(1)'s delegation to the FCC to determine what constitutes universal service similarly represents an instance of agency fact-finding or gap-filling, where Congress has provided the FCC with the relevant factors to consider. This is not a case where Congress has "found it expedient to hand off the job to the executive and direct there the blame for any later problems that might emerge." *Gundy*, 139 S. Ct. at 2143 (Gorsuch, J., dissenting). Rather, Congress recognized that "the telecommunications market [would] undergo[] dramatic

25

changes," *TOPUC II*, 265 F.3d at 322, and the definition of universal service would need to keep pace by allowing for an "evolving" standard subject to congressional prescriptions. *See also Direct Commc'ns Cedar Valley, LLC v. FCC (In re FCC 11-161)*, 753 F.3d 1015, 1036 (10th Cir. 2014) ("in the future other types of telecommunications might become necessary for the nation to remain at the forefront of technological development, and, consequently, [Congress] outlined a process for the FCC to adjust the definition of universal service as new technologies arose" (quoting *Wireless World, LLC v. Virgin Islands Pub. Servs. Comm'n*, No. Civ. A. 02-0061STT, 2005 U.S. Dist. LEXIS 15061, *22 n.7 (D.V.I. 2008) (cleaned up))). Section 254(c)'s universal service definition provides the factors the FCC "shall consider" in determining what constitutes universal service. 47 U.S.C. § 254(c).

In this way, Section 254 "set[s] forth the facts that the executive must consider and the criteria against which to measure them," and thereby "set[s] forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy*, 139 S. Ct. at 2136, 2141 (Gorsuch, J., dissenting) (quoting *Yakus*, 321 U.S. at 426). Indeed, the ability of courts to ascertain whether Congress's guidance has been followed has been borne out by federal court identification of limits on FCC action that may be taken pursuant to Section 254. *See e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 436 (5th Cir. 2021) (noting that caselaw does not support the argument that the

FCC "may deploy the universal-service mechanism to accomplish any non-prohibited purpose in the Act"); *TOPUC I*, 183 F.3d at 435 (reversing FCC decision after concluding that "[t]he agency has offered no reasonable explanation of how this outcome, which will require companies . . . to incur a loss to participate in interstate service, satisfies [Section 254(d)'s] 'equitable and nondiscriminatory' language"); *Qwest I*, 258 F.3d at 1201, 1205 (concluding that the FCC had inadequately explained how its decision was related to the statutory requirements provided in Section 254); *Qwest II*, 398 F.3d at 1234 (concluding that the FCC had erred in its constructions of "sufficient" and "reasonably comparable").

## II. PETITIONERS' TAX CLAIMS ARE WRONG ON THE LAW AND IRRELEVANT UNDER BINDING PRECEDENT.

This Court has concluded that universal service contributions are not taxes. *See Rural Cellular Ass'n & Universal Serv. v. FCC*, 685 F.3d 1083, 1090-91 (D.C. Cir. 2012) (*Rural Cellular II*) (concluding that contributions are not taxes where "contributions to the temporary reserve support a program to subsidize broadband Internet access from which those [contributing] carriers will particularly benefit"); *Rural Tel. Coal.*, 838 F.2d at 1314 (citation omitted) (rejecting tax challenge to pre-1996 Act universal service approach because "a regulation is a tax only when its primary purpose judged in legal context is raising revenue"). Numerous other courts have followed the sound conclusion of this Court. *See, e.g.*, *Consumers' Rsch. v. FCC*, 67 4th 773, 788 n.8 (6th Cir. 2023); *TOPUC I*, 183 F.3d at 427 n.52.

27

But there is a more fundamental flaw in Petitioners' argument. The question of whether a payment is a fee or a tax is irrelevant to the nondelegation inquiry. *Skinner*, 490 U.S. at 222-23 ("We find no support . . . for [the] contention that the text of the Constitution or the practices of Congress require the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power."). Thus, "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that . . . applied to other nondelegation challenges." *Id.* at 223. This Court has already reached this conclusion regarding Section 254: "Because section 254 of the Act clearly provides an intelligible principle to guide the Commission's efforts, viz., 'to preserve and advance universal service,' whether the assessment is deemed a tax is of no real moment." *Rural Cellular II*, 685 F.3d at 1091.

### III.   USAC'S ROLE IS NARROWLY CONFINED AND PETITIONERS EXAGGERATE USAC'S AUTHORITY.

Petitioners contend that USAC's role in administering universal service programs "violates the private nondelegation doctrine, contrary to Article I of the U.S. Constitution." Pet. Br. 67. This Court should reject Petitioners' arguments, which are based on an exaggerated conception of USAC's role and discretion, as the relevant regulations and the Public Notice at issue make clear.

28

The FCC's regulations demonstrate that USAC exercises no lawmaking authority.  The relevant regulations provide that "[c]ontributions to [universal service] mechanisms . . . shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly *by the Commission*."  47 C.F.R. § 54.709(a) (emphasis added).  The FCC has determined that such contributions shall be "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions."  *Id.* § 54.709(a)(2).  USAC's role is merely to gather data and make the quarterly projections from which the FCC performs the relevant calculation.  *See id.* § 54.709(a)(2)-(3).  The Public Notice that Petitioners challenge further bears this out.  *See* Public Notice at 1, 4 (stating that the quarterly contribution factor is "calculated by the Federal Communications Commission," which USAC "shall use" to then determine the amount of individual contributions).  The FCC and its Bureaus, applying Section 254, determine what the Fund supports through detailed policymaking proceedings.[10]  Petitioners therefore are wrong in claiming

---

[10] *See, e.g.*, *Establishing a 5G Fund for Rural Am.*, FCC 23-74 (rel. Sep. 22, 2023); *Wireline Competition Bureau Seeks Comment on Proposed Eligible Services List for the E-Rate Program*, DA 23-819 (rel. Sept. 12, 2023); *Connect Am. Fund: A Nat'l Broadband Plan for Our Future High-Cost Universal Service Support et al.*, FCC 23-60 (rel. July 24, 2023); *Promoting Telehealth in Rural Am.*, FCC 23-6 (rel. Jan. 27, 2023).

that "USAC decides how much money to raise each year in pursuit of 'universal service' and how to spend it." Pet. Br. 34.

Furthermore, the FCC's regulations expressly exclude USAC from policy-making functions and responsibilities. USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress," and "[w]here the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission." 47 C.F.R. § 54.702(c). Accordingly, USAC acts in a ministerial capacity when gathering data and submitting projections of demand and expenses to the FCC so that the FCC can calculate the contribution factor, and USAC does not make any laws or exercise any unreviewable authority to raise money. Members of Intervenors' USTelecom, NTCA, and CCA routinely interact with USAC by reporting revenue, submitting contributions, and receiving support—and they interact with the FCC where policy and interpretive matters are at issue.

The fact that the FCC has rarely revised USAC's calculations is only a manifestation of the ministerial data-gathering and projecting role that USAC plays. Matters of arithmetic are not subject to discretion. Thus, Petitioners' claim (Pet. Br. 67) based on *Sierra Club v. Lynn* that the FCC only acts as a rubber stamp is inapt— that case involved the far more fact- and judgment-intensive development by third parties of an environmental statement under the National Environmental Policy Act.

30

502 F.2d 43, 59 (5th Cir. 1974).  Performance of a mechanical accounting task is fundamentally different.

Petitioners rely on *In re Incomnet*, a bankruptcy case where the court answered the narrow—and irrelevant—question of whether USAC was an "initial transferee" under the Bankruptcy Code.  463 F.3d 1064, 1069 (9th Cir. 2006).  In answering that question, the court looked to the immediate control that USAC has over universal service funds, but said nothing about USAC exercising lawmaking power.  *Id.* at 1071-75.  In fact, the court noted a litany of other ways in which the FCC controls USAC's actions.  *Id.* at 1071-73. ("The FCC has responsibility for implementing and regulating the collection and distribution of the USF"; "USAC is prohibited from mak[ing] policy, interpret[ing] unclear provisions of the statute or rules, or interpret[ing] the intent of Congress"; "The FCC retains the authority to overrule USAC's actions in administering the universal service support funds"; and "[T]hose who are aggrieved by USAC, its committees, or its Board may seek review from the FCC.") (internal quotations and citations omitted).

For all these reasons, this Court should reject Petitioners' hyperbolic claims about USAC's authority.

## IV.    STRIKING DOWN SECTION 254 WOULD DISRUPT THE ECONOMY AND DISCONNECT MILLIONS OF AMERICANS AND ANCHOR INSTITUTIONS.

Congress provided the FCC specific direction regarding each of the Universal Service Fund programs in Section 254.  During the many years in which Petitioners raised no constitutional objections to these programs, millions of schools, libraries, health care providers, companies, and rural and low-income consumers have come to rely on the universal service programs for internet access and other critical communications services.  Service providers have started companies, developed long-standing business plans, and made capital investments to reach more areas and institutions.  Petitioners' campaign to eliminate the Universal Service Fund would throw this entire ecosystem into chaos.

*E-Rate Program.*  In Section 254(h), Congress directed the FCC to establish a sustainable universal service program to ensure that schools and libraries have affordable access to advanced communications services.  47 U.S.C. § 254(h)(1)(B); *see also id.* § 254(b)(6).

Pursuant to long-standing FCC rules, schools and libraries typically have entered into years-long contracts for eligible telecommunications and broadband service with providers.  *See* 47 C.F.R. §§ 54.500-54.523.  Participating schools and libraries regularly conduct competitive bidding processes to find providers for their

desired services, *see id.* § 54.503, with Universal Service funding enabling discounts of generally 20-90% from the "pre-discount price." *Id.* § 54.505(a)-(b).

When the E-Rate program was established in 1996, "only 14 percent of the nation's K-12 classrooms" had even basic access to the internet.[11]  In 2014, the FCC modernized the program to focus funding on providing schools and libraries with affordable broadband connectivity and internal Wi-Fi networks.    E-Rate has achieved tremendous results while staying well below its budget.[12]

With support from E-Rate, as of 2020, 99% of school districts obtained broadband service of at least 100 megabits per second per 1,000 users, connecting over 46 million students.[13]   In 2022 alone, over 128,500 schools, school facilities, and libraries participated in the E-Rate program, receiving discounts totaling approximately $2 billion.  Universal Service Administrative Company, *2022 Annual Report*, at 9 (2022) ("USAC 2022 Annual Report"), https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2022/USAC_2022_Annual_Report.pdf.

---

[11] Federal Communications Commission, *E-Rate: Universal Service Program for Schools and Libraries*, https://www.fcc.gov/consumers/guides/universal-service-program-schools-and-libraries-e-rate (last updated Sept. 15, 2021).

[12] Federal Communications Commission, *E-Rate – Schools and Libraries USF Program*, https://www.fcc.gov/general/e-rate-schools-libraries-usf-program  (last updated Oct. 2, 2023).

[13] *Inquiry Concerning Deployment of Advanced Telecomms. Capability to All Ams. in a Reasonable and Timely Fashion*, 35 FCC Rcd 8986, 9017-18 (2020).

Petitioners' challenge threatens to cut off educational connectivity for millions of students, teachers, and library users. Without E-Rate discounts, schools and libraries across the country may no longer be able to afford the broadband connectivity they currently rely upon to provide essential educational services. At a minimum, without E-Rate, schools and libraries would face much higher fees for the critical internet access services and equipment that make those institutions community anchor points for accessing broadband.

The ultimate E-Rate beneficiaries are the millions of students, teachers, and library patrons who depend on this universal service program for access to the advanced communications equipment and services necessary for modern education. Petitioners' challenge would undermine educational opportunities for millions who rely on broadband in their schools and libraries. It would also throw thousands of service contracts (including multi-year commitments) into disarray, leaving companies that have invested in networks and facilities to serve schools and libraries in unsustainable financial positions.

***Rural Health Care Program.*** In Section 254(h), Congress provided universal service funding to support access for rural health care providers to affordable advanced communications services. *See id.* § 254(h)(1)(A); *see also id.* § 254(b)(6).

The Rural Health Care program ensures that eligible rural health care providers pay no more than their urban counterparts for telecommunications services

34

used for health care purposes and provides a 65% discount on the cost of broadband services and equipment used for health care purposes. The goal of the program is to improve the quality of health care available to patients in rural communities by ensuring providers' access to affordable telecommunications and broadband services. As in E-Rate, health care providers participating in the program enter into contracts with telecommunications and broadband service providers after a competitive bidding process subject to FCC rules and oversight. *See* 47 C.F.R. §§ 54.600-54.633.

Many health care providers serving rural areas can afford modern telecommunications services and broadband only because of the Rural Health Care program. In 2022, for example, over 14,000 rural health care providers received funding commitments and program disbursements totaling $496 million. USAC 2022 Annual Report at 2, 4. With this universal service support, providers are far more capable of offering telehealth services to patients who otherwise would have to travel long distances for medical treatment. *See, e.g.*, *Promoting Telehealth in Rural Am.*, 34 FCC Rcd 7335, 7336, 7737-38 (2019) (describing benefits of telehealth services for patients in rural areas across the country). In particularly extreme environments, such as in Alaska, telehealth services made possible by the Rural Health Care program are often the only regularly available health care

services.  *See, e.g.*, Letter from Michael J. Dunleavy, Governor, Alaska, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 17-310, at 2 (filed Nov. 12, 2019).

Petitioners' challenge would leave many health care providers serving rural and remote communities unable to justify the cost of their connections, and it would throw contractual relationships between those health care facilities and their service providers into tumult.  *See, e.g.*, 47 C.F.R. § 54.620(b)-(c) (describing rules regarding long-term and multi-year contracts).  Worse yet, cutting off this universal service funding would impair the provision of rural health care across the country— depriving rural health care providers of affordable communications services and undermining their ability to treat patients in rural communities that lack ready access to medical care today.

***Lifeline Program.***  Since 1985, the Lifeline program has provided a discount on phone service for qualifying low-income consumers to ensure that all Americans have the opportunities and security that phone service brings, including being able to connect to jobs, family, and emergency services.  In 1996, Congress expressly codified the program, directing the FCC to preserve the preexisting Lifeline Assistance Program and to ensure that "universal service is available at rates that are just, reasonable, and affordable."  47 U.S.C. §§ 254(i), (j).

In 2016, the FCC adopted a comprehensive modernization of the Lifeline program to ensure program integrity while including broadband as a supported

service.  *See Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd 3962 (2016).  Today, Lifeline offers a monthly benefit of up to $9.25 towards phone or internet services for eligible households and up to $34.25 for eligible Tribal households.

As of 2022, nearly 7.5 million households participate in the Lifeline program. USAC 2022 Annual Report at 2.  Further, more than 1,100 qualified telecommunications providers work to help implement this program,[14] with most subscribers receiving broadband internet access as well as phone service.  *See, e.g.*, Wireline Competition Bureau, FCC, *Report on the State of the Lifeline Marketplace*, WC Docket No. 20-437, at 6 (rel. July 2, 2021).  The program is particularly critical for older Americans who use Lifeline to stay connected to their communities, health care, and livelihoods.  *See, e.g.*, Letter from AARP et al. to Ajit V. Pai, Chairman, FCC, et al., WC Docket No. 17-287, at 1 (filed May 23, 2018).

Without Lifeline support, participating seniors and other low-income households would struggle to afford basic connectivity to the internet that—as seen during the COVID-19 pandemic—has become necessary for full participation in modern life.  If successful, Petitioners' claims would cut off millions of low-income Americans from the internet and phone services that they rely on for access to

---

[14] *See* Tyler Cooper, *Report: Every ETC Registered with the FCC's Lifeline Program*, BroadbandNow (Dec. 7, 2021), https://broadbandnow.com/report/report-every-etc-registered-with-the-fccs-lifeline-program/.

emergency services, education, health care, job opportunities, e-commerce, and civic engagement.  As with other universal service programs, companies that have entered contracts with those subscribers and built businesses around serving Lifeline participants would also face significant disruption.

**_High-Cost Program._**  The FCC's high-cost program implements Section 254's direction to ensure that Americans in rural, insular, and high-cost areas have access to reasonably comparable communications services at "reasonably comparable … rates" to those in urban areas.  47 U.S.C. § 254(b)(3).

Today, small and large communications companies rely on approximately $4.3 billion annually to provide essential voice and internet services to some of the hardest-to-reach, rural communities across the country.  USAC 2022 Annual Report at 4.  Most recently, as part of the high-cost program, the FCC established the Rural Digital Opportunity Fund and held a "reverse auction" to identify support recipients that will deploy robust broadband networks to rural communities that for too long have gone without *any* broadband internet access.  *See, e.g.*, *Rural Digit. Opportunity Fund Phase I Auction (Auction 904) Closes*, 35 FCC Rcd 13888 (2020). The FCC has committed to provide monthly subsidy payments over a term of ten years to build networks capable of providing high-quality voice and broadband service to every location in their award areas.

38

Critically, these funds are already working to connect Americans across the country, and winning bidders are making significant upfront capital investments to build new broadband networks with the expectation that they will receive the awards that they won.  Petitioners' challenge would abruptly eliminate funding that thousands of small and large communications companies rely upon to provide reasonably comparable voice and broadband services to rural and high-cost consumers.  For example, Hardy Telecommunications, based in Lost River, West Virginia, is a cooperative formed in 1953 to deliver telephone service in rural West Virginia.  Today, Hardy offers voice, broadband, and other communications services to just over 3,700 customers across 421 square miles.  Universal service support through the High-Cost program has been and remains critical to the availability and affordability of services and sustainability of operations; in 2022, Hardy received nearly $4.5 million in federal universal service support to serve these sparsely populated and deeply rural areas.  Were this support eliminated, the company would face the prospect of increasing rural customers' rates dramatically in West Virginia to attempt to offset the approximately $101 per customer per month received in support from the High-Cost program.

The benefits of USF are felt not just by recipients of program funding but by everyone.  Connectivity stimulates commerce, civic engagement, and governance—

every new connected user is a potential e-commerce customer, a citizen with a

platform, and recipient of more efficient local, state, and federal governance.

## V.    CONCLUSION

For these reasons, this Court should deny the Petition.

                                                    Respectfully submitted,


*/s/ Jason Neal*                           */s/ Jennifer Tatel*
Jason Neal                                 Jennifer Tatel
HWG LLP                                    Daniel H. Kahn
1919 M Street NW, Eighth Floor             Morgan O. Schick
Washington, DC  20036-3537                 Wilkinson Barker Knauer, LLP
(202) 730-1300                             1800 M Street NW, Suite 800N
jneal@hwglaw.com                           Washington, DC 20036
*Counsel for SHLB*                         (202) 783-4141
                                           jtatel@wbklaw.com
*/s/ Andrew Jay Schwartzman*               dkahn@wbklaw.com
Andrew Jay Schwartzman                     mschick@wbklaw.com
525 Ninth Street NW, Seventh Floor         *Counsel for USTelecom, NTCA, CCA*
Washington, DC  20004
(202) 241-2408
AndySchwartzman@gmail.com
*Counsel for Benton Institute,*
 *NDIA, MediaJustice*

October 5, 2023

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,073 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 5, 2023, I filed the foregoing Joint Brief of

Intervenors USTelecom, NTCA, CCA, SHLB, Benton, NDIA, and MediaJustice in

Support of Respondents with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit using the electronic CM/ECF system. Participants

in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel