## ORAL ARGUMENT NOT YET SCHEDULED
### No. 23-1091

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**CONSUMERS' RESEARCH, ET AL.,**
*Petitioners,*

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, ET AL.,**
*Respondents.*
**COMPETITIVE CARRIERS ASSOCIATION, ET AL.,**
*Intervenors.*

Petition for Review of an Order of the
Federal Communications Commission
FCC-DA-23-216

### REPLY BRIEF FOR PETITIONERS

Jonathan Berry
R. Trent McCotter
Michael Buschbacher
Jared M. Kelson
  *Counsel of Record*
BOYDEN GRAY PLLC
801 17th St NW, Ste 350
Washington, DC 20006
202-955-0624
jkelson@boydengray.com

*Counsel for Petitioners*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Petitioners Consumers' Research, Cause Based Commerce, Inc., Edward J. Blum, Kersten Conway, Suzanne Bettac, Robert Kull, Kwang Ja Kirby, Tom Kirby, Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, and Rhonda Thomas submit this Certificate as to Parties, Rulings, and Related Cases.

### A.    Parties

Petitioners are Consumers' Research; Cause Based Commerce, Inc.; Edward J. Blum; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kirby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; and Rhonda Thomas.

Respondents are the Federal Communications Commission and the United States of America.

Intervenors for Respondents are Competitive Carriers Association; National Telecommunications Cooperative Association; Schools, Health & Libraries Broadband Coalition; The Benton Institute for Broadband & Society; USTelecom - The Broadband Association; Center for Media Justice; and National Digital Inclusion Alliance.

**B.     Ruling Under Review**

Under review is the final order of the Federal Communications Commission deeming approved the *Proposed Second Quarter 2023 Universal Service Contribution Factor*, CC Docket No. 96-45, DA 23-216 (released Mar. 14, 2023), https://docs.fcc.gov/public/attachments/DA-23-216A1.pdf, J.A.__.

**C.     Related Cases**

No other challenge has been brought to the *Second Quarter 2023 Universal Service Contribution Factor*. Eight challenges have been brought to previous and subsequent contribution factors: *Consumers' Rsch. v. FCC*, No. 21-3886 (6th Cir.) (Fourth Quarter 2021); *Consumers' Rsch. v. FCC*, No. 22-60008 (5th Cir.) (First Quarter 2022); *Consumers' Rsch. v. FCC*, No. 22-60195 (5th Cir.) (Second Quarter 2022); *Consumers' Rsch. v. FCC*, No. 22-60363 (5th Cir.) (Third Quarter 2022); *Consumers' Rsch. v. FCC*, No. 22-13315 (11th Cir.) (Fourth Quarter 2022); *Consumers' Rsch. v. FCC*, No. 22-4069 (6th Cir.) (First Quarter 2023); *Consumers' Rsch. v. FCC*, No. 23-60359 (5th Cir.) (Third Quarter 2023); *Consumers' Rsch. v. FCC*, No. 23-60525 (5th Cir.) (Fourth Quarter 2023).

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners Consumers' Research, Cause Based Commerce, Inc., Edward J. Blum, Kersten Conway, Suzanne Bettac, Robert Kull, Kwang Ja Kirby, Tom Kirby, Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, and Rhonda Thomas hereby make the following disclosures:

**Consumers' Research** is an independent educational 501(c)(3) nonprofit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**Cause Based Commerce** is a Kentucky corporation and a mobile virtual network operator (MVNO), which resells wireless communications services pursuant to agreements with mobile network operators. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

TABLE OF CITATIONS ............................................................... iv

GLOSSARY .............................................................................. viii

INTRODUCTION ........................................................................ 1

ARGUMENT .............................................................................. 5

    I.    THE USF IS AN UNCONSTITUTIONAL DELEGATION OF
           LEGISLATIVE POWER .................................................... 5

           A.    SECTION 254 VIOLATES THE ORIGINAL
                   UNDERSTANDING OF NONDELEGATION ............................ 5

           B.    SECTION 254 VIOLATES THE INTELLIGIBLE-
                   PRINCIPLE TEST ............................................................. 7

    II.    THE NONDELEGATION VIOLATIONS HERE ARE
           PARTICULARLY EGREGIOUS BECAUSE THEY INVOLVE
           CONGRESS'S EXCLUSIVE POWER TO LEVY TAXES ..................... 28

    III.    THE FCC'S DELEGATION TO USAC VIOLATES THE PRIVATE
           NONDELEGATION DOCTRINE ..................................................... 30

CONCLUSION ............................................................................. 34

CERTIFICATE OF COMPLIANCE ...................................................... 35

CERTIFICATE OF SERVICE ............................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935)..................................................... 14, 19, 26, 27, 28

*Alenco Commc'ns, Inc. v. FCC,*
    201 F.3d 608 (5th Cir. 2000)........................................................ 22, 28

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
    785 F.3d 710 (D.C. Cir. 2015)............................................................. 16

*Cummings v. Missouri,*
    71 U.S. (4 Wall.) 277 (1867)............................................................... 23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)............................................................................ 19

*Gundy v. United States,*
    139 S. Ct. 2116 (2019)................................................................... 5, 14

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ............................................................... 25

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928)..................................................... 8, 9, 11, 12, 13

*Jesse E. Brannen, III, P.C. v. United States,*
    682 F.3d 1316 (11th Cir. 2012).......................................................... 29

*Lichter v. United States,*
    334 U.S. 742 (1948)........................................................................... 10

*McCutcheon v. FEC,*
    572 U.S. 185 (2014)........................................................................... 15

*Mistretta v. United States,*
    488 U.S. 361 (1989)............................................................................. 7

*NBC v. United States*,
  319 U.S. 190 (1943) .............................................................................. 13

*NCTA v. United States*,
  415 U.S. 336 (1974) ................................................ 6, 8, 9, 11, 12, 13, 15

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ..................................................... 10, 24, 26, 27, 28

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018) ................................................................ 7

*Qwest Commc'ns Int'l, Inc. v. FCC*,
  398 F.3d 1222 (10th Cir. 2005) .......................................................... 20

*Qwest Corp. v. FCC*,
  258 F.3d 1191 (10th Cir. 2001) ................................................ 20, 21, 22

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (2009) ................................................................... 18, 22

*Rural Cellular Ass'n v. FCC*,
  685 F.3d 1083 (2012) ......................................................... 15, 16, 29, 30

*U.S. ex rel. Shupe v. Cisco Sys., Inc.*,
  759 F.3d 379 (5th Cir. 2014) .............................................................. 30

*Sierra Club v. Lynn*,
  502 F.2d 43 (5th Cir. 1974) ................................................................ 33

*Skinner v. Mid-Am. Pipeline Co.*,
  490 U.S. 212 (1989) ............................... 3, 7, 8, 9, 11, 12, 13, 14, 28, 29

*State v. Rettig*,
  987 F.3d 518 (5th Cir. 2021) .......................................................... 31, 32

*Tabor v. Joint Bd. for Enrollment of Actuaries*,
  566 F.2d 705 (D.C. Cir. 1977) ............................................................ 31

*Tex. Off. of Pub. Util. Couns. v. FCC*,
  183 F.3d 393 (5th Cir. 1999) ................................................ 9, 16, 17, 26

*Tex. Off. of Pub. Util. Couns. v. FCC,*
  265 F.3d 313 (5th Cir. 2001)................................ 3, 5, 17, 18, 22, 24, 34

*Trafigura Trading LLC v. United States,*
  29 F.4th 286 (5th Cir. 2022) ................................................ 29

*U.S. Dep't of Navy v. FLRA,*
  665 F.3d 1339 (D.C. Cir. 2012) ............................................... 7

*United States v. Grimaud,*
  220 U.S. 5063 (1911)...................................................... 10, 11

*Wayman v. Southard,*
  23 U.S. (10 Wheat.) 1 (1825) ................................................. 6

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)........................................ 3, 7, 9, 17, 19, 22, 25, 31

## STATUTES

26 U.S.C. § 3101 ........................................................... 13

47 U.S.C. § 151 ............................................................ 29

47 U.S.C. § 153 ............................................................ 24

47 U.S.C. § 254(b) .................................................... 3, 18, 21

47 U.S.C. § 254(c) ................................................. 3, 23, 24, 25

47 U.S.C. § 254(d) ......................................................... 25

47 U.S.C. § 254(e) ......................................................... 26

47 U.S.C. § 254(h) ......................................................... 26

47 U.S.C. § 254(j) ......................................................... 17

## OTHER AUTHORITIES

Amy Coney Barrett, *Stare Decisis and Due Process,*
  74 U. Colo. L. Rev. 1011 (2003) ............................................ 15

Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107 (2000) .................................... 2

Philip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL? (2014) .............. 6

John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT (Wallison & Yoo eds., 2022) ..... 10

Chris D. Linebaugh, Cong. Rsch. Srv., LSB10904, *Fifth Circuit Considers Constitutionality of the Universal Service Fund* (2023), https://crsreports.congress.gov/product/pdf/LSB/LSB10904 ............. 34

*In re Federal-State Joint Bd. on Universal Service*, 18 FCC Rcd. 4818 (2003) .................................................................... 32

*In re Universal Service Contribution Methodology*, 34 FCC Rcd. 4143 (2019) .................................................................... 32

*Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd. 9243 (2017) .................................................................... 32

# **GLOSSARY**

FCC             Federal Communications Commission

IRS             Internal Revenue Service

USAC            Universal Service Administrative Company

USF             Universal Service Fund

## INTRODUCTION

In their opening brief, Petitioners described the uniquely broad power that Congress delegated to the Federal Communications Commission ("FCC") to raise revenue from nearly every American for the Universal Service Fund ("USF"), and how the FCC then redelegated that power to the private Universal Service Administrative Company ("USAC"). Petitioners explained that Congress failed to impose meaningful objective or implied limits on how much money the FCC or USAC could raise, and Congress even gave the FCC authority to perpetually redefine what "universal service" means. The lack of objective guardrails has unsurprisingly resulted in skyrocketing quarterly contribution rates for the USF, which now collects nearly 25 times the FCC's annual budget.

As legal scholars have long noted, "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately

be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107, 110 (2000).

Petitioners demonstrated that this arrangement violates the original understanding of the nondelegation doctrine, the modern intelligible-principle doctrine, and the private nondelegation doctrine. Accordingly, Petitioners asked the Court to vacate and set aside the FCC's approval of the *Proposed Second Quarter 2023 Universal Service Contribution Factor*.[1]

The government barely disputes that section 254 of the Communications Act, 47 U.S.C. § 254—which established the USF and its funding mechanism—violates the original understanding of nondelegation, whereby Congress cannot shift significant policy choices to the executive branch. *See* Part I.A, *infra*. The government fares no better under the modern intelligible-principle test because § 254 includes a unique combination of authorities granted in the context of raising revenue, where vague phrases like "public interest" are too

---

[1] Petitioners refer to the FCC, the United States, and their supporting Intervenors collectively as "the government." The brief of Intervenors is cited separately as "Intervenors.Br."

indeterminate, and thus precedents have involved some kind of objective limit on how much money an agency can raise. There are no such limits here. Congress defined "universal service" using a vague list of principles that courts and even the FCC itself have labeled as only "aspirational." *Tex. Off. of Pub. Util. Couns. v. FCC* (*"TOPUC II"*), 265 F.3d 313, 321 (5th Cir. 2001).

Indeed, nearly every relevant provision in § 254 is couched as something the FCC merely "should" do or "consider," and thus the only substantive limitation is the FCC's own self-restraint. But the Supreme Court has made clear that "an agency's voluntary self-denial" is not a valid limitation for nondelegation purposes. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001).

Even if some clauses could seem to limit the FCC, they succumb to the agency's express power to redefine "universal service" and add new "universal service principles." 47 U.S.C. § 254(b)(7), (c)(1)(D). This unique multi-layer delegation, especially in the context of revenue-raising, proves that Congress failed to "'clearly delineate[]'" the "'boundaries of this delegated authority.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 219 (1989); *see* Part I.B, *infra*.

The FCC has also violated the private nondelegation doctrine by re-delegating operation of the USF to USAC. The government claims it closely monitors USAC's activity, which the government describes as "administrative." But in the last 25 years, the government's best example of FCC oversight is when it changed USAC's proposed taxing rate from .09044 to .091 because phone companies reported their computers could not handle five decimal places. *See* Part III, *infra*.

Notably, the government never disputes that this scheme could be replicated across the entire federal government. A single statute could authorize the Internal Revenue Service ("IRS") to raise money "in an equitable, nondiscriminatory, and sufficient manner" to fund the federal government, even allowing the IRS to choose which agencies get the funds. Alternatively, each department could have its own statute authorizing a similar collection from any part of the population to cover its entire operations or even subsidize outside programs. Appropriations would be entirely unnecessary. The lack of political accountability would be a politician's dream, but a nightmare for the separation of powers.

This Court should make clear that Congress cannot delegate such power, let alone to a private entity. The Court should grant the Petition.

**ARGUMENT**

## I.    THE USF IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

### A.    SECTION 254 VIOLATES THE ORIGINAL UNDERSTANDING OF NONDELEGATION

The revenue-raising scheme for the USF violates the original understanding of nondelegation, which provides a straightforward outcome here. Pet.Br.29–35. Congress must "make[] the policy decisions when regulating private conduct," *Gundy v. United States*, 139 S. Ct. 2116, 2135–37 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting), but § 254 instead "delegate[d] difficult policy choices to the [FCC's] discretion," *TOPUC II*, 265 F.3d at 321. It would also "frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals," *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting), but, again, the principles in § 254(b) use only "vague, general language" imposing "aspirational" limitations, *TOPUC II*, 265 F.3d at 321 (cleaned up).

The unconstitutionality of § 254 is even more apparent when considering it allows an agency to impose taxes. *See* Part II, *infra*. Tradition dating back to England demonstrates that "taxes were legislative, and therefore under 'the original frame and constitution of the government,' they 'must be by an act made by the whole legislative authority." Philip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL? 63 (2014) (quoting *Brewster v. Kidgell* (1698) 90 Eng. Rep. 1270 (KB) 1270 (Lord Holt CJ)). Indeed, certain "important subjects … must be entirely regulated by the legislature itself," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825), and levying taxes undoubtedly qualifies, *see, e.g.*, *NCTA v. United States*, 415 U.S. 336, 340 (1974).

The government responds that Congress can give agencies "the power to 'fill up the details' of a legislative program." Gov.Br.24 (quoting *Wayman* 23 U.S. at 43). But, as discussed below, § 254 does far more than that, even allowing the FCC to redefine the scope of "universal service" altogether. *See* Part I.B, *infra*.

Section 254's revenue-raising scheme thus violates the original understanding of nondelegation. At the very least, courts "'should resolve questions about the scope of [Supreme Court] precedents in light of and

in the direction of the constitutional text and constitutional history.'" *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., joined by Randolph, J., dissenting); Pet.Br.41 (collecting sources).

### B.    SECTION 254 VIOLATES THE INTELLIGIBLE-PRINCIPLE TEST

The USF also violates the modern intelligible-principle test, under which Congress must "'clearly delineate[] … the boundaries of th[e] delegated authority.'" *Skinner*, 490 U.S. at 219; Pet.Br.35–50. Congress failed to do so here.

#### 1.    WHAT QUALIFIES AS AN "INTELLIGIBLE PRINCIPLE" DEPENDS ON CONTEXT

The Supreme Court has repeatedly held that what suffices as an "intelligible principle" varies based on "the extent and character" of the power sought to be delegated, *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (cleaned up), and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475. The power to directly raise revenue is, from a constitutional perspective, a uniquely important "power" to be "congressionally conferred" on an executive agency. *Id.*; *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012) (Kavanaugh, J.) (the "power over the purse was one of the most important authorities

allocated to Congress in the Constitution's 'necessary partition of power among the several departments'").

The Supreme Court has held that delegating power to raise money based only on vague phrases like "'public policy or interest served, and other pertinent facts'" is so broad that it raises the specter of "'forbidden delegation of legislative power'" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S. at 341–42. *NCTA* demonstrates that statutory phrases like "in the public interest" may suffice for nondelegation purposes in other contexts, but not for revenue raising.

It is thus unsurprising that the Supreme Court's intelligible-principle cases focused on revenue-raising have involved more statutory specificity than other contexts. Pet.Br.36–42. For example, both *J.W. Hampton* and *Skinner* involved mathematical ceilings limiting how much money the agency could raise. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 401 (1928) (duties could not vary more than 50% from statutory amounts); *Skinner*, 490 U.S. at 215 (agency could not raise more than 105% of the amount already appropriated by Congress). Such

8

caps "'clearly delineate[d]'" the boundaries of the delegated authority. *Skinner*, 490 U.S. at 219.

The appropriate analogues here are revenue-raising precedents like *J.W. Hampton*, *Skinner*, and *NCTA*, not cases where the challenged statutory authority covered variegated matters largely incapable of precise definition beforehand.

The government disputes that an objective limitation is required, arguing that "even in sweeping regulatory schemes," the Court has "never demanded … that statutes provide a determinate criterion for saying how much … is too much." Gov.Br.44 (quoting *Whitman*, 531 U.S. at 475 (emphasis removed)). But *Whitman* involved an emissions statute that set both a floor and a ceiling, 531 U.S. at 473, whereas § 254 establishes neither. The FCC has insisted that "nothing in the statute" requires that "universal service support must equal the actual costs incurred." *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 412 (5th Cir. 1999). And even if the FCC were required to raise exactly enough money for universal service, the scope of "universal service" is itself so vaguely defined, and can be re-defined by the FCC, that there still is no clearly delineated boundary.

The government cites *Lichter v. United States*, 334 U.S. 742 (1948), where the Court upheld a wartime statute that "authorized agencies to recoup 'excess profits' paid under wartime Government contracts." Gov.Br.44. But *Lichter* was a remedial statute that set conditions for how the government should recuperate its own expenditures, which does not raise similar nondelegation concerns, *see* John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT 232 (Wallison & Yoo eds., 2022), and it was executed on a case-by-case basis rather than setting a national rate for raising money like for the USF. And, most importantly, *Lichter* considered a wartime statute, which the Supreme Court has held is a material distinction. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 422 (1935).

Moving next to *United States v. Grimaud*, 220 U.S. 506 (1911), the government argues that the Court upheld the Secretary of Agriculture's authority to charge fees for grazing sheep on forest reserves "even though Congress set no numerical limit on the amount of such fees," Gov.Br.45. But the government agrees that the only question in *Grimaud* was whether Congress authorized fees, *not* whether Congress imposed

sufficiently clear boundaries on the *amount* the Secretary could charge, as would be relevant here. 220 U.S. at 522; Gov.Br.45. And tellingly, Congress did establish a $500 cap on any fine. *Grimaud*, 220 U.S. at 509.

The government acknowledges that the statute in *J.W. Hampton* barred the executive from varying customs duties by more than 50% from statutory rates, then tries to downplay that limitation because the Court made no specific mention of it when analyzing nondelegation. Gov.Br.47 & n.14. But the cap was part of the "policy and plan" for determining rates considered by the Court. *J.W. Hampton*, 276 U.S. at 405. Runaway rates simply weren't a possibility. And even without the hard cap, the mandatory formula for determining rates in *J.W. Hampton* was significantly more concrete than § 254, requiring the executive to offset differences in the cost of production in competing countries.

While the government also attempts to dismiss *Skinner* because the mathematical ceiling on aggregate fees was "just one of 'multiple restrictions' on the Secretary's authority" in that case, Gov.Br.47–48, the Court never said it would have approved of the delegation otherwise. Nor can the government so easily dismiss *NCTA* on the basis that it required clear statutory language before agencies could charge higher rates to

recover administrative costs not inuring directly to the benefit of the payor. The Court only reached that conclusion—negating significant portions of the statutory text in the process—because of the admittedly grave nondelegation concerns that would otherwise arise if the agency could raise money based only on vague statutory language. *Skinner* never purported to overrule the reason why *NCTA* imposed such an extreme form of constitutional avoidance.

## 2. SECTION 254 FAILS TO IMPOSE OBJECTIVE AND DISCRETE LIMITATIONS

Section 254, however, sets no objective boundaries on the FCC's power to extract money, footed by millions of Americans. Congress could have said the FCC was limited to no more than a certain percentage of the FCC's annual budget (like *Skinner*), or could raise no more than $8 billion annually (which Congress could even peg to inflation rates the executive would factually calculate), or could tax up to 10% of interstate and international telecommunications revenues, or could charge amounts equal to the difference between two fact-bound determinations and subject to a cap (like *J.W. Hampton*). But Congress took none of those simple approaches, instead leaving the FCC "in search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S.

12

at 341–42. Once there is a limit to how much money the FCC can raise, Congress could perhaps even use vague standards like "public interest" to guide the disbursement of money within that limit. That framework would likely comply with both the revenue-raising cases like *Skinner* and *J.W. Hampton*, and variegated-matters cases like *NBC v. United States*, 319 U.S. 190, 194 & n.1, 216 (1943).

The government responds that § 254's lack of objective limits and use of vague phrases—like "the public interest"—are justified because of the technical nature of providing universal service. Gov.Br.36. But the Court must consider whether Congress "'clearly delineate[d]'" the "'boundaries'" of the specific "'delegated authority'" at issue, *Skinner*, 490 U.S. at 219, and the delegated authority challenged here is not to some technical aspect, or even spending, but the decision of how much money to raise from the public. That is hardly a novel scientific endeavor, and Congress—not an executive agency—is the expert when it comes to deciding how much money to raise for a nationwide government program. *See NCTA*, 415 U.S. at 341–42; *cf.* 26 U.S.C. § 3101(a) (setting exact tax rate for Social Security). Thus, in *Skinner*, Congress had no problem providing an objective limitation in the context of revenue-raising, even

13

though the statute involved a technical pipeline safety program. 490 U.S. at 220.

Finally, the government notes that the Court has only twice found that statutes lack the requisite intelligent principle, citing *Panama Refining* and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). *See* Gov.Br.23. As discussed below, § 254 bears an uncanny resemblance to the National Industrial Recovery Act at issue in those cases, *see* Part I.B.5, *infra*, which the Court later characterized as failing to "confine discretion." *Gundy*, 139 S. Ct. at 2129 (plurality) (quoting *Mistretta*, 488 U.S. at 373 n.7).

Because it directs the FCC to raise money for universal service with no caps, rates, or clearly delineated boundaries, the revenue-raising mechanism in § 254 is unconstitutional.

### 3. SECTION 254(B) IMPOSES NO MEANINGFUL IMPLIED LIMITATIONS, ESPECIALLY CONSIDERING CONGRESS'S MULTI-LAYER DELEGATION TO THE FCC

The lack of objective limitations on the FCC's revenue-raising power is amplified by the lack of meaningful implied limitations. Section 254(b) suffers from a rare combination of flaws rendering it uniquely incapable of restricting the FCC. Notably, the government never points

14

to any other scheme like this, nor does the government deny that Congress would never need to appropriate again if this funding scheme were allowed to proliferate.

The government responds by pointing to a single passing line in *Rural Cellular Ass'n v. FCC* ("*Rural Cellular II*"), 685 F.3d 1083, 1091 (2012), that § 254 "provides an intelligible principle to guide the Commission's efforts, viz., 'to preserve and advance universal service.'" *See* Gov.Br.26. But the petitioners' briefs in that case never argued that § 254 violates the intelligible-principle test. Rather, they argued only that Congress's intent to delegate its taxing power was not sufficiently clear under *NCTA*, and thus the FCC lacked the authority to raise taxes. *See* Petitioners Br. 31, 43–44, *Rural Cellular II*. This Court in *Rural Cellular II* was thus not presented with any of the arguments Petitioners raise here, which should not now be foreclosed. *Cf. McCutcheon v. FEC*, 572 U.S. 185, 202–03 (2014) ("[T]his case cannot be resolved merely by pointing to three sentences in [an opinion] that were written without the benefit of full briefing or argument on the issue."); Amy Coney Barrett, *Stare Decisis and Due Process*, 74 U. Colo. L. Rev. 1011, 1071–74 (2003).

At the very least, *Rural Cellular II* said nothing about whether § 254's multi-layer delegation violates the nondelegation doctrine.

The government reiterates the purpose of the FCC "to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide … wire and radio communication service with adequate facilities at reasonable charges." Gov.Br.26 (quoting 47 U.S.C. § 151). Such lofty language merely confirms the lack of a meaningful constraint on the FCC when it comes to extracting money from the pockets of Americans.

The "additional specifications" the government cites in § 254(b) are equally unavailing. Gov.Br.27. While § 254(b) lists six universal service "principles" upon which FCC "shall" base its universal service policies, those principles themselves aren't mandatory because they are couched as things the FCC "should" pursue, not "must." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) ("The use of language like 'may' and 'should' instead of 'shall' or 'must' suggests that the provisions that follow are meant to be 'precatory, not mandatory.'"); *TOPUC I*, 183 F.3d at 418; Pet.Br.44–45. Because they are ultimately precatory, any potential limitations turn only on the agency's

16

own self-restraint, which "has no bearing upon" "[w]hether the statute delegates legislative power." *Whitman*, 531 U.S. at 473.

And even if they were mandatory, the principles in § 254(b) are so vague and aspirational that they cannot clearly delineate limits on the FCC's revenue-raising power. Pet.Br.45–48. The government tries to portray Petitioners' description of § 254(b) as idiosyncratic, Gov.Br.29, but recognizing these principles as "aspirational" comes from the FCC itself and is taken verbatim from Fifth Circuit precedent: "[W]e have approved the FCC's interpretation of the statutory principles as aspirational only…. Indeed, the lofty and expansive language of § 254(b) hardly constitute[s] a series of specific statutory commands." *TOPUC II*, 265 F.3d at 321 (cleaned up). The Fifth Circuit has explicitly "avoided relying on the aspirational language in § 254(b) to bind the FCC to adopt certain cost methodologies for calculating universal service support." *TOPUC I*, 183 F.3d at 421.

The government next states that terms like "affordable" and "reasonably comparable" incorporated policies that had been in place prior to § 254. Gov.Br.28–29. The government similarly points to § 254(j), which states that "[n]othing in this section shall affect the collection,

17

distribution, or administration of the Lifeline Assistance Program provided for by the [FCC]," as evidence the USF is a continuation of at least that prior program. Gov.Br.29. But the government never identifies any historical definition or provision that imposed a meaningful limit on the FCC, which is unsurprising given that the modern USF is radically different than any predecessor. Rather, all Congress did was indicate the Lifeline Assistance Program should not be affected, confirming a *lack* of limitation.

Even assuming the principles in § 254(b) are mandatory, they are still written in such grandiose language that they fail to impose a meaningful limit, especially when combined with the extreme deference afforded to the FCC's decision about how to balance skyrocketing revenue-raising with "affordability" of service. *See, e.g.*, *Rural Cellular Ass'n* ("*Rural Cellular I*") *v. FCC*, 588 F.3d 1095, 1108 (D.C. Cir. 2009); *TOPUC II*, 265 F.3d at 322.

In any event, the FCC can add new "universal service principles." 47 U.S.C. § 254(b)(7). This amounts to an unusual multi-layer delegation where Congress announces open-ended, precatory "principles" and then allows the agency to perpetually amend those principles using its own

open-ended process, which independently warrants finding a
nondelegation violation. Pet.Br.48–49.[2] The Supreme Court has rejected
the notion that a broad delegation can be saved on the theory that an
agency will restrain itself. *Whitman*, 531 U.S. at 473. And the Court has
demonstrated particular concern with statutes that create multi-layer
delegations by granting broad power to the executive and then allowing
the executive to "add[] to … what is proposed, as 'in [the executive's]
discretion' he thinks necessary 'to effectuate the policy' declared by the
act." *Schechter Poultry*, 295 U.S. at 538–39.

The government responds that the FCC's authority to add new
universal service principles must still be in the "public interest" and
"consistent with" the Communications Act. Gov.Br.33. That suffers from
two errors. *First*, the government tellingly does not address the unusual
multi-layer aspect of delegation, which the Court held unconstitutional
in *Schechter Poultry*. In other contexts, the Court has similarly found
such multi-layer schemes to be unconstitutional even where a single
layer may be permissible. *See Free Enter. Fund v. Pub. Co. Acct.*

---

[2] The government argues that Petitioners failed to raise any arguments
before the FCC about the perpetual nature of delegated authority to raise
money for the USF. Petitioners did raise the argument. J.A.__, J.A.__.

*Oversight Bd.*, 561 U.S. 477, 495 (2010) ("The added layer … makes a difference.").

*Second*, as explained above, the "public interest" standard might satisfy the intelligible-principle test in variegated schemes like deciding emissions levels, but it is inappropriate for revenue-raising statutes. *See* Part I.B.1, *supra*. Recourse to the broad "public-interest" standard in the context of a multi-layer revenue-raising delegation provides no more limitation—in fact, it provides less—than it would in the context of a single-layer revenue-raising delegation.

\*    \*    \*

In response to these critical flaws, the government overstates the significance of cases like *Qwest Corp. v. FCC* ("*Qwest I*"), 258 F.3d 1191 (10th Cir. 2001), and *Qwest Communications Int'l, Inc. v. FCC* ("*Qwest II*"), 398 F.3d 1222 (10th Cir. 2005), as evidence that § 254(b) limits the FCC's revenue-raising authority, *see* Gov.Br.30–31. Those cases involved the FCC's failure to explain its conclusions. *See Qwest I*, 258 F.3d at 1201; *Qwest II*, 398 F.3d at 1234.

By contrast, on the supposed limits on the FCC's power to raise money, the Tenth Circuit was clear that "each of the principles

20

in § 254(b) internally is phrased in terms of 'should,'" which "indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" *Qwest I*, 258 F.3d at 1200. Therefore, "any particular principle can be trumped in the appropriate case." *Id*. As noted above, the illusory nature of any limitation becomes even more apparent when considering the FCC's ability to adopt new principles, 47 U.S.C. § 254(b)(7), which can then supersede the others, *Qwest I*, 258 F.3d at 1200.

More importantly, the government's argument misunderstands the scope of the nondelegation inquiry. There must be clear direction and limitations for the challenged power as a whole. The mere existence of some minor limitation in any part of a statutory regime does not validate the entire scheme. Were it otherwise, there could never be a nondelegation violation unless the statute gave literally endless power to an agency, without even subject-matter limitations.

An example is illustrative. Suppose Congress gave the FCC unbridled discretion to charge carriers for the USF but mandated that payment must be in a particular currency. Agency action could easily

exceed that one limitation, but the statutory regime as a whole would still fail to impose sufficiently clear delineations of the revenue power.

The government also cites *Rural Cellular I* and *Alenco Communications, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000), for the proposition that the FCC might be constrained by the possibility of "'pricing some consumers out of the market,'" and thus the agency has "repeatedly adopted measures to restrain spending on universal service." Gov.Br.39–40. This tentative hypothetical ignores that "any particular principle can be trumped in the appropriate case" so long as the FCC explains its decision, *Qwest I*, 258 F.3d at 1200; *Alenco*, 201 F.3d at 621, and also the extreme, if not absolute deference the FCC receives in making that determination, *Rural Cellular I*, 588 F.3d at 1108; *TOPUC II*, 265 F.3d at 322. In any event, an agency's self-imposed limits make no difference to whether the statute unconstitutionally delegates legislative authority. *Whitman*, 531 U.S. at 473.

Section 254(b) thus fails to impose meaningful and clear limits on the FCC's revenue-raising power.

### 4.    THE REST OF § 254 SUFFERS FROM THE SAME FLAWS AS § 254(B)

The government next cites § 254(c), which it claims indirectly limits revenue-raising discretion by laying out additional principles the FCC must "consider" when spending universal service funds. Gov.Br.34–37. But implied limitations on *disbursements* are not particularly relevant to whether there is an intelligible principle for *raising* money, as the executive historically has had far greater leeway in spending money than in raising it (or regulating more generally), and also because the executive could over-raise funds but not spend them all. *Cf. Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows.").

Even setting that aside, § 254(c) suffers from many of the same flaws as § 254(b). *First*, Congress failed to impose a limited definition of "universal service," instead labeling it as an "evolving" standard the FCC can define. 47 U.S.C. § 254(c)(1).

*Second*, the "principles" in § 254(c) are still excessively broad. The government argues, for example, that § 254(c) limits the FCC to raising revenue for "telecommunications services," Gov.Br.34–35, but courts

23

have repeatedly indicated that a broad subject-matter limitation is insufficient to defeat a nondelegation challenge. In *Panama Refining*, the Court invalidated the statute even though it was limited to the much narrower topic of "hot oil" transported in excess of state limits. 293 U.S. at 418. The subject-matter limitation didn't save the statute. "[T]elecommunications services" reaches nearly every American and thus similarly lacks meaningful limitation. 47 U.S.C. § 153(53).

*Third*, even if § 254(c)'s principles were more specific, they are not truly mandatory and objective. The FCC only must "consider" each factor when it decides how to redefine universal service. *Id.* § 254(c)(1). That is not a substantive restriction on the FCC's power. *See, e.g.*, *TOPUC II*, 265 F.3d at 322.

*Fourth*, and most critically, even if these standards were more specific and binding, they are effectively overtaken by a catch-all that the FCC can redefine "universal service" to be anything it thinks is "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c)(1)(D). This results in the same vague, multi-layer delegation that plagues § 254(b). *See* Part I.B.3, *supra*.

24

The government responds that the FCC "is authorized to revise its definition of supported services only to account for 'advances in telecommunications and information technologies and services.'" Gov.Br.35–36 (quoting 47 U.S.C. § 254(c)(1)). But that is inconsistent with the statute, which allows the FCC to constantly redefine the "evolving" meaning of universal service, 47 U.S.C. § 254(c)(1), and also contradicts the government's own brief, which claims the definition must keep up with "need, use, and the public interest." Gov.Br.36 (cleaned up). The government has even argued elsewhere that "'so long as the [FCC] does not violate an express statutory command, it may use the universal-service mechanism to achieve policy objectives contained elsewhere in the [Communications] Act.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 436 (5th Cir. 2021).

The government appears to mean only that it will not *actually* redefine universal service whenever it wants and would limit those decisions to technological advances. But, again, an agency's self-restraint is irrelevant for nondelegation purposes. *Whitman*, 531 U.S. at 473.

The government then pivots to § 254(d), which states that carriers "shall contribute, on an equitable and nondiscriminatory basis" to the

USF. *See* Gov.Br.30. That might limit how charges can be distributed across the industry, but it does nothing to limit how much money the FCC can raise. The statute in *Schechter Poultry* likewise prohibited "inequitable restrictions on admission" or "discriminat[ion] against" small companies, but that didn't save the statute there. 295 U.S. at 522–23; *see also Panama Refining*, 293 U.S. at 429.

The term "sufficient" in § 254(e) is no more availing. *See* Gov.Br. 30, 39–41. The FCC now emphasizes that this doesn't even impose a floor, let alone a ceiling, because the agency can impose charges that "f[a]ll *below* the[] actual costs of providing service," Gov.Br.32, consistent with a Fifth Circuit holding that "nothing in the statute defines 'sufficient' to mean that universal service support must equal the actual costs incurred," *TOPUC I*, 183 F.3d at 412.

The provisions in § 254(h) for health care providers, schools, and libraries are more precise*, see* Gov.Br.30, 41–42, but they don't even apply to revenue-raising. Further, § 254(h) provides only the amount in discounts these entities should receive, which says nothing about how much the FCC can charge in the first place. And this is only a miniscule

part of the USF, which cannot validate the revenue-raising aspects for the rest of the program.

### 5. THIS CASE RESEMBLES *PANAMA REFINING* AND *SCHECHTER POULTRY*

The government's search for an intelligible principle across a sea of vague and precatory provisions is reminiscent of *Panama Refining* and *Schechter Poultry*. As Congress listed more vague policies in the National Industrial Recovery Act, the *easier* it became to demonstrate a nondelegation violation in those cases.

For example, the statute authorized the executive to impose codes of conduct that "impose no inequitable restrictions on admission," "are not designed to promote monopolies or to eliminate or oppress small enterprises," and "will tend" to "eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, [and] to avoid undue restriction of production (except as may be temporarily required)." *Schechter Poultry*, 295 U.S. at 521–23, 535; *see Panama Refining*, 293 U.S. at 417. But that just left the executive "free to select as [it] chooses from the many and various objects generally described," *Panama Refining*, 293 U.S. at 431–32.

Similarly, § 254 provides a laundry list of vague principles, but it leaves the FCC largely "free to select as [it] chooses from the many and various objects generally described." *Id.*; *Alenco*, 201 F.3d at 621 (explaining the FCC may "ignore" a § 254(b) principle "[t]o satisfy a countervailing statutory principle"). And, again, if equity and nondiscrimination provisions couldn't satisfy the intelligible-principle test in *Panama Refining* and *Schechter Poultry*, they can't save § 254. *See Panama Refining*, 293 U.S. at 429; *Schechter Poultry*, 295 U.S. at 541. The FCC can even add to the definition of "universal service" and "universal service principles"—just like in *Schechter Poultry*, 295 U.S. at 538–39.

If the statute in *Panama Refining* and *Schechter Poultry* couldn't satisfy the intelligible-principle test, then § 254 can't, either.

## II. THE NONDELEGATION VIOLATIONS HERE ARE PARTICULARLY EGREGIOUS BECAUSE THEY INVOLVE CONGRESS'S EXCLUSIVE POWER TO LEVY TAXES

USF charges are taxes—not fees—which makes Congress's delegation of such limitless power even worse. Pet.Br.50–64. The government argues this issue is irrelevant under *Skinner*, Gov.Br.50–52, but the Court's discussion of different standards for revenue-raising was

28

unnecessary to the decision given the objective limitations in the relevant statute. *Skinner* was otherwise incorrectly decided. Pet.Br.63–64.

The government is also wrong to contend that USF charges are fees on the theory that they "confer[] special benefits on contributing carriers by expanding the network such carriers can serve." Gov.Br.52. USF benefits flow to the public, as demonstrated by the huge sums of money involved, the name of the "universal service" program, and its statutory goal of providing benefits "to all the people of the United States," 47 U.S.C. § 151. Most contributors receive nothing in return, and certainly nothing "value-for-value." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 294 (5th Cir. 2022); *cf. Jesse E. Brannen, III, P.C. v. United States*, 682 F.3d 1316, 1318 (11th Cir. 2012) (distinguishing a "tax" from a "fee" where "the public [is] the primary beneficiary of the services [funded by the charge], and not the utilities who paid the assessments"). Some, like Petitioner Cause Based Commerce, are actually injured because the extra charges encourage customers to drop their current telecommunications subscriptions. Ford Report at 8, J.A.__.

The government argues that *Rural Cellular II* already concluded USF charges are fees based on these alleged "network effects."

Gov.Br.52–53. But that statement in *Rural Cellular II* turned on the record in that case, whereas Petitioners' expert Dr. Ford soundly disproved the benefits of network effects here at the agency stage in this case. Ford Report at 6–7, J.A.__. The FCC has never disputed Dr. Ford's research or conclusions despite numerous opportunities to do so, and accordingly the FCC has forfeited any such objection. Moreover, even if network effects were material, they don't "confer special benefits" on payors but inure to the benefit of *all* carriers and users, with grant recipients (who may not be payors at all) receiving exponentially more benefit than anyone.

This Court should conclude that the USF charges are indeed taxes.

## III. THE FCC'S DELEGATION TO USAC VIOLATES THE PRIVATE NONDELEGATION DOCTRINE

The FCC's redelegation to USAC—"a private corporation owned by an industry trade group," *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 387 (5th Cir. 2014)—violates the private nondelegation doctrine. *See* Pet.Br.64–67.

The government insists that "only the [FCC] has power to adopt a quarterly contribution factor" and that USAC simply provides administrative support. Gov.Br.55. But the FCC has off-loaded to USAC

the power to operate the USF, from deciding how much money to raise each quarter, to creating a "deemed approved" mechanism whereby the FCC Commissioners only passively approve billions of dollars in collections, to deciding where and how to spend the money raised. USAC's collections are nearly 25 times the FCC's annual budget—hardly a ministerial outsourcing.

The government continues that the FCC can "use an outside entity, such as … a private contractor, to provide the agency with factual information," and that it "actively oversees" USAC. Gov.Br.56, 13 (cleaned up).[3] In particular, the government claims it "reviews and approves" USAC's proposals and "closely supervise[s]" USAC's work. Gov.Br.56, 54. Even assuming an agency's self-imposed restrictions could possibly save an otherwise improper private delegation, *contra Whitman*, 531 U.S. at 473, reality belies the government's portrayal of the FCC's role. It is unclear whether—let alone how—the FCC "review[ed] and approve[d]" USAC's work for the specific quarter challenged in this

---

[3] The private nondelegation doctrine is not contingent on delegating rulemaking authority, *see, e.g.*, *State v. Rettig*, 987 F.3d 518, 532–33 (5th Cir. 2021); *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 708 & n.5 (D.C. Cir. 1977), contrary to the government's suggestion, *see* Gov.Br.54–55.

lawsuit. No such evidence appears anywhere in the record. The FCC couldn't even be bothered to issue a separate approval document. The agency must "'independently perform[] its reviewing, analytical and judgmental functions,'" *Rettig*, 987 F.3d at 532, but the FCC failed to do so here.

Nor has the FCC "closely supervised" USAC's work in the past. None of the FCC orders cited by the government indicate review of the amounts needed for universal service as determined by USAC. *See* Gov.Br.54 & n.18, 61. The examples the FCC cites do not demonstrate oversight over the substance of that quarterly determination. Gov.Br.58–59. One was a trivial change of the tax rate from .09044 to .091 because some carriers' computers could not handle five decimal places.[4] Another was undertaken by the Wireline Competition Bureau, with only passive acceptance by the FCC Commissioners.[5] Another implemented a one-

---

[4] *In re Federal-State Joint Bd. on Universal Service*, 18 FCC Rcd. 4818, 4827 (2003).

[5] *Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Service Mechanism Budget*, 32 FCC Rcd. 9243, 9243–44 (2017).

time legislative change.[6] And recent edits to the quarterly contribution factors this year, *see* Gov.Br.58–59, were ministerial adjustments to USAC's calculations to reflect a carryover of unspent funds, not issued or directly approved by the FCC Commissioners, and not for the quarterly contribution factor at issue in this case.

Twenty-five years—and nearly a hundred quarterly ratemakings—and that is the sum total of the FCC's "oversight" over the quarterly ratemaking process, during which time the rate has skyrocketed.[7]

\*    \*    \*

An agency cannot "reflexively rubber stamp[]" action prepared by a private entity, and instead must "independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process." *Sierra Club v.*

---

[6] *In re Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4144–45 (2019).

[7] The government claims the equivalent of 80 full-time employees working on universal service activities each year, Gov.Br.62, but there is no evidence they actually oversee USAC when it determines the amounts needed for universal service. The government also claims USAC actions can be challenged, Gov.Br.61, but the cited provision applies only to carriers, not customers, and in any event does not authorize a challenge to the quarterly contribution rate itself.

*Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). But "rubber stamping" is precisely what the FCC did here and has done for decades. This would not even be the first time a court has reprimanded the FCC for giving "near-total deference" to private proposals in the context of universal service funding. *TOPUC II*, 265 F.3d at 328.

## CONCLUSION

This Court should grant the Petition.[8]

November 9, 2023                    Respectfully submitted,

                                   /s/ Jared M. Kelson
                                   Jonathan Berry
                                   R. Trent McCotter
                                   Michael Buschbacher
                                   Jared M. Kelson
                                     *Counsel of Record*
                                   BOYDEN GRAY PLLC
                                   801 17th St NW, Ste 350
                                   Washington, DC 20006
                                   202-955-0624
                                   jkelson@boydengray.com

                                   *Counsel for Petitioners*

---

[8] Intervenors claim catastrophic consequences if the USF is disturbed, Intervenors.Br.32–40, but the Court can limit relief to the named Petitioners. Congress is also already well aware of the constitutional flaws with the USF and can fund universal service at the levels it determines appropriate. *See, e.g.*, Chris D. Linebaugh, Cong. Rsch. Srv., LSB10904, *Fifth Circuit Considers Constitutionality of the Universal Service Fund* 4 (2023), https://crsreports.congress.gov/product/pdf/LSB/LSB10904.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,487 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

November 9, 2023                     /s/ Jared M. Kelson
                                                 Jared M. Kelson

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2023, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

November 9, 2023                              /s/ Jared M. Kelson
                                             Jared M. Kelson